**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| In the Matter of the Application of | |
| nCHAIN HOLDING AG, | Civil Action File No. |
| Applicant, | |
| For an Order Pursuant to 28 U.S.C. § 1782 Directing Discovery for Use in Proceedings in the United Kingdom. | |

**MEMORANDUM OF LAW IN SUPPORT OF NCHAIN'S
EX PARTE APPLICATION FOR JUDICIAL ASSISTANCE
<u>PURSUANT TO 28 U.S.C. § 1782</u>**

nChain Holding AG ("nChain"), by and through counsel, submits this Memorandum of Law in support of its Ex Parte Application ("Application") for an order under 28 U.S.C. § 1782(a), directing discovery for use in a foreign proceeding.

**INTRODUCTION**

nChain is a leading provider of blockchain technology, IP licensing, and consulting services. nChain submits its Application to secure evidence of a conspiracy led by its former CEO, Christen Ager-Hanssen ("Ager-Hanssen"), to misappropriate nChain's confidential information and to wrest control of nChain from its Board of Directors. nChain further intends to use evidence obtained through this Application to seek injunctive relief against Custos Group Limited ("Custos"),

a company incorporated in England and Wales of which Ager-Hanssen is the sole registered director and majority shareholder.

After terminating Ager-Hanssen in September 2023, nChain successfully sought an injunction from the High Court of England and Wales (the "High Court"), preventing Ager-Hanssen from disseminating its confidential information. The High Court has also sentenced Ager-Hanssen to 10 months in prison for his persistent contempt of its orders.  nChain is now preparing to initiate litigation against Ager-Hanssen and his co-conspirators in the same court for the tort of "unlawful means conspiracy," a cause of action similar to a civil conspiracy claim in the United States. Although the full scope of the conspiracy is not yet known, nChain has cause to believe that Ager-Hanssen planned to use nChain's confidential information for his own business ventures, and to weaponize it against nChain's directors and senior management as part of a bid to take over the company.  nChain also has cause to believe that large quantities of nChain's confidential information were forwarded from Ager-Hanssen's nChain email account to his Custos email account. Accordingly, nChain is preparing to file a claim for injunctive relief in the High Court that will require Custos to return and then delete nChain's confidential information under Custos's control.

nChain also has reason to believe that Ager-Hanssen and/or his co-conspirators and/or Custos shared at least some of the confidential and/or privileged

information he misappropriated with Eric Finnerud, a music producer living in this District who goes by "E. Smitty."  Finnerud, through his then-counsel, recently contacted nChain, commenting that Finnerud "believes the public revelation of these unlawful claims and the associated information [would] be catastrophic for the BSV blockchain, nChain and the nChain Group" which appears to be a threat to disclose nChain's confidential and privileged information—including some of the very same information Ager-Hanssen sought to use against nChain.  nChain therefore seeks discovery from Finnerud, whose contacts with Ager-Hanssen, and the information shared between them, will provide critical evidence for nChain's claims against Ager-Hanssen, his co-conspirators, and Custos in the High Court.

## BACKGROUND

### I.    nChain Engages Ager-Hanssen as CEO

nChain engaged Ager-Hanssen as its CEO in November 2022, pursuant to a consulting agreement (the "Consulting Agreement").  (Matthews Decl. ¶ 5; *see also* Consulting Agreement, Matthews Decl., Ex. 1.)[1]  Ager-Hanssen also manages other businesses, including the Custos and AddReax family of companies.  (Matthews Decl. ¶ 6.)  When Ager-Hanssen joined nChain, he brought several close confidants with him, including David Brookes, the General Counsel of one of the Custos

---

[1] Ager-Hanssen was CEO of a group of subsidiary companies known as the "the nChain Group," (Matthews Decl. ¶¶ 2, 5) but this Memorandum of Law refers to "the nChain Group" simply as "nChain."

entities, Endri Gjata, the Chief Technology Officer at the Custos Group, as well as Lars Bo, a longtime associate of Ager-Hanssen. (*Id.* ¶ 7.) Ager-Hanssen also engaged a barrister, Zafar Ali KC, and Peter Coulson and involved them in nChain's activities. (*Id.*)

## II.   Ager-Hanssen Conspires Against nChain

nChain is still investigating the full scope of Ager-Hanssen's activities while he was serving as CEO. (*Id.* ¶ 16.) It has learned, however, that during Ager-Hanssen's tenure as CEO, he hired his family members, childhood friends, several Custos and AddReax employees, and business connections—but nChain has not been able to determine what (if anything) many of these employees were hired to do. (*Id.*) For example, Ager-Hanssen's son was paid a total of £127,436 (approximately $160,000) by nChain, but nChain has identified scant evidence of any work he performed. (*Id.* ¶ 17.)

In September 2023, Ager-Hanssen launched a power grab. Using his access to nChain's confidential information, he assembled a document he called the "Fairway Brief," which was styled as a whistleblower report. (*Id.* ¶ 8.) In fact, however, the Fairway Brief was a mishmash of nChain's confidential information along with baseless allegations that several of nChain's directors were engaged in an attempt to defraud the company. (*See id.* ¶¶ 8, 13.)

In late September 2023, Ager-Hanssen convened what he called a "management" meeting. (*Id.* ¶ 9.) Those in attendance included some staff and individuals affiliated with Ager-Hanssen, including Peter Coulson, Andrew Moody, Jacob Bo, and Zafar Ali. (*Id.*) But no members of the Board attended the meeting. (*Id.*).

At the meeting, Ager-Hanssen presented the Fairway Brief as a valid whistleblower report and claimed that the alleged fraud described in the Fairway Brief provided a basis to remove senior nChain officers and directors, which would have given him *de facto* control of the company. (*Id.* ¶ 10.) Ager-Hanssen requested that the attendees sign pre-written minutes of the meeting authorizing various courses of action. (*Id.* ¶ 15.) Ager-Hanssen's co-conspirator, Zafar Ali, a King's Counsel, lent credibility to the proceedings, purporting to instruct attendees that they were at legal risk if they did not comply with Ager-Hanssen's demands. (*See id.*)

The following day, Ager-Hanssen emailed the Fairway Brief to Stefan Matthews, who forwarded it to the members of the nChain board, and Ager-Hanssen sought to gain access to company email accounts and files to purportedly investigate the allegations contained within. (*Id.* ¶¶ 8, 11.) Ager-Hanssen, aided by his co-conspirators, sought to take physical control of the nChain offices in London, and demanded that nChain's IT personnel give the co-conspirators access to a number of email accounts. (*See id.* ¶¶ 10–11, 15.)

When nChain's Board learned of his conduct, and his attempted unauthorized access of company emails, it terminated Ager-Hanssen's Consulting Agreement and commissioned an investigation.  (*Id.* ¶¶ 12–13; *see also id.*, Company Statement, Matthews Decl., Ex. 2.)  In the days following his termination, nChain (through counsel) reminded Ager-Hanssen of his confidentiality obligations to nChain and asked him to return all the information and other property belonging to nChain.[2]  (Anderson Decl. ¶ 4; *see* CMS Sep. 30, 2023, Letter to Ager-Hanssen, Anderson Decl., Ex. 1.[3])  But instead of abiding by his obligations, Ager-Hanssen posted excerpts of the Fairway Brief online on X (formerly known as Twitter) on September 30, 2023.  (Anderson Decl. ¶ 6.)  And on October 11, 2023, Ager-Hanssen posted a redacted version of the Fairway Brief online and posted a link to the Fairway Brief on X.  (*Id.* ¶ 7.)  Ager-Hanssen's posts on X that day also promised future posts containing recordings and other materials that would supposedly verify the allegations in the Fairway Brief.  (*Id.*)

---

[2] Ager-Hanssen's Consulting Agreement defined nChain "Confidential Information" as: "any and all information, technology and materials, in whatever form (whether oral, written, electronic, digital or otherwise), tangible or intangible, whether disclosed to or learned or developed by the Consultant, pertaining in any manner to the business of or used by any Group company or to any other person or entity to whom or which any Group company owes a duty of confidentiality, including any trade secret, technical or business information, knowhow, knowledge or data relating to the Group's past, present, planned or foreseeable business or technology." (Consulting Agreement at 4, Matthews Decl., Ex. 1.)
[3] Going forward in this Memorandum of Law, all exhibits shall refer to exhibits discussed in the Anderson Declaration unless noted otherwise.

### III.    nChain sues Ager-Hanssen to Prevent Him From Further Disseminating nChain's Confidential Information

nChain sought an injunction without notice (*i.e.*, an *ex parte* injunction) against Ager-Hanssen, to prevent further dissemination of the Fairway Brief.  (*See* Anderson Decl. ¶ 8.)  Later that day, the High Court granted that application on a temporary basis (the "October 13 Injunction"), prohibiting Ager-Hanssen from publishing the Fairway Brief and any other Confidential Information in his possession or control.  (*Id.* ¶ 9; *see also* October 13 Injunction, Ex. 2.).  Among other things, the October 13 Injunction required Ager-Hanssen to remove the Brief from the Internet.  (*Id.* ¶ 9; *see also* October 13 Injunction at 3–4, Ex. 2.).  And on October 27, 2023, the High Court continued the injunction against Ager-Hanssen until trial or further order.  (*Id.* ¶ 10.)

On January 19, 2024, the High Court ordered Ager-Hanssen to return certain nChain devices to nChain by January 26, 2024, and to deliver his personal devices to an IT expert to delete all Confidential Information from the devices.  (*See id.* ¶ 13; *see also* Device Return Order at 2, 3-6, Ex. 4.)  The Device Return Order further required Ager-Hanssen to provide an IT expert with access to his Custos Group email account, where Ager-Hanssen had admitting to forwarding thousands of emails from his nChain email account, including emails containing nChain's Confidential Information. (Device Return Order at 3, Ex. 4; *see also* CMS April 12, 2024 Letter to Custos Group at 2, Ex. 19.)  After providing the IT expert access to his Custos

account for imaging purposes, Ager-Hanssen was supposed to delete nChain's Confidential Information from that account.  (Device Return Order at 4, Ex. 4.)

Ager-Hanssen did not comply with any part of the Device Return Order.  Nor did he appear in Court to respond to the injunction applications.  (*See* Anderson Decl. ¶ 15.)   With Ager-Hanssen absent, the High Court made the October 27 Injunction permanent on 19 April 2024.  (*See id.* ¶ 16; *see also* Permanent Injunction Order, Ex. 5.)  Additionally, on May 3, 2024, the Court sentenced Ager-Hanssen to ten months in prison for contempt. (*Id.* ¶ 17; *see also* Contempt Order, Ex. 6.)

## IV.   nChain Pursues Claims for Unlawful Means Conspiracy Against Ager-Hanssen and His Co-Conspirators

As required for legal proceedings in England and Wales, nChain has notified Ager-Hanssen and the co-conspirators of its intention to pursue claims against them in the High Court by submitting "notices of claim"—essentially, pre-action letters. (Anderson Decl. ¶¶ 18–21; *see also* Letters of Claim, Exs. 8–14.)  As described in those letters, nChain intends to pursue claims for "unlawful means conspiracy" against the co-conspirators.  (*See* Letters of Claim, Exs. 8–14.)  "Unlawful means conspiracy" is an agreement by two or more persons that has as one of its purposes the injury of a third person (here, nChain).[4]

---

[4] *See, e.g.* Clerk & Lindsell on Torts (24th Ed.) at 23-108 (attached hereto as Addendum 1) (stating that unlawful means conspiracy "is committed where two or more persons combine and take action which is unlawful in itself with the intention of causing damage to a [third party] who does incur the intended damage. It is not

nChain intends to show in the High Court that the co-conspirators agreed to use the spurious allegations in the Fairway Brief to coerce nChain staff into giving them access to company information and documents, and then to use the false allegations as a reason to remove nChain officers so they could take over the company. (*Id.*)  As set forth in the Notice of Claim to Ager-Hanssen, nChain is prepared to establish that the conspirators used a number of unlawful means to accomplish their conspiracy, including misrepresentations of fact in the Fairway Brief, breaches of confidence (including through intimidation of nChain staff), breaches of fiduciary duty, and breaches of contract. (*See* Letter of Claim to Ager-Hanssen, Ex. 8; *see also* Anderson Decl. ¶ 23.)

## V.    nChain Pursues Claim for Injunctive Relief Against Custos Group Limited

nChain is also actively preparing a claim to be filed in the High Court against Custos, given Ager-Hanssen's admission that he previously forwarded thousands of emails he had received from his nChain email account to his Custos email account. (*See* Anderson Decl. ¶¶ 24–26; *see also* CMS April 12, 2024 Letter to Custos Group at 2, Ex. 19.)  As noted above, Ager-Hanssen was supposed to provide an IT expert with access to his Custos email account and to delete nChain's Confidential

---

necessary for the injured party to prove that causing him damage was the main or predominant purpose of the combination but that purpose must be part of the combiners' intentions").

Information from that account, but Ager-Hanssen never complied with that order. (*See* Anderson Decl. ¶¶ 13, 15.)  nChain now intends to seek an injunction against Custos, prohibiting Custos from disclosing any of nChain's Confidential Information, including the Fairway Brief.  (*See* Anderson Decl. ¶ 26.)  nChain will further seek an injunction requiring Custos to delete any of nChain's Confidential Information under its control and to provide an IT expert with access to Custos's data to ensure compliance.  (*Id.*)

## VI.   Finnerud Reveals He Possesses nChain's Confidential Information, Including the Fairway Brief

On January 29, 2024, while nChain's injunction claims against Ager-Hanssen were unfolding in the High Court, nChain received a letter from counsel for Finnerud.  (*See* Anderson Decl. ¶ 27; *see also id.*, Finnerud Jan. 29, 2024 Letter to nChain, Ex. 15.)  In the letter, Finnerud claimed, among other things, to be a party to an "oral agreement" supposedly entered into with nChain in February 2023, while Ager-Hanssen was CEO.  (Finnerud Jan. 29, 2024 Letter to nChain at 1, Ex. 15.) Finnerud alleged that, around the time nChain terminated Ager-Hanssen's employment, nChain breached this alleged oral agreement, and he demanded $100 million in damages payable in 30 days from the date of the letter.  (*Id.* at 2.)[5]

---

[5] Although the substance of Finnerud's claims are not at issue in this Application, the claims are entirely baseless.

When nChain requested basic information from Finnerud about the purported contract and relationship with Ager-Hanssen, Finnerud refused to answer, except to underscore that he possesses nChain's confidential and privileged information, including:

- "evidence of many details set forth in that certain document commonly referred to as 'The Fairway Brief,' dated 26 September 2023";

- "audio recordings of discussions among nChain developers and attorneys with [Finnerud]";

- "affidavits and testimony of former and current C-suite executives and in-house and outside legal counsel, including nChain's former Chief Executive Officer, Christian [sic] Ager-Hanssen,"

(Finnerud Feb. 27, 2024, Letter to nChain, Ex. 17; *see also* nChain February 27, 2024, Letter to Finnerud, Ex. 16; Anderson Decl. ¶¶ 28–30.)  Notably, Finnerud's February 27th letter attached a *fully unredacted* copy of the Brief, whereas the version that Ager-Hanssen had publicly posted a few months before was a *partially redacted* copy.[6]  (Anderson Decl. ¶¶ 7, 31.)

nChain is not aware of any means by which Finnerud—who appears to be a music producer resident in this District, *see infra* Section II—should have been able to access privileged and confidential materials belonging to nChain, a blockchain

---

[6] The Anderson Declaration attaches a true and correct copy of Finnerud's February 27, 2024 letter to nChain, Ex. 17, except that it excludes the copy of the Fairway Brief that was attached to that letter because the Brief contains nChain's highly sensitive Confidential Information and the contents of the Fairway Brief are not relevant for the purpose of evaluating this Application.

technology company located in the United Kingdom, unless he was provided those materials by Ager-Hanssen, one of Ager-Hanssen's co-conspirators, or by someone affiliated with Custos.  (*See* Anderson Decl. ¶ 35; *see also* Matthews Decl. ¶ 18.)

**LEGAL STANDARD**

Section 1782(a) of Title 28 of the United States Code allows United States District Courts to issue orders granting discovery for use in foreign proceedings.  In relevant part, the statute provides:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person[.]

28 U.S.C. § 1782(a).

The "purpose of Section 1782 is to liberalize the assistance given to foreign and international tribunals," *In re Clerici*, 481 F.3d 1324, 1333 (11th Cir. 2007) (quotation omitted), and "the Eleventh Circuit has repeatedly recognized the liberal policy in favor of granting petitions for judicial assistance pursuant to section 1782." *In re Travessia Securitizadora De Creditos Financeiros VIII S.A.*, No. 23-MC-24235-RAR, 2023 WL 8814777, at *2 (S.D. Fla. Dec. 18, 2023) (citing *Glock v. Glock, Inc.*, 797 F.3d 1002, 1007 (11th Cir. 2015)); *see also In re Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1269 (11th Cir. 2014) ("[T]he history of Section 1782 reveals

Congress' wish to strengthen the power of district courts to respond to requests for international assistance.").

To secure discovery pursuant to Section 1782, (1) "the request must be made 'by a foreign or international tribunal,' or by 'any interested person'"; (2) "the request must seek evidence, whether it be the 'testimony or statement' of a person or the production of 'a document or other thing'"; (3) "the evidence must be 'for use in a proceeding in a foreign or international tribunal'"; and (4) "the person from whom discovery is sought must reside or be found in the district of the district court ruling on the application for assistance." *In re Clerici*, 481 F.3d at 1332 (quoting 28 U.S.C. § 1782(a)); *accord JAS Forwarding*, 747 F.3d at 1269.

If an application satisfies the statutory criteria, the district court may grant the application considering four factors set forth by the Supreme Court in *Intel Corp v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004):  (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding" or a non-participant (because the need for § 1782(a) discovery from non-participants in the litigation is greater, whereas discovery from participants "generally is not as apparent" as participants are already subject to the discovery rules of the foreign proceeding); (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government,  court, or agency" to U.S. federal-court judicial assistance; (3) "whether the § 1782(a) request conceals

an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is otherwise "unduly intrusive or burdensome." *Id.* at 264-65; *see also In re Clerici*, 481 F.3d at 1334.

**ARGUMENT**

This Court should grant nChain's Section 1782(a) Application. The Application satisfies every requirement for obtaining relief under the statute, and every discretionary factor weighs heavily in favor of granting the Application.

## I.   Section 1782 Authorizes the Court to Grant nChain's Application

nChain's Application satisfies every requirement under Section 1782(a):

*First*, nChain will be a party to any proceedings for unlawful means conspiracy and to any proceedings against Custos for injunctive relief. Thus, nChain unequivocally qualifies as an "interested person" under Section 1782(a). *See, e.g.*, *Intel*, 542 U.S. at 256 ("litigants are included among, and may be the most common example of" the interested person "who may invoke § 1782"). *Second*, as demonstrated by nChain's proposed subpoenas, attached hereto as Appendix A and Appendix B, nChain's Application seeks "testimon[ial]" evidence and "document[ary] evidence," 28 U.S.C. § 1782(a). *Third*, the evidence nChain seeks is "for use in a proceeding in a foreign … tribunal," § 1782(a)—the High Court. *See, e.g.*, *Municipality of Mariana*, No. 1:23-MC-00033-KWR, 2024 WL 246235, at *3

(D.N.M. Jan. 23, 2024) (holding the High Court was a "foreign tribunal" within the meaning of the statue).[7]  *Fourth* and finally, Finnerud "resides" or can "[be] found" in the Northern District of Georgia.  28 U.S.C. § 1782(a).  Finnerud has submitted invoices to nChain for purported "Consulting and Business Development Services" on behalf of his business, Sound Alive Enterprise, LLC ("Sound Alive"),[8] which is based in Atlanta, Georgia.  (*See* Baker Decl. ¶¶ 4–5; *see also* Sound Alive Business Search Records, Baker Decl., Ex. 2; Invoices, Baker Decl., Exs. 3 and 4.)  Finnerud's LinkedIn profile also indicates that he resides or can be found in Atlanta, Georgia.  (*See* Baker Decl. ¶3; *see also* Finnerud LinkedIn Profile, Baker Decl. Ex. 1.)  *See Menashe v. Covington & Burling LLP*, 552 F. Supp. 3d 35, 41 (D.D.C. 2021) (finding that the "is found" requirement was satisfied based on information published on a

---

[7] It does not matter that nChain has not yet filed its conspiracy and injunction claims in the High Court.  For purposes of Section 1782, a "future proceeding" qualifies as a "proceeding" as long as it is "more than speculative" that the claim will be filed and that it will be instituted "within a reasonable time."  *See JAS Forwarding*, 747 F.3d at 1270 (quotation omitted).  There is nothing speculative about whether nChain will file its claim or do so in a reasonable time.  It has already sent Notices of Claim to each of the co-conspirators—the required last step before it can initiate a lawsuit in the High Court.  (*See* Notices of Claim, Exs. 8–14; Anderson Decl. ¶ 21.)  nChain also sent a letter to Custos, demanding that Custos comply with the High Court's Device Return Order and explaining nChain's intent to commence litigation against Custos absent Custos complying with the Order, which Custos never did.  (*See* CMS April 12, 2024 Letter to Custos, Ex. 19; Anderson Decl. ¶ 25.)  nChain is therefore actively preparing to file a claim seeking injunctive relief against Custos.  (Anderson Decl. ¶ 26.)

[8] nChain disputes Finnerud's claim that he is entitled to payment under these invoices.  (*See* Baker Decl. ¶ 6.)

LinkedIn profile); *see also In re Edelman*, 295 F.3d 171, 180 (2d. Cir. 2002) (holding that a person is "found" under § 1782(a) if the person can be "served with a subpoena while physically present in the district").

## II.   The Court Should Grant nChain's Application

The Court should grant nChain's Application because each of the four *Intel* factors weighs decisively in nChain's favor.  542 U.S. at 264–65.

*First*, Finnerud is not expected to be a participant in the claims that will be filed in England against the co-conspirators and Custos.  Generally, there is a greater need for Section 1782(a) aid when discovery is sought from a nonparticipant.  *See id.* at 264.  That is because nonparticipants in foreign proceedings, like Finnerud, tend to be "outside the foreign tribunal's jurisdictional reach."  *Id.* at 264.  As a result, "[Finnerud's] evidence, available in the United States, may be unobtainable absent § 1782(a) aid."  *Id.*  Thus, because Finnerud is and will be a *non*participant, the first *Intel* factor weighs in nChain's favor.

*Second*, there is no reason to think that the High Court "would reject evidence obtained with the aid of § 1782."  *In re Orthogen Int'l GmbH*, No. 23-mc-80743, 2023 WL 6813223, at *10 (S.D. Fla. Oct. 16, 2023) (quotation omitted); *see also In re Request for Jud. Assistance From Dist. Ct. in Bayreuth, Germany* ("*In re Bayreuth*"), No. 121MI00108MHCLTW, 2022 WL 16542591, at *2 n.1 (N.D. Ga. Jan. 13, 2022) (noting that the second factor favored the applicant because there was

"no evidence" that the German court would be unreceptive to Section 1782 aid).  To the contrary, federal courts "routinely find that 'courts in the United Kingdom … are [] receptive to Section 1782 discovery.'"  *In re BM Brazil 1 Fundo de Investimento em Participacoes Multistrategia* ("*Multistrategia*"), No. 23MISC208JGLCGS, 2024 WL 555780 (S.D.N.Y. Jan. 18, 2024), at *11 (collecting cases), report and recommendation adopted sub nom. *In re BM Brazil 1 Fundo De Investimento EM Participacoes Multistrategia*, No. 23MC208JGLCGS, 2024 WL 554302, at *1 (S.D.N.Y. Feb. 12, 2024). The second *Intel* factor therefore favors nChain.

*Third*, nChain's application is not an "attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265.  Both England and the United States allow discovery of non-privileged information relevant to a litigant's claims.  *See* England and Wales Civil Procedure Rules Part 31; Fed. R. Civ. P. 26.  Moreover, nChain is not subject to any court order anywhere in the world that prohibits it from pursuing the requested discovery.  (*See* Anderson Decl. ¶ 38.)

*Last*, nChain's request is neither "intrusive [n]or burdensome."  *Intel*, 542 U.S. at 265.  Section 1782 discovery mirrors the requirements imposed by Federal Rules of Civil Procedure 26-36.  *See Weber v. Finker*, 554 F.3d 1379, 1384 (11th Cir. 2009).  As such, "[p]arties may obtain discovery regarding any nonprivileged matter

that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1); *see also Weber*, 554 F.3d at 1384.

The requested discovery here easily meets that test. Finnerud has threatened to disclose the same types of confidential and privileged information that Ager-Hanssen used in his attempt to take over nChain, including the Fairway Brief. And the same type of Confidential Information, including the Fairway Brief, will be the subject of nChain's claim for injunctive relief against Custos. Whether and when Ager-Hanssen disclosed this information to a Georgia-based music producer—and *why* he did so—will elucidate the timeline, scope and objectives of the conspiracy. (*See* Anderson Decl. ¶ 36.) It will also confirm that Ager-Hanssen breached his confidentiality obligations, which is one of the "unlawful means" nChain intends to allege in its conspiracy claim against Ager-Hanssen. (*Id.* ¶¶ 18, 23.) Additionally, evidence that nChain uncovers regarding Custos providing the Fairway Brief or any other Confidential Information to Finnerud will only support nChain's claim for injunctive relief against Custos. (*Id.* ¶ 37.)

The requested discovery is also "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). As evidenced by nChain's proposed subpoenas, nChain's requests are limited to specific subject matter and certain requests are further limited by time periods. The requests do not seek any privileged information. The requests are narrowly focused on the issue of why and how Finnerud came to possess

nChain's Confidential Information, including the nature of Ager-Hanssen's relationship with Finnerud and the extent of Finnerud's knowledge of the conspiracy. Thus, the fourth and final *Intel* factor favors nChain.

## III.   *Ex Parte* Relief is Appropriate

Courts in the Eleventh Circuit and elsewhere routinely grant Section 1782 applications submitted ex parte. *See, e.g.*, *In re Clerici*, 481 F.3d at 1329 (upholding grant of 1782 ex parte application); *In re Bayreuth*, 2022 WL 16542591, at *3 (granting ex parte 1782 application). *Ex parte* relief is appropriate in the Section 1782 context because "any of the persons from whom discovery is sought may file a motion to quash if that person objects to any part of the subpoena." *In re Sociedad Militar Seguro De Vida*, 985 F. Supp. 2d 1375, 1381 (N.D. Ga. 2013) (granting ex parte Section 1782 application). Accordingly, courts have found it "both common and proper for section 1782 applicants to apply for discovery assistance on an ex parte basis." *In re Ex Parte in re Colombo Agroindústria S.A.*, No. 22-21670-MC-ALTONAGA, 2022 WL 2167719, at *1 (S.D. Fla. June 16, 2022) (citing *In re Clerici*, 481 F.3d at 1337) (granting ex parte Section 1782 application); *accord In re Bah. Island Consortium Ltd.*, No. 6:23-mc-2-WWB-DCI, 2023 U.S. Dist. LEXIS 17841, at *1 (M.D. Fla. Feb. 1, 2023) (granting ex parte Section 1782 application); *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) (affirming ex parte grant of Section 1782 application).

*Ex parte* relief is appropriate here. Allowing nChain to file its Application *ex parte* will ensure that nChain can serve its subpoenas promptly and minimize the chances that Finnerud will fail to preserve or destroy discoverable evidence. Nor will allowing nChain to file *ex parte* prejudice any of Finnerud's rights. If Finnerud were to object to any part of nChain's subpoena, Finnerud would be free to file a motion to quash in this Court, and the Court would have an opportunity to decide the issue before Finnerud would be obligated to provide the discovery. *In re Sociedad Militar Seguro De Vida*, 985 F. Supp. 2d at 1381.

## CONCLUSION

nChain's Section 1782 Application fulfills every statutory requirement, and each *Intel* factor strongly favors granting the Application. nChain therefore respectfully asks this Court to grant its Application.

(*signature on following page*)

Respectfully submitted, this 15th day of July, 2024.

/s/ John M. Moye
John M. Moye
Georgia Bar No. 685211
BARNES & THORNBURG LLP
3340 Peachtree Road N.E., Suite 2900
Atlanta, Georgia 30326-1092
Tel. 404-846-1693 | Fax 404-264-4033
JMoye@btlaw.com

Rollo C. Baker IV*
Vivek Tata*
Shams Hirji*
ELSBERG BAKER & MARURI PLLC
1 Penn Plaza
New York, New York 10119
Tel. 212-597-2600
rbaker@elsberglaw.com
vtata@elsberglaw.com
shirji@elsberglaw.com

* *pro hac vice* applications forthcoming

*Attorneys for Applicant*

## <u>CERTIFICATION ON TYPE AND POINT LIMITATIONS</u>

Pursuant to Local Rule 7.1(D), the undersigned counsel hereby certifies that the foregoing **Memorandum of Law in Support of Ex Parte Application for Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782** complies with the font and point selections approved by the Court in Local Rule 5.1(C).  This document was prepared on a computer using Times New Roman font (14 point).

Respectfully submitted, this 15th day of July, 2024.

*/s/ John M. Moye*
John M. Moye
Georgia Bar No. 685211
