# Addendum 1

in the parallel removal of protection in tort from trade unions in trade disputes.[472] Their further treatment is therefore postponed to that section of this chapter.[473]

## 5. CONSPIRACY

## (a)  General

**23-101   The nature of conspiracy**[474]   "A conspiracy consists … in the agreement of two or more to do an unlawful act, or to do a lawful act by unlawful means."[475] The principles were developed largely in the course of the twentieth century.[476] Conspiracy may be a crime[477]; but the historical links between the crime and the tort have now been greatly weakened.[478] The crime inheres in the agreement to act

---

[472] TULRCA 1992 ss.222(3), 225(1), (2); cf. Lewis and Simpson, (1982) 11 I.L.J. 227; Wedderburn, *The Worker and the Law*, 3rd edn (1986), pp.606–611; Evans and Lewis (1988) 17 I.L.J. 209, 223–226.

[473] See para.23-191 onwards. See also the liability under TULRCA 1992 s.235A for interruption of goods or services: paras 23-17 to 23-169.

[474] See *Crofter Hand Woven Harris Tweed Co v Veitch* [1942] A.C. 435 at 439–445 per Viscount Simon LC; and at 461–472 per Lord Wright; the monumental judgment of Evatt J in Australia in *McKernan v Fraser* (1931) 46 C.L.R. 343 at 363–412; *Lonrho Plc v Fayed* [1992] 1 A.C. 448 at 463–466 per Lord Bridge; *Revenue & Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] 1 A.C. 1174 at [65]–[78] per Lord Walker; *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727; *Canada Cement La Farge v British Columbia Lightweight Aggregate Ltd* (1983) 145 D.L.R. (3d) 385 SCC at 396–400. For a critical appraisal see H. Carty "The Tort of Conspiracy as a Can of Worms", Ch.13 in S. Pitel et al (eds), *Tort Law: Challenging Orthodoxy* (Oxford: Hart, 2013). For a critique of judicial development of tortious liability for conspiracy which argues that if Lord Nicholls' analysis of the tort of causing loss by unlawful means in *OBG Ltd v Allan* [2007] UKHL 21; [2008] 1 A.C. 1 is preferred to that of Lord Hoffmann (see para.23-83), there is neither need nor justification for a separate tort of conspiracy in either of its forms, see P.S. Davies and Sir Philip Sales, "Intentional Harm, Accessories and Conspiracies" (2018) 134 L.Q.R. 69. For a contrary view, see J. Murphy, *The Province and Politics of the Economic Torts* (Oxford: Hart, 2022), Ch.4.III (at 95, of unlawful means conspiracy: "its limited practical application should not be mistaken for redundancy … [U]nlawful means conspiracy can be invoked to provide a remedy for those who are victims of especially egregious, collaborative wrongdoing.") and Ch.5.I (at 120: "far from being an anomaly whose days are numbered, lawful means conspiracy remains a vital tort that fulfils (or has the capacity to fulfil) a number of roles which, for all that they are rather esoteric, are nonetheless important.").

[475] *Mulcahy v R.* (1868) L.R. 3 H.L. 306 at 317 per Willes J; *Baxendale-Walker v Middleton* [2011] EWHC 998 (QB) at [59]–[60].

[476] *Crofter Hand Woven Harris Tweed Co v Veitch* [1942] A.C. 435 at 461 per Lord Wright. The tort is "a modern invention": per Lord Denning MR in *Midland Bank Trust Co Ltd v Green (No.3)* [1982] Ch. 529 at 539. cf. *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [6] per Lords Sumption and Lloyd-Jones: "of all the economic torts it is the one whose boundaries are perhaps the hardest to define in principled terms."

[477] See Criminal Law Act 1977 ss.1 and 5 abolishing the crime of conspiracy except for conspiracy to defraud (*Scott v Metropolitan Police Commissioner* [1975] A.C. 819 HL); conspiracy to corrupt public morals (*Shaw v DPP* [1962] A.C. 220 HL); conspiracy to outrage public decency (*R. v Knuller* [1973] A.C. 435 HL). The crime of conspiracy otherwise rests upon the agreement to pursue conduct which involves the commission of a criminal offence. See J. Smith and B. Hogan, *Criminal Law*, 15th edn (2018), Ch.11.3.

[478] Although "both the crime and the tort grew from a common root" there is "no good logical or historical reason" for "slavishly applying in the law of tort" rules applicable to the crime: per Oliver J in *Midland Bank Trust Co Ltd v Green (No.3)* [1979] Ch. 496 at 522 and 525; affirmed [1982] Ch. 529 CA where Fox LJ said at 540 that although "the crime and the tort shared the same definition … [which] suggests some considerable affinity between the two … the affinity is not … in fact very close at all". See too *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [9]

Conspiracy

unlawfully[479]; but the tort arises when damage is caused (or, for a quia timet injunction, threatened) by the combination.[480] As a tort:

> "very little is heard of it until the nineteenth century, when it was brought into prominence as a result of the legislature having, in 1875, enacted that combination in furtherance of trade disputes should not be indictable as conspiracies in any case where the act, if committed by one person, would not be a crime."[481]

It is now clear that a "conspiracy to injure"—what would now be called a lawful means conspiracy—"might give rise to civil liability even though the end were brought about by conduct and acts which by themselves, and apart from the element of combination or concerted action, could not be regarded as a legal wrong".[482]

**The two forms**   The tort of conspiracy takes two forms: conspiracy to use unlawful means, and lawful means conspiracy, which at one time was commonly called "conspiracy to injure".[483] The latter does, but the former does not, require a predominant purpose to injure.[484] Today, "it matters not" whether "the two types of actionable conspiracy" are treated "as different torts" or as "species of the same tort".[485] In *JSC BTA Bank v Ablyazov (No.14)*,[486] Lords Sumption and Lloyd-Jones

**23-102**

---

per Lords Sumption and Lloyd-Jones: while "the essence of the crime is the agreement or understanding that the parties will act unlawfully, whether or not it is implemented … a tortious conspiracy, like most tortious acts, must have caused loss to the claimant or the cause of action will be incomplete. It follows that a conspiracy must necessarily have been acted on. However, there is no more to it than that. The critical point is that the tort of conspiracy is not simply a particular form of joint tortfeasance." It is actionable as a distinct tort once it is established that a conspiracy has caused loss and it is not a form of secondary liability but a primary liability: per Lord Wright in *Crofter Handwoven Harris Tweed Co v Veitch* [1942] A.C. 435 at 462: "it is in the fact of conspiracy that the unlawfulness resides," reaffirmed in *Revenue & Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] 1 A.C. 1174.

[479] *Mulcahy v R.* (1868) L.R. 3 H.L. 306 at 317. *Phillips v News Group Newspapers Ltd* [2012] UKSC 28; [2013] 1 A.C. 1 at [43]–[45] per Lord Walker; the offence of conspiracy was complete when the agreement was made, and the conspirators could be prosecuted even though no performance had taken place.

[480] *Midland Bank Trust Co Ltd v Green (No.3)* [1979] Ch. 496 at 523–524 per Oliver J; affirmed [1982] Ch. 529 per Fox LJ at 541. Intentional, not merely foreseeable, damage is essential to the tort: *Crofter Hand Woven Harris Tweed Co Ltd v Veitch* [1942] A.C. 435 at 461 per Lord Wright; it is "the gist" of the cause of action per Lord Diplock in *Lonrho Ltd v Shell Petroleum Co Ltd (No.2)* [1982] A.C. 173 at 188. Parallels between the tort and the crime must now be drawn with great caution. See *Kuwait Oil Tanker Co SAK v Al-Bader* [2000] 2 All E.R. (Comm) 271 at 312.

[481] *Midland Bank Trust Co Ltd v Green (No.3)* [1979] Ch. 496 at 523 per Oliver J; Conspiracy and Protection of Property Act 1875 s.3 gave this protection after *R. v Bunn* (1872) 12 Cox 316, had extended the crime of conspiracy in relation to organising strikes. That section was replaced by the Criminal Law Act 1977 ss.1 and 3. Similar protection against liability for the tort of conspiracy was provided by the Trade Disputes Act 1906 s.1; now TULRCA 1992 s.219(2); see para.23-148.

[482] *Quinn v Leathem* [1901] A.C. 495 at 510 per Lord Macnaghten, approved in Crofter [1942] A.C. 435 per Viscount Maugham at 448 per Lord Wright at 461.

[483] In *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [8], Lords Sumption and Lloyd-Jones identified "lawful means conspiracy" as more satisfactory than the rival label—"conspiracy to injure"—since "all actionable conspiracies are conspiracies to injure, although the intent required may take a variety of different forms".

[484] *Lonrho Plc v Fayed* [1992] 1 A.C. 448 HL at 463–468 per Lord Bridge; *Paragon Finance v Thaktra* [1999] 1 All E.R. 400; *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [8]; *MX1 Ltd v Farahzad* [2018] EWHC 1041 (Ch); [2018] 1 W.L.R. 5553 at [22].

[485] per Nourse LJ (judgment of the court) *Kuwait Oil Tanker Co SAK v Al-Bader* [2000] 2 All E.R. (Comm) 271 at 311. In the unlawful means type of conspiracy, where the unlawful means alleged

identified "the absence of just cause or excuse" for the combination as "a more use-ful concept" in explaining what made a conspiracy tortious than either "a predominant purpose of injuring the claimant" in the case of lawful means conspiracy or "the use of unlawful means" in the case of the other form of conspiracy: "In either case there is no just cause or excuse *for the combination*."[487] However, since it appears to remain the case that this absence of "just cause or excuse" must be demonstrated by either a "predominant purpose of injuring the claimant" or "the use of unlawful means", it unclear that this "useful concept" will affect how claimants present their claims.[488] Liability for lawful means conspiracy, where the acts would without combination be lawful, forms a qualification to the general rule that the mere agreement of many persons to act in concert cannot make the act of any one or more wrongful, if it would not be wrongful when done by each alone independently.[489] Indeed: "Why should an act which causes economic loss to A but is not actionable at his suit if done by B alone become actionable because B did it pursuant to an agreement between B and C?"[490] The conventional reply (made particularly in the cases against trade unions or their officials after 1875) was that "numbers may annoy and coerce where one may not"[491] and that a combination could make oppressive what in a single person was not.[492] This reasoning has been doubted, in that it is unrealistic:

> "to suggest today that acts done by one street-corner grocer in concert with a second are more oppressive and dangerous to a competitor than the same acts done by a string of supermarkets under a single ownership or that a multinational conglomerate ... does not exercise greater power than any combination of small businesses."[493]

---

were themselves a tort, the conspiracy claim did not merge with that tort so as to preclude the claim-ant from suing for conspiracy, [2000] 2 All E.R. (Comm) 271 at 319.

[486] *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727.

[487] [2018] UKSC 19; [2020] A.C. 727 at [10] (emphasis in the original).

[488] With respect, it is submitted that the assertion that those who combine in order to pursue their ends by using "unlawful means" will necessarily lack a "just cause" for combining involves a strained use of language.

[489] *Ware and De Freville v Motor Trade Assoc* [1921] 3 K.B. 40 at 70 per Scrutton LJ.

[490] *Lonrho Ltd v Shell Petroleum Co Ltd (No.2)* [1982] A.C. 173 at 188 per Lord Diplock. In *Lakatamia Shipping Co Ltd v Su* [2021] EWHC 1907 (Comm), Bryan J held, at [94]–[106], that a defendant could be liable for participating in a conspiracy even if their individual form of participation was "passive", as, an example provided at [98], "where a majority shareholder and director 'consents' (which can be inferred) to a minority shareholder using a company to smuggle drugs." See also *Digicel (St Lucia) Ltd v Cable & Wireless Plc* [2010] EWHC 774 (Ch) at Annex I, [74]–[77] per Morgan J.

[491] per Lord Lindley in *Quinn v Leathem* [1901] A.C. 495 at 538: "Annoyance and coercion by many may be so intolerable as to become actionable, and produce a result which one alone could not produce." Seeing strikes, as he did, as "a form of coercion, intimidation, molestation or annoy-ance" to employers and to workers willing to work, judges imposed the then new liability for conspiracy on this basis.

[492] See *Mogul SS Co v McGregor Gow* (1889) 23 Q.B.D. 598 at 616 per Bowen LJ; affirmed at [1892] A.C. 25 HL. cf. Lord Walker in *Revenue & Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] 1 A.C. 1174 at [77] who regarded Bowen LJ's second reason, that "the very fact of the combination may shew that the object is simply to do harm, and not to exercise one's own just rights", as "more principled". Lord Walker identified a third, largely unarticulated reason influencing judges at the end of the 19th century, namely the deep suspicion by the governing class of collective action in the political and economic spheres as potential threats to the constitution and framework of society, [2008] UKHL 19; [2008] 1 A.C. 1174 at [78]; See also *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [7].

[493] *Lonrho Ltd v Shell Petroleum Co Ltd (No.2)* [1982] A.C. 173 at 189 per Lord Diplock.

CONSPIRACY

However, the fact that every gang is not more dangerous than every individual does not provide a conclusive reason for thinking it absurd to impose special limits on those who are minded to participate in gangs with the purpose of causing harm to others: the frequency with which gangs prove to be oppressive or coercive may identify them as deserving special attention. In any case, the lawful means form of the tort, although arguably "anomalous", is too well-established to be "discarded".[494]

**The combination**    The tort requires an agreement, combination, understanding, or concert to injure, involving two or more persons. Of the various words used to describe a conspiracy, "combination" has been preferred to "agreement" on the ground that "agreement" might be thought to require some agreement of a contractual kind, whereas all that is needed is a combination and common intention.[495] The tort has also been said to require "concerted action taken pursuant to agreement"[496]; but this is only because "a tortious conspiracy, like most other tortious acts, must have caused loss to the claimant, or the cause of action will be incomplete."[497] Because: "It is a rare case where there is evidence of an agreement", in most cases, "it will be necessary to scrutinise the acts relied upon in order to see what inferences can be drawn as to the existence or otherwise of the alleged conspiracy or combination".[498] Neither form of conspiracy is simply a variety of joint tortfeasance, though there may clearly be situations where a defendant will have simultaneously committed the conspiracy tort and acted so as to be jointly liable for a separate tort as a result of participation in a "common design" to commit it[499]; both forms of conspiracy tort impose primary liability for a wrong that imposes liability for having combined with another to injure the claimant without a just cause or excuse.[500] A previous edition of this work suggested that "the question whether a person is a party to a combination constituting a conspiracy is essentially the same as whether he is liable as a joint tortfeasor in procuring a wrong,

**23-103**

---

[494] *Lonrho Ltd v Shell Petroleum Co Ltd (No.2)* [1982] A.C. 173 at 188–189 per Lord Diplock; *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [7], "the tort of conspiracy has an established place in the law of tort"; cf. *Lonrho Plc v Fayed* [1992] 1 A.C. 448 HL; *Canada Cement La Farge v British Columbia Lightweight Aggregate* (1983) 145 D.L.R. (3d) 385, SCC.

[495] *Belmont Finance Corp v Williams Furniture Ltd (No.2)* [1980] 1 All E.R. 393 at 404 per Buckley LJ; cf. *Crofter Hand Woven Harris Tweed Co Ltd v Veitch* [1942] A.C.435 at 439–440 and 461 per Viscount Simon and Lord Wright. cf. *Douglas v Hello! Ltd (No.3)* [2003] EWHC 786; [2003] 3 All E.R. 996 where conspiracy allegations failed, inter alia, because there was "no common plan or intent" between those said to be involved. cf. *Phillips v News Group Newspapers Ltd* [2010] UKSC 28; [2013] 1 A.C. 1 at [44] where Lord Walker said that the crime of conspiracy "involved an agreement, express or implied." See also *Energy Renewals Ltd v Borg* [2014] EWHC 2166 (Ch); [2014] I.R.L.R. 73 at [61]–[62]; and *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727.

[496] *Lonrho Ltd v Shell Petroleum Co Ltd (No.2)* [1982] A.C. 173 at 188 per Lord Diplock.

[497] *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [9].

[498] *Racing Partnership Ltd v Done Brothers (Cash Betting) Ltd* [2019] EWHC 1156 (Ch); [2020] Ch. 289 at [257]; quoting *Kuwait Oil Tanker Company SAK v Al-Bader* [2000] 2 All E.R. (Comm) 271 CA at [112]. (On appeal, there was no challenge to Zacaroli J's finding as to the combination in the *Racing Partnership* case: [2020] EWCA Civ 1300; [2021] Ch. 233 CA at [18].)

[499] Liability for a tort as a result of participation in a common design is discussed above, para.4-03.

[500] *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [10] (emphasis in the original): "A person has a right to advance his own interests by lawful means even if the foreseeable consequence is to damage the interests of others. The existence of that right affords a just cause or excuse. Where, on the other hand, he seeks to advance his interests by unlawful means he has no such right. The position is the same where the means used are lawful but the predominant intention of the defendant was to injure the claimant rather than to further some legitimate interest of his own … In either case, there is no just cause or excuse *for the combination*."

by reason of a common design".[501] Recent cases, however, have tended to deny any association with joint tortfeasance and to emphasise that participation in an actionable conspiracy is a form of *primary* wrongdoing. Moreover, there are two further reasons why it may be appropriate not to rely too closely on authorities relating to joint tortfeasance through "common design" when seeking to determine whether a defendant's alliance with another amounts to a "combination": in instances of lawful means conspiracy there need not be any civil wrong that the conspirators could have jointly committed and, in any case, the requirements for establishing joint tortfeasance vary depending on the nature of the tort that is alleged to have been committed pursuant to a "common design".[502]

**23-104**   Husband and wife were once thought to be one person in the eyes of the common law and, therefore, to be incapable of conspiring together.[503] This is still the case in criminal conspiracy, indeed in this context the anomaly has been extended to civil partners, though it ceases to apply if the combination includes a third person.[504] However, it has been held that, in the absence of binding authority, and of a compelling rationale or public policy, the primitive maxim that spouses are one person should not be imported into the tort of conspiracy.[505]

**23-105**   It is not clear whether a trade union can be party to a conspiracy. In *EETPU v Times Newspapers Ltd*, O'Connor J held that a union had no separate "personality" because what is now TULRCA 1992 s.10(2) states that "a trade union shall not be, or be treated as if it were, a body corporate".[506] While that suggests that it cannot be party to a conspiracy, later decisions making a trade union liable in tort suggest that it can be a party.[507]

**23-106**   It seems to be the better view that an employer is not ordinarily "in combination" with his employees and that no charge of conspiracy can be brought when the latter merely go about his business.[508] A different answer could be reached, however,

---

[501] 22nd edn (2018), para.24-97. This approach reflected the frequency with which judgments, particularly before the decision of the House of Lords in *Revenue & Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] 1 A.C. 1174, intermingled principles associated with conspiracy and joint tortfeasance.

[502] In *Vestergaard Frandsen A/S v Bestnet Europe Ltd* [2013] UKSC 31; [2013] 1 W.L.R. 1556 at [34], Lord Neuberger adopted a proposition advanced by Lord Sumption in argument, to the effect that "in order for a defendant to be party to a common design, she must share with the other party, or parties, to the design, each of the features of the design which make it wrongful." Later in his judgment, at [36]–[37], he treated this as importing that a party can be party to a common design to commit a strict liability wrong, such as patent infringement, without knowing that the acts are wrongful, but can only be liable for a common design to commit a conscience-based wrong, such as misuse of a trade secret, if she knows that a conscience-based wrong is to be committed. The question whether a defendant can commit the tort of unlawful means conspiracy without knowing that the means are unlawful has become controversial, and is discussed below at para.23-124.

[503] *DPP v Blady* [1912] 2 K.B. 89 at 92 (Lush J, dissenting on other matters); *Mawji v R.* [1957] A.C. 126 (polygamous marriage; the point was conceded).

[504] Criminal Law Act 1977 s.2(2)(a). See also *R. v Lovick (Sylvia)* [1993] Crim. L.R. 890.

[505] *Midland Bank Trust Co Ltd v Green (No.3)* [1979] Ch. 496 at 527 per Oliver J; affirmed [1982] Ch. 529 CA at 538 per Lord Denning MR, and at 541 per Fox LJ.

[506] [1980] Q.B. 585. The relevant statutory provision was then TULRA 1974 s.2(1).

[507] e.g. *Dimbleby & Sons Ltd v NUJ* [1984] 1 W.L.R. 427 HL. On international and foreign "persons" see *International Tin Council, Re* [1990] 2 A.C. 418 HL; *Arab Monetary Fund v Hashim (No.3)* [1991] 2 A.C. 114 HL; Foreign Corporations Act 1991. On the Crown, see *Folland v Ontario* (2003) 225 D.L.R. (4th) 50 (Ont. CA), where the court refused to strike out a claim for conspiracy to injure against the Crown, rejecting the submission that an action for malicious prosecution was the only possible claim against the Crown for prosecutorial misconduct.

[508] per Lord Wright in *Crofter Hand Woven Harris Tweed Co v Veitch* [1942] A.C. 435 at 468; (Viscount

CONSPIRACY

if a person who is an employee of another makes a *separate* agreement with that other, without any sense that in making this agreement, or discharging its obligations, he is doing what he has been employed to do. A company, being a separate legal person, can conspire with its directors[509]; and the knowledge of the company may be found in the person (usually a director) who has management or control (as its "alter ego") for the transaction or act in question.[510] It has been held that a criminal conspiracy between a "one-man" company and its sole controller is an impossibility because it is not possible to find an agreement between two minds.[511] This might not be the case in a civil action where the controller had used the corporate machinery in what was alleged to be a conspiracy to damage the claimant. Certainly, where a defendant controls more than one company, and brings about a situation where these companies combine to cause loss to a claimant by the use of unlawful means, courts appear willing to find that the tort of unlawful means conspiracy has been committed by controller and companies.[512]

The conspirators need not all join in at the same time, nor need they have exactly the same aim in mind; but the possession of a separate aim may be evidence that the party concerned has not participated in the combination at all, at any rate if he acted throughout in ignorance of the true facts.[513] The question is how far the

**23-107**

---

Simon LC seems to take the opposite view at 441, but it is suggested that Lord Wright's view is more consistent with the rule in *Said v Butt* [1920] 3 K.B. 497); discussed at para.23-44.

[509] *Belmont Finance Corp v Williams Furniture Ltd (No.2)* [1980] 1 All E.R. 393 CA; *Prudential Assurance Co Ltd v Newman Industries Ltd (No.2)* [1982] Ch. 204 CA (in both of which the knowledge of directors was imputed to their companies); *Digicel (St Lucia) Ltd v Cable & Wireless Plc* [2010] EWHC 774 (Ch) at Annex I, [77].

[510] The "directing mind and will" of the company may be found in different persons for different purposes as its "alter ego": *El Ajou v Dollar Land Holdings Plc* [1994] 2 All E.R. 685 CA esp. per Nourse LJ at 693–698 per Rose and Hoffmann LJJ at 699 and 705–706 (seeking out the person having de facto control); *Meridian Global Funds Ltd v Securities Commission* [1995] 2 A.C. 500 HL; cf. *Tesco Supermarkets Ltd v Nattrass* [1972] A.C. 153 HL (distinguished in *Supply of Ready Mixed Concrete (No.2), Re* [1995] 1 A.C. 456 HL). In *Belmont Finance Corp v Williams Furniture Ltd (No.2)* [1980] 1 All E.R. 393 at 404, Buckley LJ stated that a company has imputed to it the knowledge of a director under a duty to disclose to the company; but where the director would disclose his own breach of duty in disclosing the information, the company is not in possession of it: *Houghton v Nothard* [1928] A.C. 1 HL; cf. Wedderburn (1984) 47 M.L.R. 345 (how does a company forget?). So, too, where directors acquire information in another, private capacity and do not disclose it: *Lagunas Nitrate Co v Lagunas Syndicate* [1899] 2 Ch. 392 at 431 per Lindley LJ. Similarly, the knowledge of an agent is not necessarily that of the principal: *El Ajou v Dollar Land Holdings Plc* [1994] 2 All E.R. 685 CA at 702–703 per Hoffmann LJ; *David Payne & Co, Re* [1904] 2 Ch. 608 CA. In *The Dolphina* [2011] SGHC 273; [2012] 1 Lloyd's Rep. 304 (on the basis that the purpose of the tort of conspiracy "seems to lie in the law's concern to prevent harmful combinations": *Revenue & Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] 1 A.C. 1174 per Lord Hope at [44] and Lord Walker at [77]) it was held that for this purpose a company should be identified with the person or persons who could cause it to combine with others so as to harm the plaintiff, which in the first place would be its board of directors. On the facts, the defendant company's knowledge was held to include knowledge which one of its directors gained as a director of another company.

[511] *R. v McDonnell* [1966] 1 Q.B. 233.

[512] In *Taylor v Smith* [1991] I.R. 142 (Ir. Supreme Court), such liability was favoured: see esp. at 162–165. In *Barclay Pharmaceuticals v Waypharm* [2012] EWHC 306 (Comm) at [229], Gloster J stated that she found the approach in this case persuasive. See also *Twentieth Century Fox v Harris* [2014] EWHC 1568 (Ch) at [150] per Barling J. The Court of Appeal has held the point to be sufficiently arguable: *Raja v McMillan* [2021] EWCA Civ 1103. Such a controller can make a binding contract with his company: *Lee v Lee's Air Farming Ltd* [1961] A.C. 12 PC; cf. (1966) 82 L.Q.R. 151 at 153.

[513] See per Harman J in *Huntley v Thornton* [1957] 1 W.L.R. 321 at 343; per Evatt J in *McKernan v Fraser* (1931) 46 C.L.R. 343 at 401 and 407; *Bird v O'Neal* [1960] A.C. 907 at 920–921; *PTY Homes*

defendant was aware of the plan and then "joined in the execution" of it.[514] A person may be a party to a combination to use unlawful means, even though he himself cannot commit the unlawful acts in question, for example a person who joins parties to a contract in making threats that they will break that contract, thereby constituting a conspiracy to intimidate.[515]

### (b)   Unlawful means conspiracy

**23-108**     This form of the tort is committed where two or more persons combine and take action which is unlawful in itself with the intention of causing damage to a claimant who does incur the intended damage.[516] It is not necessary for the injured party to prove that causing him damage was the main or predominant purpose of the combination but that purpose must be part of the combiners' intentions. The main issues raised by this form of the tort are: first, the degree of intention required, secondly what forms of behaviour will count as unlawful means, thirdly whether the unlawful means were "indeed the means" by which damage was caused, and fourthly whether the defendants must know that their means are unlawful.

### *(i)   Intention*

**23-109**     As in the other economic torts, difficulty has arisen over the degree of intention required for liability for unlawful means conspiracy. In 1982, the House of Lords appeared to decide in *Lonrho Ltd v Shell Petroleum Co (No.2)* that, even if unlawful means were involved, liability for conspiracy only arose where the defendants had acted with "injury to the [claimant] and not the self-interest of the defendants … [as] the predominant purpose of the agreement".[517] However, a decade later, in *Lonrho Plc v Fayed*, the House of Lords rejected this interpretation of the law,

---

*Ltd v Shand* [1968] N.Z.L.R. 105 at 110. On disparity of objects, see para.23-132. The combination has been said to need "an assenting mind" not "mere words"; per Rand J in *R. v O'Brien* [1955] 2 D.L.R. 311 at 315.

[514] per Gatehouse J in *Metall und Rohstoff AG v Donaldson, Lufkin & Jenrette Inc* [1990] 1 Q.B. 391 ("a factual issue": reversed on other grounds, [1990] 1 Q.B. 391 CA; overruled in relation to those grounds *Lonrho Plc v Fayed* [1992] 1 A.C. 448 HL); *The Dolphina* [2011] SGHC 273; [2012] 1 Lloyd's Rep. 304 at [282]: "A conspirator need not know all of the details of the plot so long as he is aware of the common objective and what his role in bringing it about involves." *XY Inc v International Newtech Developments Inc* 2013 BCCA 352; (2013) 366 D.L.R. (4th) 443 at [54]–[55] where the personal defendants were part of a team which acted in concert to carry out unlawful acts that would injure the plaintiff.

[515] This was the position of Silverthorne in *Rookes v Barnard* [1964] A.C. 1129. So too, the position of Captain Stafford in *Kuwait Oil Tanker Company SAK v Al-Bader* [2000] 2 All E.R. (Comm) 271 CA.

[516] *Baxendale-Walker v Middleton* [2011] EWHC 998 at [60]; cf. *Pell Frischmann Engineering Ltd v Bow Valley Iran Ltd* [2009] UKPC 45; [2011] 1 W.L.R. 2370 at [55]. However, the view of some commentators that unlawful means conspiracy was only a form of secondary liability for acts which were themselves an actionable civil wrong was rejected by the House of Lords in *Revenue & Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] 1 A.C. 1174 per Lord Walker at [101]–[104], Lord Mance at [116] and Lord Neuberger at [225]. On the overlap of liability for conspiracy and inducing breach of contract see *Tree Savers International v Savoy* (1992) 87 D.L.R. (4th) 202 at 206–207 (Alta. CA).

[517] *Lonrho Ltd v Shell Petroleum Co Ltd (No.2)* [1982] A.C. 173 per Lord Diplock delivering the decision of the House of Lords (Lonrho 1982); cf. *Revenue & Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] 1 A.C. 1174 at [82] per Lord Walker: "Lord Diplock uncharacteristically failed to make a clear distinction between the requirement of predominant purpose under one

which in the interim had not in fact been acceptable to other jurisdictions.[518] When conspirators use unlawful means to injure the claimant, the Law Lords decided, "it is no defence for them to show that their primary purpose was to further or protect their own interests; it is sufficient to make their action tortious that the means used were unlawful"; in such cases "an intention to injure the claimant", rather than a predominant purpose to injure, is enough.[519]

It was noted above, that a defendant can only be held liable for the tort of caus- **23-110** ing loss by unlawful means if he or she acted with an "intention to cause loss" to the claimant.[520] Since injury to the claimant does not have to be the "predominant purpose" of an unlawful means conspiracy, a common meaning for "intention" could have been adopted across both the economic tort liabilities that are based on the use of unlawful means. Indeed, many modern cases have assumed that the torts of causing loss by unlawful means and unlawful means conspiracy define "intention to injure" in the same way.[521] For the purposes of the causing loss by unlawful means tort, a defendant will be held to have intended to cause loss to a claimant if this was the defendant's goal, or the means that the defendant had selected to achieve some goal, or the necessary corollary of the defendant's goal or means,

---

variety of the tort of conspiracy and the lower requirement of intentional injury needed for the other variety."

[518] See *Canada Cement La Farge Ltd v British Columbia Lightweight Aggregate Ltd* (1983) 145 D.L.R. (3d) 385 (SCC); *SSC B Lintas NZ v Murphy* [1986] 2 N.Z.L.R. 436; *Taylor v Smyth* [1991] 1 I.R. 142 Ir. S.C.

[519] *Lonrho Plc v Fayed* [1992] 1 A.C. 448 at 466 and 468 per Lord Bridge. See too *WH Newson Holdings Ltd v IMI Inc* [2013] EWCA Civ 1377; [2014] 1 All E.R. 1132 at [32] onwards. cf. *Wagner v Gill* [2014] NZCA 336; [2015] 3 N.Z.L.R. 157 at [89]–[107] where French J, giving the judgment of the court, said that the House of Lords decision in *Total Network* did not endorse a broad view of intention in conspiracy cases, and on balance the court preferred to retain the requirement that the defendant's conduct had to be directed at the plaintiff.

[520] See para.23-81.

[521] Cases where it has been accepted that the necessary "intention" to cause loss to the claimant is the same in the tort of intentionally causing loss by the use of unlawful means and in unlawful means conspiracy include: *Meretz Investments NV v ACP Ltd* [2007] EWCA Civ 1303; [2008] Ch. 244 at [146]; *Digicel (St Lucia) Ltd v Cable & Wireless Plc* [2010] EWHC 774 (Ch) at Annex I, [84]; *Emerald Supplies Ltd v British Airways Plc (Nos 1 & 2)* [2015] EWCA Civ 1024; [2016] Bus. L.R. 145 at [133]; *Palmer Birch (a partnership) v Lloyd* [2018] EWHC 2316 (TCC); [2018] 4 W.L.R. 164 at [220]; *Media-Saturn Holding Gmbh v Toshiba Information Systems (UK) Ltd* [2019] EWHC 1095 (Ch); [2019] 5 C.M.L.R. 7 at [226]. Similarly, in *Recovery Partners GB Ltd v Rukhadze* [2018] EWHC 2918 (Comm); [2019] Bus. L.R. 1166 at [446](iv), Cockerill J applied dicta from *OBG Ltd v Allan* [2007] UKHL 21; [2008] 1 A.C. 1 on "intention" for the purposes of the tort of causing loss by unlawful means in order to hold defendants liable for unlawful means conspiracy. In *E D & F Man Capital Markets Ltd v Come Harvest Holdings Ltd* [2022] EWHC 229 (Comm) QBD, Calver J provides a detailed analysis of "intention to cause loss" for the purposes of unlawful means conspiracy (at [479] – [522]), concluding that the account of intention to cause loss provided in the *OBG* case for the purposes of the tort of intentionally causing loss by unlawful means is also applicable to unlawful means conspiracy. The facts of the case point to a special problem that can arise in conspiracies to make gains by using unlawful means: *some* conspirators may have more information about the victims, who will be caused corresponding losses, than *other* conspirators (e.g. where D1 supplies crucial material, and D2 chooses who to deceive using this material, D2 may have better knowledge than D1 as to who will suffer the loss that is the flip-side of the conspirators' gain). The cases have not settled at what point a gain-seeking defendant will be able to claim that he did not intend to cause loss to *the claimant* (or to anyone else) because he was unable to predict with any accuracy who suffer the losses corresponding to the conspirators' gains. See also *CMOC Sales & Marketing Ltd v Person Unknown* [2018] EWHC 2230 (Comm) at [125]–[126]; [2019] Lloyd's Rep. F.C. 6.

in the sense of being simply "the other side of the same coin",[522] and this definition has been employed regularly in cases involving unlawful means conspiracy.[523] However, when providing a summary of the unlawful means conspiracy tort in *JSC BTA Bank v Ablyazov (No.14)*, Lords Sumption and Lloyd-Jones incorporated a different account of intention, relying on a Canadian case,[524] which suggested that a "constructive intent" can be sufficient, and will be found where conspirators have "directed" their unlawful conduct at a claimant and ought to have known that this would be likely to cause injury to the claimant.[525] "Constructive intent" is far easier to establish than a true intention, since the mere fact that a consequence is known to be likely does not mean that it is truly intended, and in the quotation cited by Lords Sumption and Lloyd-Jones the scope of the concept is extended still further by the insistence that it is enough that a party "ought to have known". However, the suggestion that "constructive intent" is sufficient seems to be undercut by the requirement for the unlawful means to be "directed towards" the claimant. One way of understanding when *unlawful means* have been "directed at" a claimant would be that it is the case when those means are being used in order to cause loss to the claimant. To put the same point another way, it is not clear how a defendant who merely "ought to have known" that his unlawful acts would harm the claimant can be said to have "directed" those acts at the claimant. Given these uncertainties, and the absence of any strong indication that the Supreme Court in *JSC BTA Bank v Ablyazov (No.14)* intended to depart from the account of "intention to harm" that has been consistently used by the courts since *OBG Ltd*, it may be best to overlook the reference to "constructive intent".[526]

### (ii)   Unlawful means

**23-111**    A previous edition of this work observed that there is no good reason why the ambit of "unlawful means" in this form of conspiracy should not be coterminous with its scope in the other economic torts[527]; this, however, is not the current law: a broader range of unlawful acts can constitute "unlawful means" for the purposes of the unlawful means conspiracy tort as against those which can be relied on to establish liability for the tort of causing loss by unlawful means. It was noted above that a defendant will not be liable for committing the unlawful means tort in a three-

---

[522] See para.23-83.
[523] See cases cited in support of the previous sentence.
[524] *Canada Cement La Farge Ltd v British Columbia Lightweight Aggregate Ltd* (1983) 145 D.L.R. (3d) 385 at 388–391 (SCC) (if unlawful means used, liability in conspiracy if conduct directed at claimant and defendants knew this was likely to result in injury).
[525] *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [13].
[526] The uncertainty caused by the Supreme Court's discussion of "intention" in *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [13]–[14] is reflected in the divergent views of commentators. In contrast to the view expressed above, T. Grant and D. Mumford, *Civil Fraud*, 1st edn (London: Sweet & Maxwell, 2018), para.2-086, treated the case as having re-established the need for a "highly specific intention" which "targets" the claimant. In *E D & F Man Capital Markets Ltd v Come Harvest Holdings Ltd* [2022] EWHC 229 (Comm) QBD, Calver J conducted a thorough review of the case law and concluded, at [500], that in order to be liable for unlawful means conspiracy "a specific intention to target the defendant is not required", and, at [522], that in referring to the Canadian case and "constructive intent" Lord Sumption and Lloyd-Jones were *not* intending to modify the necessary test for intention so as to depart from the test laid down by the House of Lords in *OBG*.
[527] 22nd edn (2018), para.24-101.

Conspiracy

party situation unless the means used (to cause loss to a claimant by restricting a third party's liberty to deal with him) could have been actionable at the suit of the third party.[528] However, liability for participating in an unlawful means conspiracy can be established in situations where other forms of unlawful means have been used. It has been held that whenever the means used involves the commission of a tort, or torts, against the claimant, a combination to inflict harm using those means will be a tortious conspiracy.[529] Thus a combination to cause damage to the claimant by means of intimidatory threats to break contracts[530] or by way of procurement of breaches of contracts[531] or by violence or fraud[532] is actionable. However, a claim can also be based on a conspiracy to cause loss by means of acts that are criminal, but not tortious. In *JSC BTA Bank v Ablyazov (No.14)*,[533] the Supreme Court summarised the position: "a criminal offence could be a sufficient unlawful means for the purpose of the law of conspiracy, provided that it was objectively

---

[528] The position was summarised in *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [12]: in *Revenue & Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] 1 A.C. 1174 "the House declined to apply to unlawful means conspiracies the condition which it had held in *OBG Ltd v Allan* [2008] 1 A.C. 1 to apply to the tort of intentionally harming the claimant by unlawful acts against third parties, namely that those acts should be actionable at the suit of the third party. They held that the means were unlawful for the purpose of founding an action in conspiracy, whether they were actionable or not." cf. *Pro-Sys Consultants Ltd v Microsoft Corp* 2014 BCSC 1280; (2014) 376 D.L.R. (4th) 302 at [38]–[45] where the submission that the Supreme Court decision in *Bram Enterprises Ltd v AI Enterprises Ltd* 2014 SCC 12; (2014) 366 D.L.R. (4th) 573 had changed the law on what constituted unlawful means for the purposes of unlawful means conspiracy was rejected. In *Bram*, Cromwell J had held that it was not necessary to seek identical treatment for "unlawful means" for all the torts where it was a requirement and he expressly limited his reasoning to the unlawful means tort and distinguished the approach to unlawful means in the torts of conspiracy and intimidation; see *Pro-Sys v Microsoft* at [67] and [69]. In *Reisinger v JC Akin Architect Ltd* 2017 SKCA 11; (2017) 411 D.L.R. (4th) 687, it was noted that in *Bram Enterprises Ltd v AI Enterprises Ltd* 2014 SCC 12; (2014) 366 D.L.R. (4th) 573 the Canadian Supreme Court had observed that unlawful means conspiracy might require a broader definition of unlawful means than that which was appropriate for the unlawful means tort because of the existence of "the so-called predominant purpose conspiracy tort". It was not necessary for the unlawful means or acts required for conspiracy to be actionable torts if they were otherwise unlawful.

[529] *Crofter Hand Woven Harris Tweed Co Ltd v Veitch* [1942] A.C. 435 at 462 per Lord Wright; *Sorrell v Smith* [1925] A.C. 700 at 723, 729–730 per Lord Dunedin and at 712 and 714 per Viscount Cave LC. In *Maranello Rosso Ltd v Lohomij BV* [2021] EWHC 2452 (Ch), HH Judge Keyser QC expressed the opinion, at [167], that the tort of negligence could not be "unlawful means" for the purposes of the tort: "the very notion of a conspiracy to injure by the use of unlawful means requires that there be some deliberate act or omission, not merely some oversight or want of care." With respect, we would suggest that the judge's valid premise may not be sufficient to support the conclusion: some instances of *deliberately* endangering a claimant might fall within no tort other than *negligence*, and, consequently, we would not be inclined to rule out the possibility—strange as it sounds—of conspirators been found to have intentionally caused injury to a claimant by *deliberate* instances of negligence.

[530] *Rookes v Barnard* [1964] A.C. 1129. See also *Messenger Group Newspapers Ltd v NGA* [1984] I.R.L.R. 397 (intimidation, nuisance and other torts).

[531] *Stratford & Son Ltd v Lindley* [1965] A.C. 269 HL; *Pritchard v Briggs* [1980] Ch. 338 at 410–418 per Goff LJ; *Norbrook Laboratories Ltd v King* [1984] I.R.L.R. 200 CA (NI) (interference with contract by unlawful means as well as nuisance and trespass). The suggestion made by Porter J in *De Jetley Marks v Greenwood* [1936] 1 All E.R. 863 at 872, that a conspiracy to induce a breach of contract is actionable only after the breach has been effected, does not seem to have survived the modern cases.

[532] *Crofter* [1942] A.C. 435 at 462 per Lord Wright; *Metall und Rohstoff AG v Donaldson, Lufkin & Jenrette Inc* [1990] 1 Q.B. 391 at 481.

[533] *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [11].

ECONOMIC TORTS

directed against the claimant".[534] The court, however, left open the actionability of a combination to cause loss by means of "breaches of civil statutory duties, or torts actionable at the suit of third parties, or breaches of contract or fiduciary duty".[535] Lords Sumption and Lloyd-Jones identified these wrongs as "liable to raise more complex problems"; in the case of torts actionable at the suit of third parties, or breaches of contract or fiduciary duty, this was because: "Compliance with the criminal law is a universal obligation. By comparison, legal duties in tort or equity will commonly and contractual duties will always be specific to particular relationships."[536] This feature of such duties generates complexity because it means that the unlawful means employed by the conspirators may be wrongful only in relation to some person *other than* the claimant.[537] For example, in *Racing Partnership Ltd v Done Brothers (Cash Betting) Ltd*,[538] one of the unlawful methods by which the conspirators were alleged to have caused harm to the claimant was by using information from two online betting exchanges in breach of contracts with those exchanges that precluded use for commercial purposes, but, as Zacaroli J pointed out, from the claimant's point of view it was "irrelevant" whether the conspirators used the prices in breach of contract or by agreement, having paid the exchanges a fee.[539] In the case of breaches of civil statutory duties there is a further source of complexity: "Their relevance may depend on the purpose of the relevant statutory provision, which may or may not be consistent with its deployment as an element in the tort of conspiracy."[540]

**23-112    Crimes**    In *Revenue & Customs Commissioners v Total Network SL*,[541] the House of Lords held that unlawful means for the purposes of unlawful means conspiracy

---

[534] The Supreme Court treated this as having been decided by the House of Lords in *Revenue & Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] 1 A.C. 1174. The proposition that crimes directed at a claimant can be sufficient to support a claim for an unlawful means conspiracy has been relied on by claimants seeking injunctions against those who disrupt controversial construction projects, such as the installation of oil pipelines: in such cases the main proponent of the project may not have possession of the land, and so may not be able to claim for trespass or private nuisance, and there may be uncertainties as to who owns equipment that is targeted: *Esso Petroleum v Breen* [2022] EWHC 2664 (KB); *Shell UK Oil Products Ltd v Persons Unknown* [2022] EWHC 1215 (QB) at [25]–[27].

[535] *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [15].

[536] *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [15].

[537] Some care is required here. The "complex problem" arises where conspirators, D1 and D2, cause loss to a claimant, C, by using means that are "unlawful" because they amount to a wrong to a third party, T. However, in some cases, where the harm to C results from a wrong to T limiting T's freedom to deal with C, one or more of the conspirators may have committed the tort of causing loss by unlawful means *to C*, and the "complex problem" can be side-stepped by using *this tort to C* (instead of the wrong to T) as the "unlawful means" required to establish an unlawful means conspiracy.

[538] *Racing Partnership Ltd v Done Brothers (Cash Betting) Ltd* [2019] EWHC 1156 (Ch); [2020] Ch. 289. Zacaroli J held, at [252], that the breach of the exchanges' terms and conditions could not amount to "unlawful means" for the purposes of the conspiracy tort. This, however, was rejected by the Court of Appeal ([2020] EWCA Civ 1300; [2021] Ch. 233 CA at [155]) that the "unlawful means": the issue is discussed further below, at para.23-115.

[539] *Racing Partnership Ltd v Done Brothers (Cash Betting) Ltd* [2019] EWHC 1156 (Ch); [2020] Ch. 289 at [251]. With respect, Zacaroli J's observation will not be true in all cases: e.g. if the exchanges had a contract with the claimants prohibiting them from licencing the conspirators to use the information in the relevant way, then it would be relevant to the claimants whether the conspirators' use of the information resulted from the exchanges breaking this contract.

[540] *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [15].

[541] [2008] UKHL 19; [2008] 1 A.C. 1174; reversing [2007] EWCA Civ 39; reported in [2008] 1 A.C. 1174 at 1178–1203, where, at [78] the Court of Appeal felt bound to follow its earlier decision in

CRITICAL

could include crimes whether or not the conspirators' criminal acts were otherwise actionable by the claimant. Lord Walker derived from the authorities "a general assumption, too obvious to need discussion, that criminal conduct engaged in by conspirators as a means of inflicting harm on the claimant is actionable as the tort of conspiracy, whether or not that conduct, on the part of a single individual, would be actionable as some other tort."[542] While Lord Scott agreed with Lord Walker,[543] the opinions of the other Law Lords on this point were expressed in more qualified terms. In Lord Neuberger's opinion, since a "claim in conspiracy to injure can be established even where no unlawful means, let alone any other actionable tort, is involved … it would be anomalous if an unlawful means conspiracy could not found a cause of action where, as here, the means 'merely' involved a crime … [which] had as its purpose the protection of the victim of the conspiracy".[544] Lord Hope similarly concluded that where, as on the facts, the case was virtually indistinguishable from the tort of lawful means conspiracy, the fact that the unlawful means were not in themselves actionable did not seem to be "significant".[545] Lord Mance agreed with Lords Walker and Neuberger that "the history and jurisprudence of unlawful means conspiracy pointed clearly to the conclusion that at least some criminal acts, not amounting to torts, might suffice to ground the tort", but "not every criminal act committed in order to injure can or should give rise to tortious liability even where the element of conspiracy is present".[546]

In *JSC BTA Bank v Ablyazov (No.14)*,[547] the Supreme Court held that a criminal contempt of court (albeit punishable in civil proceedings) could amount to unlawful means for the purposes of this form of the tort of conspiracy, at least where the claimant was a bank and the contempt involved serial breaches of a freezing order and receivership order, that had been made on the application of the bank. The single judgment of Lords Sumption and Lloyd-Jones provided further general guidance:

**23-113**

> "Conspiracy being a tort of primary liability, the question what constitute unlawful means cannot depend on whether their use would give rise to a different cause of action independent of conspiracy. The real test is whether there is a just cause or excuse for combining to use unlawful means. That depends on (i) the nature of the unlawfulness, and (ii) its relationship with the resultant damage of the claimant."[548]

The suggestion that whether acts constitute "unlawful means" depends on an evalu-

---

*Powell v Boldaz* [1998] Lloyd's Rep. Med. 116 at 126 that "the unlawful act relied on must be actionable at the suit of the plaintiff".

[542] [2008] UKHL 19; [2008] 1 A.C. 1174 at [94]; see generally [93]–[95].
[543] [2008] UKHL 19; [2008] 1 A.C. 1174 at [47].
[544] [2008] UKHL 19; [2008] 1 A.C. 1174 at [221].
[545] [2008] UKHL 19; [2008] 1 A.C. 1174 at [44].
[546] [2008] UKHL 19; [2008] 1 A.C. 1174 at [116] and [119]. cf. *Agribrands Purina Canada Inc v Kasamekas* 2011 ONCA 460; (2011) 334 D.L.R. (4th) 714 at [27]–[38] where Lord Walker's speech in the *Total Network* decision was cited in support of the need to recognise that the torts of intentional interference with economic relations and unlawful means conspiracy had each developed its own concept of unlawful conduct: "what is required therefore to meet the 'unlawful conduct' element of the conspiracy tort is that the defendants engage in concert in acts that are wrong in law, whether actionable in private law or not." See also *XY Inc v International Newtech Development Inc* 2013 BCCA 352; (2013) 366 D.L.R. (4th) 443 at [49]–[50]: presentation of false reports and breach of confidence held to satisfy the unlawful means requirement. cf. para.23-120.
[547] [2018] UKSC 19; [2020] A.C. 727.
[548] [2018] UKSC 19; [2020] A.C. 727 at [11].

ation of the conspirators' reasons for combining to use those means ("just cause or excuse") is not straightforward; the primary difficulty is that the *other* form of conspiracy—lawful means conspiracy—depends on the predominant object of the conspirators being objectionable, whilst this form, by contrast, depends on the unlawfulness of the means used: to suggest that whether the means are "unlawful" *turns on* the justness of the defendants' cause confusingly blends the two forms of the tort. Moreover, the two factors that are identified as relevant to whether the defendants have a "just cause of excuse"—"(i) the nature of the unlawfulness, and (ii) its relationship with the resultant damage of the claimant"—do not refer to the *cause* of the defendants' behaviour or to any possible *excuse* for it. With respect, there is a strong case for treating the attempt to unify the two forms of conspiracy in terms of an absence of "just cause or excuse" as unnecessarily ambitious, and beyond the ratio of the case; but rejection of the unifying explanation in terms of "just cause or excuse" casts no doubt on the significance of "(i) the nature of the unlawfulness, and (ii) its relationship with the resultant damage of the claimant" to the question whether particular means are sufficient to ground liability for "unlawful means conspiracy".[549]

**23-114**   The identification of "the nature of the unlawfulness" as a factor that ought to influence whether a crime is held to be "unlawful means" can be linked to Lord Neuberger's suggestion in the *Total Network* case that it may be relevant whether the crime "had as its purpose the protection of the victim of the conspiracy".[550] Above, it was noted that Lords Sumption and Lloyd-Jones were hesitant about allowing claims for unlawful means conspiracy to be based on means that are wrongful only in relation to some person *other than* the claimant, and whilst they also described criminal law as imposing a "universal obligation",[551] it seems plausible that some behaviour may have been prohibited by the criminal law for reasons wholly unrelated to extending the range of acts that a claimant can legitimately object to a gang deploying against him or her in the course of economic competition. The matter is far from clear, however, and Lords Sumption and Lloyd-Jones may instead have been intending to refer to Lord Walker's acceptance in the *Total Network* case that "the sort of considerations relevant to determining whether a breach of statutory duty is actionable in a civil suit (*Cutler v Wandsworth Stadium Ltd*[552]) may well overlap, or even occasionally coincide with, the issue of unlawful means in the tort of conspiracy".[553] Lord Walker's comment is somewhat opaque; "the sort of considerations relevant to determining whether a breach of statutory duty is actionable in a civil suit" are those considerations which tend to indicate whether Parliament intended the duty it was imposing to create private law entitlements, and it is not clear that Parliament's intentions can be a direct guide to what forms of behaviour will count as "unlawful means" for the purposes of the conspiracy tort.

**23-115**   The second factor, the relationship between any crime committed by the

549 In *Palmer Birch (a partnership) v Lloyd* [2018] EWHC 2316 (TCC); [2018] 4 W.L.R. 164 at [189], HH Judge Russen QC took the quoted passage to mean that "there may be categories of unlawfulness which a combiner may be excused from agreeing to perpetrate either because of the classification of the unlawful act (identified by reference to the purpose or duty which it subverts) or because it is too incidental to the claimant's position to be actionable".
550 [2008] UKHL 19; [2008] 1 A.C. 1174 at [221].
551 *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [15].
552 [1949] A.C. 398.
553 [2008] UKHL 19; [2008] 1 A.C. 1174 at [96].

CONSPIRACY

conspirators and the resultant damage to the claimant, seems to be strongly related to the insistence that an unlawful means conspiracy can only be based on criminal behaviour where this was "indeed the means" or the "instrumentality" by which harm was intentionally inflicted.[554] It is submitted that this second factor is relevant in a broader range of cases than those based on crimes, and consequently it will be discussed separately below.[555]

**Breach of statute**   Some earlier authorities suggested that breach of a criminal statute (or other crime) must always amount to unlawful means for the purposes of tort liability for conspiracy.[556] Subsequent to the *Total Network* and *JSC BTA Bank* cases, it is clear that this was too bold, and whether a claim can be based on a particular statutory *crime* will depend on application of the general approach outlined in the previous five paragraphs. In the *JSC BTA Bank* case, the Supreme Court stated that whether, or when, breach of a civil statutory duty would constitute "unlawful means" was "liable to raise more complex problems": "Their relevance may depend on the purpose of the relevant statutory provision, which may or may not be consistent with its deployment as an element in the tort of conspiracy."[557] Where a statutory provision is one that can be enforced by a claimant making a civil claim for the tort of breach of statutory duty, there is no obvious reason why its breach should not equally amount to "unlawful means" for the purposes of a claim for unlawful means conspiracy by the claimant: the claimant's position will be equivalent to having been the victim of a combination to commit an actionable tort.[558] However, a broader range of breaches of non-criminal statutes may also be sufficient to complete the conspiracy tort.[559] It is submitted that the question from the *JSC BTA Bank* case of whether the "purpose of the relevant statutory provision" was "consistent with its deployment as an element in the tort of conspiracy" could be treated as asking both (i) whether the statutory provision had as its purpose the protection of the victim of the conspiracy (by analogy with the position in relation to crimes); and (ii) whether use of the statutory provision to extend the scope

23-116

---

[554] The phrase "indeed the means" comes from Lord Walker's speech in *Revenue & Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] 1 A.C. 1174 at [95], where he also equated the phrase with the concept of "instrumentality" used by Lord Nicholls in *OBG Ltd v Allen* [2008] 1 A.C. 1 at [159]. Lord Walker's analysis of this issue is cited with approval in *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [14].

[555] See para.23-122.

[556] *Sorrell v Smith* [1925] A.C. 700 at 714 per Viscount Cave LC and 719 per Lord Dunedin; and per Lord Wright in *Crofter* [1942] A.C. 435 at 461–462, including breach of the Conspiracy and Protection of Property Act 1875 s.7 (now TULRCA 1992 s.241), but after the careful analysis of Scott J in *Thomas v NUM (South Wales Area)* [1986] Ch. 20 at 54–65, no independent tort liability can be based on that section.

[557] *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [15].

[558] This view is also put forward in T. Grant and D. Mumford, *Civil Fraud*, 1st edn (London: Sweet & Maxwell, 2018), para.2-058.

[559] e.g. *Brent LBC v Davies* [2018] EWHC 2214 (Ch) raises the question whether a conspiracy of public officials to cause harm to a public authority by acting in ways that were contrary to the statutes that governed their powers might be actionable; in the actual case Zacaroli J did not have to confront such questions since he found that there had not been a pre-conceived plan to harm the claimant, and the conspirators were unaware that their actions were unlawful. In *Digicel (St Lucia) Ltd v Cable & Wireless Plc* [2010] EWHC 774 (Ch), at App.I at [62], Morgan J held that a non-actionable breach of a non-criminal statute would not be "unlawful means" for the purposes of unlawful means conspiracy, and a similar view was expressed by HH Judge Hodge QC, sitting as a judge of the High Court, in *Chiang v Mishcon de Reya* [2015] EWHC 164 (Ch) at [49]–[50].

of the tort of unlawful means conspiracy would be in tension with the policy behind the statute; it may also be necessary to determine (again, by analogy with the position in relations to crimes) whether breach of the statutory provision was "indeed the means" by which harm was intentionally inflicted.[560] Similar principles to those applicable in deciding when breach of statute can constitute unlawful means were previously applied to determine when breach of directly applicable provisions of European Community law could amount to the use of unlawful means.[561]

**23-117**   **Acts that the defendants were not at liberty to commit**   The *Total Network* and *JSC BTA Bank* cases have expanded the scope of "unlawful means" in the context of conspiracy, but do not appear to have gone so far as to re-instate the former "general" approach, which found unlawful means whenever defendants had done acts which they were not at liberty to commit.[562] Such an approach would risk "tortifying" too many forms of behaviour that are prohibited for reasons very different from those that should determine the scope of protection in the economic sphere, would undercut the high requirement for a "predominant purpose" of causing injury that is a condition of liability for lawful means conspiracy, and would further magnify the contentious difference between the scope of the tortious liability of individuals acting alone and in combination with others.

**23-118**   **Breach of contract**   Further difficulty arises in relation to a combination to commit a breach of contract as a form of unlawful means conspiracy. Where there is a combination to threaten a breach, this might amount to conspiracy to intimidate such as was found to have occurred in the House of Lords in *Rookes v Barnard*. Since in that case the House of Lords held that a breach of contract was an "illegal act" for the purposes of the tort of intimidation, there might not seem to be any reason for excluding it from the scope of unlawful means for the purposes of unlawful means conspiracy.[563] Yet Lord Devlin (alone of the Law Lords in *Rookes v Barnard*) went out of his way to leave this point open.[564] Notwithstanding this reservation, in several subsequent cases it was stated, albeit only in obiter dicta, that a person could be liable for conspiracy to break a contract to which he was not party where he merely combined, with a common design, together with the party or parties committing the breach.[565] Furthermore, as a matter of justice it seems correct that defendants should be liable for committing unlawful means conspiracy if they

---

[560] On the requirement that the unlawful means must be "indeed the means", see para.23-122.

[561] *Garden Cottage Food Ltd v Milk Marketing Board* [1984] A.C. 130 HL; *Barretts & Baird (Wholesale) Ltd v IPCS* [1987] I.R.L.R. 3; *R. v Secretary of State for Transport Ex p. Factortame* [2001] 1 W.L.R. 942; *Three Rivers DC v Bank of England (No.3)* [2003] 2 A.C. 1; Fox [2001] C.L.J. 33.

[562] *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch. 106 at 139 per Lord Denning MR; an approach approved in *Associated British Ports v TGWU* [1989] 1 W.L.R. 939 CA (reversed on other grounds [1989] 1 W.L.R. 939 HL).

[563] The Donovan Report of the Royal Commission on Trade Unions (1968) Cmnd.3623 accepted the need to protect against this liability in trade disputes (see para.854), and the Trade Union and Labour Relations Act 1974 s.13(3) did so until its repeal by the Employment Act 1980 s.17(8).

[564] [1964] A.C. 1129 at 1210: "I am not saying that a conspiracy to commit a breach of contract amounts to the tort of conspiracy; that point remains to be decided."

[565] *Barretts & Baird (Wholesale) Ltd v IPCS* [1987] I.R.L.R. 3 at 8–10 per Henry J; and see Lord Denning MR in *Midland Bank Trust Co Ltd v Green (No.3)* [1982] Ch. 529 at 539. This is also consonant with the reasoning of the Court of Appeal in *Associated British Ports v TGWU* [1989] 1 W.L.R. 939 CA (reversed on other grounds: [1989] 1 W.L.R. 939 HL).

combine so as to co-ordinate their breaking of their contracts with the claimant so as to amplify the loss caused. As noted above, however, in the *JSC BTA Bank* case, Lords Sumption and Lloyd-Jones highlighted that there might be a reason for not treating a breach of contract as "unlawful means" in situations where the claimant was not a party to the broken contract, so that its breach could not be described as unlawful as between the defendants and him or her. This reasoning was followed at first instance in *Racing Partnership Ltd v Done Brothers (Cash Betting) Ltd*,[566] where one of the unlawful methods by which the conspirators were alleged to have caused harm to the claimant was by using information that a contract with a third party prohibited them from using for commercial purposes; as Zacaroli J pointed out, from the claimant's point of view it was "irrelevant" whether the conspirators used the information in breach of contract or by agreement, after paying a fee. On appeal, however, it was held that a breach of a contract with a third party could be "unlawful means", since a key element of the reasoning in the *Total Network* case was that the tort of unlawful means conspiracy did not require any conspirator to employ a form of "unlawful means" which would have been actionable by the claimant in the absence of the conspiracy.[567] The Court of Appeal's approach attached less significance to the nature of the unlawfulness, and more to a proper understanding of whether the unlawful means were "the instrumentality", or "indeed the means", by which the conspirators intentionally caused harm to the claimant.[568]

For the time being, the decision of the Court of Appeal in the *Racing Partner-* **23-119** *ship* case has settled the question whether a breach of contract can constitute unlawful means for the purposes of the tort of unlawful means conspiracy. It remains true, however, that situations could arise where the fact that the means used by the conspirators involved them breaking contracts seems wholly fortuitous from the perspective of the claimant. That said, it is submitted that there are at least three situations where breaches of contract should not be classed as irrelevant, and should be treated as "unlawful means" for the purpose of the tort: (i) where defendants combine to break a contract (or contracts) between them and the claimant; (ii) where defendants combine to break a contract (or contracts) that exist between them and a third party, but one of the reasons that such a contract (or contracts) exists is to protect some interest of the claimant; and (iii) where defendants combine to break a contract and by doing so also commit some other tort to the claimant, such as intimidation. In the first of these situations, the breach of contract will be an actionable civil wrong to the claimant, so there seems little scope for conspirators to argue that they should be left at liberty to combine to use such a method of intentionally inflicting harm on the claimant. So far as there is any basis for hesitation in cases falling within the first situation, it might be that a court should be cautious before finding that a defendant has joined a conspiracy to break a contract where: (i) that defendant was not itself a party to any contract broken; *and* (ii) that defendant would not have been held to have procured any breach of contract. Such hesitation would be particularly appropriate if it appeared that a claim was formulated as being for an unlawful means conspiracy primarily to circumvent obstacles to a find-

---

[566] [2019] EWHC 1156 (Ch); [2020] Ch. 289. Zacaroli J held, at [252], that the breach of the exchanges' terms and conditions could not amount to "unlawful means" for the purposes of the conspiracy tort.
[567] *Racing Partnership Ltd v Sports Information Services Ltd* [2020] EWCA Civ 1300; [2021] Ch. 233 CA at [155].
[568] This requirement is discussed further below, at para.23-122.

ing that the defendant had committed the tort of procuring a breach of contract. With respect to the second situation, where defendants combine to inflict loss on a claimant by breaking a contract (or contracts) between them and a third party, it is submitted that there is a strong case for treating such behaviour as "unlawful means" where one of the reasons that such a contract (or contracts) exists is to protect some interest of the claimant; here it cannot be said that the fact that the behaviour is a breach is *irrelevant* from the claimant's perspective, and there is a helpful parallel with the idea that criminal acts can straightforwardly be treated as "unlawful means" when one of the reasons for the existence of the crime was to protect the claimant's interest. The possibility of liability in the third situation reflects the fact that when a conspirator breaks a contract with a third party they may also have committed an economic tort other than unlawful means conspiracy vis-à-vis the claimant. Thus a combination to cause loss to a claimant by breaking a contract with a third party *in order to prevent* that third party from dealing with the claimant can be treated as a conspiracy to commit the tort of causing loss by the use of unlawful means, and a combination to cause loss to a claimant by threatening to break a contract with a third party *in order to persuade* that third party to cease dealing with the claimant can be treated as a conspiracy to commit the tort of three-party intimidation: in such cases, the claims can be built on the combination being pursued by means of committing the economic tort to the claimant, rather than directly on any breach of contract.

**23-120** **Breach of fiduciary duties and equitable wrongs**   It was noted above that in *JSC BTA Bank v Ablyazov (No.14)* the Supreme Court left open the actionability of a combination to cause loss by means of breach of fiduciary duty because of the "complex problems" that stem from the fact that such duties are specific to particular relationships.[569] In such cases, there is also the risk of liability for the conspiracy tort being inconsistent with the principles under which third parties can be held liable in equity for "knowing receipt" or "knowing assistance".[570] Recent cases have proceeded on the basis, however, that a breach of fiduciary duty can amount to "unlawful means" for the purposes of the conspiracy tort.[571]

**23-121** **Justification**   The question whether a defendant can rely on a defence of justification to avoid liability for unlawful means conspiracy is not straightforward. Two obstacles face the submission that such a defence should be recognised: it would only have logical space to operate in cases where whatever justification the defendant invoked was both insufficient to prevent the means being categorised as unlawful and insufficient to permit a finding that the defendant never intended to harm

---

[569] *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [15]. See above, para.23-111.

[570] See *Lewin on Trusts*, 20th edn (2020), Chs 42 and 43.

[571] See, e.g. *Aerostar Maintenance International Ltd v Wilson* [2010] EWHC 2032 (Ch) at [170]–[172], where Morgan J expressly raised the concern about the overlap with secondary liability in equity; *Keymed (Medical & Industrial Equipment) Ltd v Hillman* [2019] EWHC 485 (Ch) at [122]. In *FM Capital Partners Ltd v Marino* [2018] EWHC 1768 (Comm) at [455]–[456], it was conceded that "knowing receipt" or "knowing assistance" could themselves amount to unlawful means for the purposes of an unlawful means conspiracy (appeal dismissed without reference to this point: [2020] EWCA Civ 245; [2021] Q.B. 1); *Iranian Offshore Engineering & Construction Co v Dean Investment Holdings SA* [2019] EWHC 472 (Comm) at [172]; *Kidd v Lime Rock Management LLP* [2020] CSOH 96; 2021 S.L.T. 35 (conspiracy to *facilitate* a breach of fiduciary duty); *Maranello Rosso Ltd v Lohomij BV* [2021] EWHC 2452 (Ch) at [155].

CONSPIRACY

the claimant. In *Palmer Birch (a partnership) v Lloyd*,[572] HH Judge Russen QC expressly rejected the possibility of justification being a defence "to an otherwise established unlawful means conspiracy". However, an apparently contrary position was adopted by Toulson LJ in *Meretz Investments NV v ACP Ltd* where the three alleged conspirators had acted so as to: (i) lawfully exercise a power of sale of a lease, granted as security for the loan of money to carry out property development; which (ii) prevented the borrower from performing its contractual promise to leaseback the premises to the claimant. Despite the fact that the transaction brought about a breach of contract by the borrower, Toulson LJ reasoned that because the purchaser of the lease "had a perfectly legitimate reason for acting as he did [i]t would therefore be wrong to classify such conduct as founding an action for unlawful means conspiracy".[573] It is submitted that the *Meretz* case reveals that where a claim alleges a *conspiracy* to breach a contract it may be appropriate to recognise a defence of justification of a breadth equivalent to the potential defence of justification for *procuring* a breach of contract.[574] Otherwise, a party who could rely on his "equal or superior right" as a justification for procuring a breach could nonetheless end up liable—as a conspirator—for having combined with the party in breach to cause loss to the claimant by means of the breach.

### (iii)   "Indeed the means"

In the *Total Network* case, Lord Walker counter-balanced the extension of the concept of "unlawful means" to cover acts that would not be actionable if performed by a solitary defendant, such as some crimes, by insisting that to form the basis for a conspiracy claim such acts must have been "indeed the means … of intentionally inflicting harm",[575] and this approach was endorsed by Lords Sumption and Lloyd-Jones in *JSC BTA Bank v Ablyazov (No.14)*.[576] Their elaboration of the "indeed the means" requirement, however, linked it to the conspirators' intentions: thus situations where it was the combination's predominant purpose or "constructive intention" to cause harm to the claimant were "contrasted with a situation in which the harm to the claimant was purely incidental because the unlawful means were not the means by which the defendant intended the harm to the claimant".[577] With respect, this contrast is problematic: the question whether the defendant intended to inflict *the harm suffered by the claimant*, as opposed to this harm being "purely incidental", is not the same as the question whether the defendants intended *particular means* to be "the instrument" by which harm would be inflicted.[578] The difference can be seen by analysing a hypothetical case that has been frequently discussed: a defendant business—perhaps a courier or a pizza

**23-122**

---

[572] [2018] EWHC 2316 (TCC); [2018] 4 W.L.R. 164 at [193].

[573] [2007] EWCA Civ 1303; [2008] Ch. 244 at [170] per Toulson LJ.

[574] See paras 23-59 to 23-63.

[575] *Revenue & Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] 1 A.C. 1174 at [95] per Lord Walker. He equated this requirement with one proposed by Lord Nicholls in *OBG Ltd v Allen* [2008] 1 A.C. 1 at [159], using the wording that the unlawful means must be the "instrumentality".

[576] [2018] UKSC 19; [2020] A.C. 727 at [14].

[577] [2018] UKSC 19; [2020] A.C. 727 at [14].

[578] In *Racing Partnership Ltd v Sports Information Services* [2020] EWCA Civ 1300; [2021] Ch. 233 CA at [154], Arnold LJ noted that discussions of whether the "unlawful means" were "indeed the means", which he referred to as "instrumentality", frequently conflated questions about the

company—gains an advantage over its rival by instructing its delivery drivers to drive faster than the speed limit. Lord Nicholls' explanation for the *absence* of liability in such a situation does not claim that the defendant business had no intention to cause loss to its rival by luring away its potential (but impatient) customers, but that the "criminal conduct is not an offence committed against the rival company in any realistic sense of that expression".[579] The claim that where unlawful means are not "indeed the means" then any harm inflicted on the claimant will have been unintended is equally absent from Lord Walker's discussion of the requirement in the *Total Network* case. Lord Walker is clear that it is *the means* that will have been "merely incidental" to the (intended) harm:

"But all the statements of general principle in the classic cases seem to me to be consistent with the proposition that unlawful means, both in the intentional harm tort and in the tort of conspiracy, include both crimes and torts (whether or not they include conduct lower on the scale of blameworthiness) provided that they are indeed the means by which harm is intentionally inflicted on the claimant (rather than being merely incidental to it)."[580]

The nature of the requirement that Lord Nicholls and Lord Walker sought to identify may be illuminated by considering a variation on the delivery hypothetical, where a pizza delivery business knowingly employs illegal workers as delivery drivers, thereby committing a criminal offence.[581] In such a situation, the business owner may well intend to take a portion of a rival business's trade, thereby inflicting a loss, but the unlawful means will not be "the instrument"; the work of the (illegally-employed) delivery drivers will be how the owner advances his or her business, but their *immigration status* will not be what encourages customers to stop ordering their pizzas from the rival.

**23-123**   In *Racing Partnership Ltd v Sports Information Services Ltd*,[582] Arnold LJ suggested that the requirement that the "unlawful means" must be "indeed the means" involved an issue of causation: "The unlawful means must have caused loss to the claimant, rather than merely being the occasion of such loss being sustained." For Arnold LJ:

"this is the best explanation of the courier service/pizza delivery example: in that example the claimant's loss is caused by customers (who may be presumed not to appreciate that the defendant is systematically breaking the law and some of whom may prefer the defendant's service for other reasons) choosing to place their orders with the defendant, and so the unlawfulness is the occasion for the loss rather than the direct cause of it."[583]

Such an approach is readily comprehensible, allocates a useful function to the

defendants' intention and questions about the nature of the causal link between the means employed and the harm caused.
[579] *OBG Ltd v Allen* [2008] 1 A.C. 1 at [160].
[580] *Revenue & Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] 1 A.C. 1174 at [93]. Similarly, in Lord Walker's explanation of the absence of liability in the *Lonrho v Shell* case, at [95], he does not treat the harm as unintended: "In *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] A.C. 173, the sanctions order against Southern Rhodesia was part of the story, but it was not the instrument for the intentional infliction of harm."
[581] Immigration, Asylum and Nationality Act 2006 s.21(1) (as amended).
[582] [2020] EWCA Civ 1300; [2021] Ch. 233 CA at [154].
[583] [2020] EWCA Civ 1300; [2021] Ch. 233 CA at [154]. See also Phillips LJ, who agreed with Arnold LJ on the issues relating to unlawful means conspiracy, at [172].

requirement, and aligns the courier service/pizza delivery example with the immigration status variation which was mentioned above; its possible weakness, however, is that it re-explains the courier service/pizza delivery example, which had usually been thought to be one where there would be no liability despite the fact that the customers *did* select the defendants' offering because of its quicker (because unlawful) service. As Lewison LJ, who dissented on unlawful means conspiracy, noted, the courier service/pizza delivery example has usually been treated as demanding "something more than 'but for' causation" between the unlawful means and the claimant's loss, rather than only something more than the unlawful means being "merely the occasion" for the loss.[584]

### (iv)   Knowledge of the unlawfulness of the means

Recent litigation has raised the question whether defendants can have committed an unlawful means conspiracy if they did not know that the means that they used to inflict harm on the claimant were unlawful. In *Stobart Group Ltd v Tinkler*,[585] HH Judge Russen QC, sitting as a judge of the High Court, held himself bound by the decision of the Court of Appeal in *Belmont Finance Corp v Williams Furniture (No.2)*[586] to conclude that: "The fact that the conspirator did not know that his actions were unlawful is no defence to liability. In order for him to be liable, it is enough to show that he had sufficient knowledge of the essential facts, that acts which were unlawful were to be carried out so as to implicate him in liability for them." He also, however, offered arguments in support of the view that this was the *right* answer.[587] He pointed to the practical problems that might be caused for claimants by having to inquire into each conspirator's legal knowledge in a case where, as in the one he was considering, the unlawfulness—breach of a director's fiduciary duties to the company—depended on law that was complicated and contestable; moreover, in such a case he believed it might be too easy for defendants to manufacture legal advice sufficient to negate any suggestion that a scheme was *known* to be unlawful; and he noted the knock-on legal issues that might arise with regard to "the standard of knowledge (or suspicion) required" and the legal burden of proof.[588] However, in *Racing Partnership Ltd v Done Brothers*,[589] Zacaroli J reached a different conclusion. In this case, it was alleged that one of the conspira-

**23-124**

---

[584] [2020] EWCA Civ 1300; [2021] Ch. 233 CA at [269]–[270].

[585] *Stobart Group Ltd v Tinkler* [2019] EWHC 258 (Comm) at [573]. Norris J reached a similar conclusion in *First Subsea Ltd v Baltec Ltd* [2014] EWHC 866 (Ch) at [150]–[157].

[586] [1980] 1 All E.R. 393 CA.

[587] *Stobart Group Ltd v Tinkler* [2019] EWHC 258 (Comm) at [555]–[556].

[588] Burden of proof was mentioned as an issue because in *Meretz Investments NV v ACP Ltd* [2007] EWCA Civ 1303; [2008] Ch. 244 at [174], Toulson LJ suggested that lack of knowledge of unlawfulness might take effect as part of a *defence* of justification. However, the passage in Toulson LJ's judgment is problematic, since he claims to be agreeing with a proposition made by Arden LJ, whilst the passage in her judgment that he cites is one which adopts a different approach: she holds that the defendants' belief as to the lawfulness of their behaviour was inconsistent with them having had an intention to injure the claimant.

[589] [2019] EWHC 1156 (Ch); [2020] Ch. 289. (The decision of the Court of Appeal in this case, [2020] EWCA Civ 1300; [2021] Ch. 233 CA, is discussed in the next paragraph.) The same conclusion as that reached by Zacaroli J had been common ground between the parties in a case that he had previously tried: *Brent LBC v Davies* [2018] EWHC 2214 (Ch) at [284]. Morgan J had previously held that a defendant who genuinely believed that acts were lawful would not be liable for unlawful means conspiracy, but reached this conclusion by following the opinion of Toulson LJ, discussed in the

tors had committed the wrong of breach of confidence, though they honestly believed that they were at liberty to supply the information concerned, and the recipient was found to have been aware of a risk that the information could not be provided lawfully, but not to have *known* of the illegality, despite turning a blind eye to the risk.[590] On the question whether proof of knowledge of the unlawfulness was required, Zacaroli J held that it was: he held that the decision of the Court of Appeal in *Belmont Finance*, which Judge Russen QC had held himself bound by, was decided per incuriam the earlier, contrary, decision of the Court of Appeal in *British Industrial Plastics Ltd v Ferguson*.[591] Significantly, however, Zacaroli J also disagreed with HH Judge Russen QC as to the merits of making knowledge a condition of liability: "I consider that to find a person liable, where that person knows that a (non-predominant) purpose of the combination is to injure the claimant but honestly believes, for example, that on its true construction the contract between the claimant and one of the conspirators does not prohibit the relevant action, would risk trespassing on legitimate competitive business practices."[592] Thus whilst HH Judge Russen QC emphasised the practical problems of proving knowledge about points of law, Zacaroli J focused directly on the question whether tort law ought to prohibit a defendant from combining with others—with the intention of causing loss—if the defendant *honestly* believed that the combination's methods would be lawful. He also doubted, however, whether Judge Russen QC's preferred inquiry into whether a defendant "had sufficient knowledge of the essential facts, that acts which were unlawful were to be carried out" would prove to be simpler in practice than an inquiry into knowledge of the law.[593]

**23-125**  The question divided the panel when the *Racing Partnership*[594] case reached the Court of Appeal, with the majority, Arnold and Phillips LJJ, holding that a defendant can be held liable for committing conspiracy to use unlawful means even if it did not know that the means were unlawful, and Lewison LJ expressing the opinion that where the unlawful means consist of a violation of some private right, knowledge of unlawfulness is an essential ingredient of the tort.[595] Arnold LJ, who discussed the topic in the greatest depth, supported his opinion primarily by reference to the authority of *Belmont Finance* and the earlier criminal case of *Churchill*

---

previous footnote: *Digicel (St Lucia) Ltd v Cable & Wireless Plc* [2010] EWHC 774 (Ch), at App.I at [117]–[118].
[590] *Racing Partnership Ltd v Done Brothers (Cash Betting) Ltd* [2019] EWHC 1156 (Ch); [2020] Ch. 289 at [200]: "there is in my judgment an important distinction between recklessness as to whether conduct is unlawful, turning a blind-eye to suspicions to the contrary, and believing conduct is lawful but recognising the risk that someone affected by it might take a different view, and even seek to vindicate that view by taking legal proceedings."
[591] [1938] 4 All E.R. 504 CA. The House of Lords dismissed an appeal, at [1940] 1 All E.R. 479, but without making any reference to the unlawful means conspiracy claim.
[592] *Racing Partnership Ltd v Done Brothers (Cash Betting) Ltd* [2019] EWHC 1156 (Ch); [2020] Ch. 289 at [284].
[593] Thus he raised the question whether knowledge that information was subject to an obligation of confidentiality was a question about "essential facts" or about a point of law.
[594] [2020] EWCA Civ 1300; [2021] Ch. 233 CA at [144] (per Arnold LJ), [171] (per Phillips LJ) and [265] (per Lewison LJ).
[595] The same conclusion, that a defendant can be liable for committing the tort of unlawful means conspiracy without *knowing* that the means that would be used to cause loss were unlawful, was reached by the Singapore Court of Appeal in *Crest Capital Asia Pte Ltd v OUE Lippo Healthcare Ltd* [2021] SGCA 25; [2021] 1 S.L.R. 1337.

…

CONSPIRACY

*v Walton*.[596] However, whilst he acknowledged that there are also good arguments in support of the opposite conclusion, he pronounced: "nevertheless I am not persuaded by them".[597] He set out his reasons for rejecting three arguments supporting the opposite conclusion. The first contends that a requirement of knowledge is necessary in order to maintain a limit on the scope of the tort. To that, his response was that although it is appropriate to maintain limits on the tort, this does not establish that "knowledge" of the unlawfulness should be a limit, particularly when ignorance of the law is not generally regarded as an excuse. The second argument identifies a risk of a broader tort of unlawful means conspiracy undercutting the tort of procuring a breach of contract, where the defendant does have to be shown to have intended to procure a breach—so will avoid liability if he can show that he honestly believed that the party could cease dealing with the claimant without breaking a contract. In response to this, Arnold LJ pointed out that procuring a breach of contract does not require proof of an intention to cause loss to the claimant; one might put the same point a different way—the tort of procuring breach of contract is a form of secondary liability, so it makes sense to insist that the defendant must know that what he is participating in is a wrong, that is, a breach of contract; by contrast, unlawful means conspiracy is a special liability of those who participate in gangs intending to cause harm to another, and there is no equivalent reason why each gang member's activity should only be a tort if he has recognised the unlawfulness of the means being used by the gang. The third argument is that knowledge of the unlawfulness of the means should be required at least where the unlawful means involves "an infringement of private law rights, even if it is not required where it consists of a crime or contravention of a regulatory provision imposed for public benefit". On this, Arnold LJ said that he could not see why the "private rights" dimension should make a difference. One possible answer to this might be to point out, as noted above, that the existence of a private right—such as a contract between a conspirator and a third party—might make wrongful a form of behaviour that would ordinarily not be wrongful. However, from the perspective of a conspirator's opportunity to know whether the means employed were lawful or not, there is no obvious reason for thinking that matters of private right are generally harder to obtain reliable information about than matters of, for example, public regulatory law. Arnold LJ was not oblivious to the appearance of harshness involved in imposing liability on a conspirator who was unaware that there was any prohibition on the means that were to be employed; in his opinion, however, any such harshness could be sufficiently mitigated by, if authority had allowed, the recognition of a positive defence of belief in legality:

> "… if it were open to this Court to do so, I would hold that it is a defence to a claim in unlawful means conspiracy for the defendant to prove that they believed that the means were lawful. I would stress, however, that this would require the defendant to establish a positive belief: it should not be sufficient, in my opinion, for the defendant merely to establish that they gave the matter no thought."[598]

Lewison LJ dissented from the majority on the question whether a conspirator **23-126** must know that the "unlawful means" are unlawful. Given the different opinions

---

[596] *Churchill v Walton* [1967] 2 A.C. 224; [1967] 2 W.L.R. 682.
[597] [2020] EWCA Civ 1300; [2021] Ch. 233 CA at [140].
[598] [2020] EWCA Civ 1300; [2021] Ch. 233 CA at [146].

ECONOMIC TORTS

expressed, and the unsatisfactory state of the appellate authorities before the *Racing Partnership* case,[599] it may be that the point cannot be regarded as finally settled. From the perspective of first principles, it might seem obvious that where the unlawful means relied on is a breach of contract it would be convenient for liability for unlawful means conspiracy to run in parallel with liability for procuring a breach of contract, where knowledge of the relevant contract is required, since this will reduce any temptation to allege conspiracy in order to circumvent the limits on the procuring tort. However, the case for such consistency must not be exaggerated, particularly since it appears that knowledge of the illegality is not a general requirement for liability in the parallel field of joint tortfeasorship.[600] Indeed, the modern trend with regard to both forms of the conspiracy tort has been to emphasise that the act of joining a combination that has the intention of inflicting loss on a claimant is *in itself* a significant part of what makes a defendant's behaviour tortious, whilst the modern account of the procuring tort is built around the idea of the defendant having done enough to be liable as an accessory to breach of a contract that he was not a party to. Moreover, where a defendant has joined a combination with the intention of inflicting loss on a claimant and knows what methods will be employed to achieve this, it is arguable that his or her eccentric beliefs as to the legality of such methods should not prevent liability, particularly where the methods are prohibited by the general criminal law.[601]

---

[599] To summarise: the opinion of Toulson LJ in *Meretz Investments NV v ACP Ltd* [2007] EWCA Civ 1303; [2008] Ch. 244 at [174], is obiter, and states that it coincides with an opinion of Arden LJ that she did not express in the paragraph that is cited; *Belmont Finance Corp v Williams Furniture (No.2)* [1980] 1 All E.R. 393 was decided without reference to *Ferguson*; and, in *British Industrial Plastics v Ferguson* [1938] 4 All E.R. 504 the point is only expressly addressed by Finlay LJ, at 515, with MacKinnon LJ going no further than to say, at 513, that "the same considerations" applied in the conspiracy claim as in the claim for procuring breach of contract, and Slesser LJ relying on a different argument, at 512.

[600] *Digicel (St Lucia) Ltd v Cable & Wireless Plc* [2010] EWHC 774 (Ch) at App.I at [93]: "If the principal tortfeasor commits a tort and that tortfeasor's belief as to the lawfulness of his action is not material to his liability then the established rules as to the liability of a joint tortfeasor do not require any investigation into the state of the joint tortfeasor's belief as to the lawfulness of his action." In this case, Morgan J surveyed the case law in detail, at [94]–[119], and concluded that a conspirator who honestly believed that the means used by the combination were lawful should avoid liability.

[601] In the tort of intentionally causing loss by the use of unlawful means, where the unlawful means has to be a potentially actionable civil wrong, there is no authority suggesting that the defendant must have identified the means as being unlawful; but, there have been few cases, and none where the defendant expressly invoked his or her mistaken belief that the methods that he used were lawful. However, in his dissent in *Racing Partnership Ltd v Sports Information Services Ltd* [2020] EWCA Civ 1300; [2021] Ch. 233 CA at [265], Lewison LJ concluded: "I would hold, therefore, that where the unlawful means consist of a violation of some private right, knowledge of unlawfulness is an ingredient of the tort of intention to injure by unlawful means; and of conspiracy to commit that tort." With respect, this sentence seems to downplay the significance of the insistence in *Total Network* that unlawful means conspiracy is an independent tort, and not merely a means of imposing joint liability on those who join gangs to commit other torts (such as intentionally causing loss by unlawful means); moreover, quite apart from the question of knowledge it is unlikely that the claimant in the *Racing Partnership* case could have established that any of the conspirators had committed the tort of intentionally injuring them by the use of unlawful means, because that tort requires the unlawful means to restrict a third party's freedom to deal with the claimant (see, on this para.23-93 whilst the conspiracy in *Racing Partnership* was intended to reduce the disadvantages of not dealing with the claimant—all the actors remained free to do so.

[1776]

### (c)   Lawful means conspiracy

We now turn to combinations which employ no acts or means that are in **23-127**
themselves unlawful, commonly known as "lawful means conspiracies", or,
sometimes, "simple conspiracies" or "conspiracies to injure".[602] Everything here
turns on the distinction "between the case where the object is the legitimate benefit
of the combiners and the case where the object is deliberate damage without any
… just cause".[603] Earlier cases must now be read in the light of this principle clearly
established by the House of Lords in *Crofter Hand Woven Harris Tweed Co Ltd v
Veitch*.[604]

> "Lord Cave L.C. in *Sorrel v Smith*[605] when what he called 'the famous trilogy of cases
> …'[606] were submitted to a close examination … formulated as a result two propositions
> of law which he stated as follows:
>
> (a)   A combination of two or more persons wilfully to injure a man in his trade is
> unlawful and, if it results in damage to him, is actionable.
> (b)   If the real purpose of the combination is, not to injure another, but to forward or
> defend the trade of those who enter into it, then no wrong is committed and no
> action will lie, although damage to another ensues."[607]

Thus a defendant who has combined with others to further "some legitimate inter-
est of his own" will not be liable, but if a defendant joins with others with "the

---

[602] The 22nd edition of this work used the label "conspiracy to injure", but the joint judgment of Lords Sumption and Lloyd-Jones in *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [8], expressed a preference for "lawful means conspiracy" because "all actionable conspiracies are conspiracies to injure, although the intent required may take a variety of different forms".

[603] *Crofter Hand Woven Harris Tweed Co v Veitch* [1942] A.C. 435 at 469 per Lord Wright. Lord Wright identified the word "object" as preferable to other possibilities such as "purpose", "motive" etc: [1942] A.C. 435 at 469; but Viscount Simon LC was equally happy with "purpose", though not "motive" at 444–445, and "purpose" seems to have become the orthodox term: see, e.g. *Lonrho Ltd v Shell Petroleum Co Ltd* [1973] A.C. 173 at 188–189 per Lord Diplock; *Lonrho Plc v Fayed* [1992] 1 A.C. 448 at 465–466 per Lord Bridge: "Where conspirators act with the predominant purpose of injuring the plaintiff and in fact inflict damage on him, but do nothing which would have been actionable if done by an individual acting alone, it is in the fact of their concerted action for that illegitimate purpose that the law, however anomalous it may now seem, finds a sufficient ground to condemn their action as illegal and tortious." The joint judgment of Lords Sumption and Lloyd-Jones in *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727, uses "purpose" and "intention" interchangeably; and in *MX1 Ltd v Farahzad* [2018] EWHC 1041 (Ch); [2018] 1 W.L.R. 5553, Marcus Smith J uses "purpose" and "object" interchangeably in the paragraph where he provides a detailed analysis of the law, [22].

[604] [1942] A.C. 435.

[605] [1925] A.C. 700 at 711–712.

[606] *Mogul SS Co v McGregor, Gow & Co* [1892] A.C. 25; *Allen v Flood* [1898] A.C. 1 (discussed at paras 23-02 and 23-78); and *Quinn v Leathem* [1901] A.C. 495 (in which this tort was invented; it has subsequently sometimes been called "the *Quinn v Leathem* type": per Lord Devlin in *Rookes v Barnard* [1964] A.C. 1129 at 1204; per Lord Bridge in *Lonrho Plc v Fayed* [1992] 1 A.C. 448 at 463; cf. per Lord Walker in *Revenue and Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] 1 A.C. 1174 at [73]: "*Quinn v Leathem* can … be recognised as a case of 'unlawful object' (or 'lawful means') conspiracy.")

[607] per Viscount Simon LC in *Crofter Hand Woven Harris Tweed Co v Veitch* [1942] A.C. 435 at 441–442, emphasising that the principles were formulated with reference to the facts of that case; similar principles apply outside the area of "trade". See also per Viscount Maugham at 445–449; per Lord Wright at 469-470; per Lord Porter at 492; and *Canada Cement La Farge Ltd v British Columbia Lightweight Aggregate Ltd* (1983) 145 D.L.R. (3d) 385 SCC.

predominant purpose not of advancing his own interests but of injuring the claimant" then he will commit the tort because a conspirator whose predominant purpose is to injure the claimant will not be able to identify any "just cause or excuse" for combining with others to inflict harm in this way.[608]

**23-128**   **Legitimate and illegitimate objects**   As Lord Cave suggested, pursuit of business or other similar gain is regarded as a legitimate object. Thus, in *Mogul SS Co v McGregor, Gow & Co*,[609] the defendants, an association of shipowners, combined to reduce freights to an unremunerative level to drive the claimants (shipowners trading to the same ports) out of the trade. Their action, taken to protect their own trade interests, and not merely to injure the claimants, was held to be lawful. Similarly, at common law a trade association has been held entitled to enforce restrictions on retail prices by blacklisting traders,[610] to threaten to cut off supplies from a wholesaler if he continued to supply a particular retailer[611] and even to demand money from the offenders as an alternative to blacklisting.[612] So in *Crofter* itself, a combination between trade union officials and employers to prevent (without unlawful acts on anyone's part) the handling by dockers in the union of supplies for the employers' trade competitors was held to be legitimate. All the parties were pursuing their legitimate trade interests. Their Lordships did not finally define "legitimate interests", but the case shows that they include pursuit by companies of business profits and by trade unions of higher wages, wider membership and better collective bargaining procedures.[613] Indeed, as early as 1924, it was accepted that such objectives, together with exclusion from the industry of non-unionists, were legitimate.[614] Moreover, a genuine belief that such objectives are the object and likely result of the combination is now enough to validate it.[615] It is worthy of note that in some cases trade union officials have escaped liability for lawful means conspiracy by reason of the fact that they acted in order "to forward what they believed to be the interests of the union and fundamental trade union principle".[616] That genuinely held belief is sufficient to establish pursuit of a

---

[608] This formulation adopts the language used in the joint judgment of Lords Sumption and Lloyd-Jones in *JSC BTA Bank v Ablyazov (No.14)* [2018] UKSC 19; [2020] A.C. 727 at [10]. In that paragraph, their Lordships link the question whether a defendant is acting with the predominant purpose of injuring the claimant to the question whether the defendant can establish any "just cause or excuse *for the combination*" (emphasis in the original).
[609] [1892] A.C. 25 HL; also *Allen v Flood* [1898] A.C. 1 at 140 per Lord Herschell.
[610] *Ware and De Freville v Motor Trade Assoc* [1921] 3 K.B. 40. However, on this issue statute has gradually overtaken the common law: Competition Act 1998, repealing and replacing most of the Fair Trading Act 1973 and the Restrictive Trade Practices Acts 1976 and 1977.
[611] *Sorrell v Smith* [1925] A.C. 700; cf. *Jenkinson v Nield* (1892) 8 T.L.R. 540; *Bulcock v St Anne's Master Builders' Federation* (1902) 19 T.L.R. 27; *Trollope & Sons v London Building Trades Fedn* (1895) 72 L.T. 342.
[612] *Thorne v Motor Trade Assoc* [1937] A.C. 797. cf. *The Dolphina* [2011] SGHC 273; [2012] 1 Lloyd's Rep. 304 at [210]: predominant purpose of damaging the plaintiff bank not made out where purpose of one of the defendants was to secure payment due under a contract with one of the bank's customers.
[613] [1942] A.C. 435 at 446–447 per Viscount Simon LC; at 456 per Viscount Maugham and at 478–480 per Lord Wright. See too *Byrne v Kinematograph Renters Soc Ltd* [1958] 1 W.L.R. 762.
[614] *Reynolds v Shipping Federation* [1924] 1 Ch. 28; see also *White v Riley* [1921] 1 Ch. 1 CA. cf. now TULRCA 1992 ss.222 and 225.
[615] [1942] A.C. 435 at 477–478 per Lord Wright. Such a belief is not enough to exclude liability for a conspiracy to use unlawful means: *Lonrho Plc v Fayed* [1992] 1 A.C. 448 HL.
[616] *Stratford & Son Ltd v Lindley* [1965] A.C. 269 at 323 per Lord Reid (a case in which the House of

CONSPIRACY

legitimate interest,[617] even if damage to the employer is known to be inevitable and is even intended.[618]

The action taken should not exceed what is necessary for the protection of such legitimate interest[619]; and although liability is not to be determined by asking whether the damage inflicted is disproportionate to the objective, "this may throw doubts on the bona fides of the avowed purpose".[620] To be legitimate, it is not necessary that the interests should be material in that they can be exchanged for cash; it was, therefore, legitimate for trade union officers to organise a boycott of a dance-hall which applied a "colour bar", thereby pursuing an object which, although it brought no financial benefits to members, was genuinely thought by them and their members to be in the interests of the union.[621]

**23-129**

On the other hand, *Quinn v Leathem* shows that a combination is wrongful if the real object is to injure, and not to advance some legitimate interest of the conspirators.[622] On this ground, Leathem succeeded in that case against trade union officials who had intervened to prevent a customer of his from dealing further with him. Similarly, if the object is to injure the claimant by way of punishing him, or by way of compelling him to pay a debt, it is an actionable conspiracy.[623] Where a workman in a dispute with his local union committee was hounded by that committee from every job which he obtained in the district, the members of the committee were held liable for conspiracy because they had ceased to act in the interests of their union and were out to damage the claimant, thinking only of their own "ruf-

**23-130**

---

Lords so held despite the fact that they also held that the defendants were not acting in furtherance of a "trade dispute"); *Deane v Craik*, *The Times* 16 March 1962; *PTY Homes Ltd v Shand* [1968] N.Z.L.R. 105; *McKernan v Fraser* (1931) 46 C.L.R. 343 at 398–400 per Evatt J.

[617] *Stratford & Son Ltd v Lindley* [1965] A.C. 269; see too *Rookes v Barnard* [1964] A.C. 1129 at 1232 per Lord Devlin; *Bowles v Lindley* [1965] 1 Lloyd's Rep. 207.

[618] See *Hadmor Productions Ltd v Hamilton* [1983] 1 A.C. 191 at 228 per Lord Diplock. *Rihan v Ernst & Young Global Ltd* [2020] EWHC 901 (QB) at [761]–[777], provides a good recent example of the difficulties of ascertaining whether the predominant intention of the alleged conspirators was to injure a claimant or to advance the legitimate interests of an organisation: Kerr J found that two of the alleged conspirators could "readily foresee" the claimant's resignation and the consequent destruction of his career with the organisation and "were sanguine about the prospect", but held that this fell short of them intending to injure his financial prospects.

[619] *Trollope & Sons v London Building Trades Assoc* (1895) 72 L.T. 342.

[620] *Crofter* [1942] A.C. 435 at 447 per Viscount Simon LC.

[621] *Scala Ballroom (Wolverhampton) Ltd v Ratcliffe* [1958] 1 W.L.R. 1057 at 1061 (note that the union had black members and that the court accepted that the removal of the bar was important because it is "impossible for musicians to insulate themselves from their audience"). Had the defendants induced or threatened to induce their members to break their employment contracts they could have been prima facie liable under the *Lumley v Gye* or intimidation torts, but since racial discrimination is now unlawful under the Equality Act 2010, it might follow that in such a case, the defence of justification would be applicable to a claim for inducing breach of contract, and that this would similarly prevent a threat to induce a breach from being an unlawful threat for the purposes of a claim based on intimidation; alternatively, a court might refuse to allow a claimant to sue for intimidation where a threat had been used solely to persuade a claimant to comply with the law.

[622] [1901] A.C. 495 HL. The case must be understood to turn upon the finding of fact that this intention was paramount: see *Crofter* [1942] A.C. 435 at 474 per Lord Wright. So too an equivalent finding must explain *Pratt v British Medical Assoc* [1919] 1 K.B. 244, in the light of *Thompson v BMA (NSW) Branch* [1924] A.C. 764. See also *Pacific Western Airlines v British Columbia Federation of Labour* (1986) 26 D.L.R. (4th) 87 ("hot declarations" in inter-union support; no predominant intent to injure).

[623] *Giblan v National Amalgamated Labourers Union* [1903] 2 K.B. 600; cf. *White v Riley* [1921] 1 Ch. 1, where per Warrington LJ at 25, the object of the combination was not to injure the claimant but ensure that he joined a particular union.

fled dignity"; but two union officials who were ignorant of the true facts, but who had assisted the committee, were held not liable because their object was proved to be still the furtherance of union interests.[624] Similarly, where employees refused to work alongside the claimants, who had once broken the agreed National Working Rules in the industry but had ceased to be in breach of them at the relevant time, an injunction was granted on grounds of a conspiracy to injure since the court could see no possible justification for continuation of the embargo.[625] Action taken to demonstrate the power of the combiners is illegitimate[626]; and where action is taken for reasons which are proscribed by legislation on discrimination, for example on racial grounds, it must be regarded as pursuit of an illegitimate object.[627] In the case of action taken against a claimant because of his views or opinions which fall outside the territory covered by this legislation, it is possible that genuine belief in the promotion of the combiners' own interests could suffice to preclude liability for conspiracy to injure. Similarly action taken in pursuit of political goals (other than those which are proscribed by legislation) might possibly be seen as pursuit of a legitimate objective.[628] It is doubtful whether it is lawful to combine to coerce another into taking action of a charitable nature in which none of the parties is materially interested.[629] Pursuit of family interests or duties may be a legitimate object.[630] It has been said that a sale of property for full consideration to another probably cannot be held to be a transaction intended to injure a claimant.[631] Where, however, the participants in such a transaction were indifferent as to whether they enjoyed the property or its price, and were motivated primarily by the goal of preventing the claimant from gaining access to the property, there may be some basis for arguing that their *predominant* purpose was to cause loss.

**23-131   Mixed objectives and predominant purpose**   It is plain that a combination may have more than one object or purpose. If so:

"liability must depend on ascertaining the predominant purpose. If that predominant purpose is to damage another person and damage results that is tortious conspiracy.[632] If the predominant purpose is the lawful protection or promotion of any lawful interests of

---

[624] *Huntley v Thornton* [1957] 1 W.L.R. 321.

[625] *Hutchinson v Aitchison* (1970) 9 K.I.R. 69; sed quaere whether this decision paid insufficient attention to whether the defendant employees genuinely believed that they were acting in their own legitimate interests. Any trade dispute, it was held had ceased to exist.

[626] *Crofter* [1942] A.C. 435 at 445–446 per Viscount Simon LC; at 449 per Viscount Maugham. Similarly action "which would undermine principles of commercial or moral conduct": at 439 per Viscount Simon LC.

[627] cf. *Crofter* [1942] A.C. 435 at 451 per Viscount Maugham; and see *Boots v Grundy* (1900) 82 L.T. 769 at 773 per Phillimore J. Legislation currently proscribes discrimination on grounds of race, sex, disability, religion or belief, sexual orientation and age: see Equality Act 2010.

[628] See esp. Morris LJ in *Scala Ballroom (Wolverhampton) Ltd v Ratcliffe* [1958] 1 W.L.R. 1057 at 1063, whose dicta allow for legitimate "political" strikes. (For a more restrictive interpretation see Kahn-Freund, (1959) 22 M.L.R. 71.) On "political" strikes in relation to the quite separate question of contemplation or furtherance of a "trade dispute", see para.23-165.

[629] per Lord Porter in *Crofter* [1942] A.C. 435 at 493; and compare his dicta at 489.

[630] It has even been suggested that such a duty can justify procurement of breach of contract: per Viscount Simon LC in *Crofter* [1942] A.C. 435 at 442–443; *Midland Bank Trust Co Ltd v Green* [1980] Ch. 590 at 633 (reversed on other grounds [1981] A.C. 513 HL); cf. *Pritchard v Briggs* [1980] Ch. 338 at 415–417 per Goff LJ.

[631] *Midland Bank Trust Co Ltd v Green* [1980] Ch. 590 at 626 per Eveleigh LJ; but possibly not if the consideration is "wholly inadequate"; at 627; and see per Lord Denning MR at 625.

[632] As in *Quinn v Leathem* [1901] A.C. 495. However the defendants' interests may still be legitimate

CONSPIRACY

the combiners (no illegal means being employed) it is not a tortious conspiracy even though it causes damage to another person."[633]

In ascertaining that predominant purpose the court can have regard to both the short and the long-term objectives of the combiners.[634]

**Disparity of interests and objects**   To be legitimate there need not be "a complete identity of interest between parties to a combination"; but there must be "sufficient identity of object though the advantage to be derived from that same object may not be the same".[635] Thus, in the *Crofter* case,[636] a sufficient community of interest was established between two different sections of the union, and between the union and the employers, even though it amounted only to a desire for a prosperous industry for different reasons. It has been said, however, that if a conspiracy is once established, "the actions of any one of them (i.e. the conspirators) in furtherance of the objects of their conspiracy will be treated as the actions of all of them".[637] However, where the aims or objects of the combiners are distinct, and certainly where their knowledge of the facts differs, the court does not adopt that approach to the extent of imputing the motives of one conspirator to all the others.[638] A party to a combination who had a separate and predominantly vindictive or mercenary interest of his own, other than trade interests, might not be protected[639]; but, in such a case, if the other parties have predominantly lawful objects of their

**23-132**

---

even if their purpose includes a deterrent or even a punitive element: *Eastham v Newcastle Utd FC Ltd* [1964] Ch. 413.

[633] per Viscount Simon LC in *Crofter* [1942] A.C. 435 at 445. See also per Lord Wright at 473 and 478; per Viscount Maugham at 452; per Lord Porter at 490. See also, *Lonrho Ltd v Shell Petroleum Co Ltd (No.2)* [1982] A.C. 173 HL at 188–189; *Lonrho Plc v Fayed* [1992] 1 A.C. 448 HL; *Canada Cement La Farge v British Columbia Lightweight Aggregate Ltd* (1983) 145 D.L.R. (3d) 386 (SCC) (aliter if unlawful means employed).

[634] *Crofter Handwoven Harris Tweed Co Ltd v Veitch* [1942] A.C. 435 at 469 per Lord Wright; at 486 per Lord Porter; see also per Evatt J in *McKernan v Fraser* (1931) 46 C.L.R. 343 at 400. Quaere where there are "two equal concurrent purposes", one legitimate and one not, a point undecided by Sachs J in *Rookes v Barnard* [1963] 1 Q.B. 623 at 638, and not discussed on appeal. Note that in *Crofter* at 445 Viscount Simon LC carefully stipulated "no illegal means being employed".

[635] See the *Crofter* case [1942] A.C. 435 at 479 per Lord Wright; and Viscount Maugham believed, [1942] A.C. 435 at 453, that "reasonable self interest in trade or business is a 'just cause or excuse' for those combining even though each of them has his own axe to grind". Lord Porter thought that a "desire for prosperity or peace in the industry" was enough to justify the combination: [1942] A.C. 435 at 495. See also per Lord Thankerton at 460.

[636] [1942] A.C. 435 HL. See also for two applied but different trade interests: per Harman J in *Byrne v Kinematograph Renters Soc Ltd* [1958] 1 W.L.R. 762 at 776; *Reynolds v Shipping Federation* [1924] Ch. 28.

[637] *DC Thomson & Co Ltd v Deakin* [1952] Ch. 646 at 674 per Evershed MR.

[638] See, e.g. *Huntley v Thornton* [1957] 1 W.L.R. 321 at 343 (where Harman J would not encumber the two ignorant officials with liability for the committee's motives); and per Evatt J in *McKernan v Fraser* (1931) 46 C.L.R. 343 at 401 and 408. Differences of knowledge and of purpose may be relevant in deciding the primary question of "combination". That is clearly the approach suggested by the Privy Council in *Bird v O'Neal* [1960] A.C. 907 at 920–921; and by the adoption in *Pritchard v Briggs* [1980] Ch. 338 at 414 and 424 of Viscount Dilhorne's test as to knowledge in *Churchill v Walton* [1967] 2 A.C. 224 at 237; *Belmont Finance Corp Ltd v Williams Furniture Ltd* [1979] Ch. 250 at 261 and 271.

[639] See per Lord Thankerton in *Crofter* [1942] A.C. 435 at 460; per Viscount Maugham at 453; per Lord Wright at 480. Nor are mere "busybodies" protected per Lord Porter at 491.

own he will, even though malicious, incur no liability at all.[640] If, however, the other parties know of and countenance his vindictive purpose, they will, it is submitted, be jointly responsible with him for wrongful conspiracy.[641]

**23-133**   **Onus of proof**   The burden of proving both the combination and the purpose of damaging the claimant is normally on the claimant himself.[642] In so far as the cases talk of a need for "just excuse" or "justification"[643] those words seem to be no more than a description of the need for evidence (as to his trade or other legitimate interests) which a defendant can put in to meet the claimant's case when the latter has adduced evidence of apparent intention to injure on the defendant's part,[644] and do not alter the primary burden of proof. By contrast it has been held that where the claimant can prove acts unlawful in themselves, done in pursuance of the conspiracy, that is the other form of the tort, unlawful means conspiracy, the burden of justifying such acts passes to the defendant.[645]

### (d)   Damage

**23-134**   Damage is an essential element of both forms of the tort of conspiracy,[646] the gist of the cause of action.[647] It has been held that the damage constituted by the expense incurred by claimants in exposing and resisting the wrongful activities of the

---

[640] *Allen v Flood* [1898] A.C. 1; and see per Evatt J in *McKernan v Fraser* (1931) 46 C.L.R. 343 at 401–410. There will be no actionable lawful means conspiracy, and malice alone is not a cause of action.

[641] A proposition hesitantly supported by Lord Porter in *Crofter* [1942] A.C. 435 at 495. In *MXI Ltd v Farahzad* [2018] EWHC 1041 (Ch); [2018] 1 W.L.R. 5553 at [22](5), Marcus Smith J stated that it was "an open question whether a party to the combination, who knows of and countenances the unlawful object of the other parties, can be said him or herself to have an unlawful object in mind." He noted the opinion in this text that such a party would be liable, then continued: "In my judgment, provided that party lacks another legitimate object, the inference that he or she is adopting the unlawful object of the others must be hard to resist." Compare *CBS Songs Ltd v Amstrad Consumer Electronics Plc* [1988] A.C. 1013 at 1057–1059 (common design and liability as joint tortfeasor); *Paterson Zochonis Ltd v Merfarken Packaging Ltd* [1986] 3 All E.R. 522 CA at 530, 534 and 538–541; cf. *Kuwait Oil Tanker Co SAK v Al-Bader* [2000] 2 All E.R. (Comm) 271 CA.

[642] *Crofter* [1942] A.C. 435; per Lord Wright at 471–472; per Lord Thankerton at 459; and *Sorrell v Smith* [1925] A.C. 700 at 726 per Lord Dunedin and at 748 per Lord Buckmaster. See also *Allen v Flood* [1898] A.C. 1 at 139 per Lord Herschell.

[643] e.g. *Sorrell v Smith* [1925] A.C. 700 at 712 per Lord Cave LC.

[644] Viscount Maugham in *Crofter* [1942] A.C. 435 at 449–450, did not, it is suggested, mean to say more than this; cf. *Metall und Rohstoff AG v Donaldson, Lufkin & Jenrette Inc* [1990] 1 Q.B. 371 CA at 454–460 and 467 (overruled on other grounds: *Lonrho Plc v Fayed* [1992] 1 A.C. 448 HL at 464). However, some earlier judgments do suggest that the burden is on the defendant, e.g. per Bowen LJ in *Mogul SS Co v McGregor, Gow Co* (1889) 23 Q.B.D. 598 CA at 613; per Bankes LJ in *Ware and De Freville v Motor Trade Assoc* [1921] 3 K.B. 40 at 61 (Scrutton and Atkin LJJ disagreed at 70 and 79).

[645] *Crofter* [1942] A.C. 435 at 495–496 per Lord Porter; and see *Lonrho Plc v Fayed* [1992] 1 A.C. 448 HL. For the question whether there is a defence of justification available in a case of unlawful means conspiracy, see para.23-121.

[646] *Crofter* [1942] A.C 435 at 440 per Viscount Simon LC. cf. *Ward v Lewis* [1955] 1 W.L.R. 9; *Lonrho Ltd v Shell Petroleum Co Ltd (No.2)* [1982] A.C. 173 HL; *Lonrho Plc v Fayed (No.5)* [1993] 1 W.L.R. 1489 CA at 1501 per Stuart-Smith LJ.

[647] *Crofter Hand Woven Harris Tweed Co Ltd v Veitch* [1942] A.C. 435 at 461 per Lord Wright; per Lord Diplock in *Lonrho v Shell* [1982] A.C. 173 at 188; per Oliver J in *Midland Bank Trust Co Ltd v Green (No.3)* [1979] Ch. 496 at 524; cf. Holdsworth, *History of English Law*, 2nd edn (1937), Vol.VIII pp.393–394.

[1782]

defendants can be awarded to them as damage directly caused by the conspiracy.[648] Damages for injury to feelings or to reputation, however, cannot be recovered in an action based upon either a lawful means conspiracy[649] or an unlawful means conspiracy.[650] The special limitations surrounding the granting of injunctions against publication of allegedly defamatory material may, however, be displaced if a lawful means conspiracy is proved.[651]

## 6. TRADE DISPUTES IMMUNITIES

### (a)   General

**Statutory immunities**   In the sphere of industrial conflict, the impact of the common law discussed in the preceding sections was greatly affected by the Trade Disputes Act 1906. That statute was the first to give protection against some of the liabilities described above in respect of acts done in contemplation or furtherance of a "trade dispute".[652] Had no such statute been enacted the modern system of trade unions and collective bargaining could not have emerged without constant risk of tort liability.[653] The current provisions are mainly found in the Trade Union and Labour Relations (Consolidation) Act 1992 (TULRCA 1992), as amended by the

**23-135**

---

[648] *British Motor Trade Assoc v Salvadori* [1949] Ch. 556. Damages appear to be at large: *McGregor on Damages*, 21st edn (2022), para.48-020.

[649] *Lonrho Plc v Fayed (No.5)* [1993] 1 W.L.R. 1489 CA, at least in the absence of proof of pecuniary loss, since that would allow the claimant "to circumvent the requirements of a defamation action … without the defendants being able to plead justification" per Dillon LJ at 1493. As to the place of such a claim for damages "parasitically", or as part of damages at large, see the differing formulations of Dillon LJ, [1993] 1 W.L.R. 1489 CA at 1494–1497, Stuart-Smith LJ at 1501 and 1504–1505, and Evans LJ at 1509. cf. *Joyce v Sengupta* [1993] 1 W.L.R. 337 CA (malicious falsehood and damage to reputation).

[650] *Mbasogo v Logo Ltd* [2006] EWCA Civ 1370; [2007] Q.B. 846. J. Murphy, *The Province and Politics of the Economic Torts* (Oxford: Hart, 2022) 86, notes that the decision in *Mbasogo* treated it as significant that the cause of action for harassment created by Parliament in the Protection from Harassment Act 1997 requires conduct on at least two occasions: the strength of that point as an argument against allowing claims for distress in conspiracy cases may be open to debate. e.g. if conspirators band together to amplify harm to a claimant by *simultaneously* breaking contracts of a type where damages for breach of contract commonly extend to mental distress (e.g. contracts to provide services relating to a wedding reception), it might seem contentious that the claimant's action for an unlawful means conspiracy could not redress this form of damage.

[651] See *Gulf Oil (GB) Ltd v Page* [1987] Ch. 327 CA, limiting the practice based upon *Bonnard v Perryman* [1891] 2 Ch. 269 CA.

[652] Described as "a golden formula which became the bedrock" after 1906 of the liberty to strike: Wedderburn, *The Worker and the Law* (1965), p.222, 3rd edn (1986), pp.520–521. The Act of 1906 also declared that no court should entertain an action against a trade union "in respect of any tortious act": s.4(1). However, this protection was removed in 1982: Employment Act 1982 s.15, which also enacted a code of vicarious liability which, under TULRCA 1992 ss.20 and 21, now applies to a trade union's liability for most of the economic torts. The capacity of trade unions as defendants in tort is set out above: see para.5-91 onwards.

[653] For detailed consideration see O. Kahn-Freund, *Labour and the Law*, 3rd edn (1983), P. Davies and M. Freedland (eds), Ch.8; S. Deakin and G. Morris, *Labour Law*, 6th edn (2012), Ch.11; G. Morris and T. Archer, *Collective Labour Law* (2000) Ch.6; C. Barrow, *Industrial Relations Law*, 2nd edn (2002), Chs 13–17; K. Wedderburn, *The Worker and the Law*, 3rd edn (1986) Chs 7 and 8; and (1989) 18 I.L.J. 1; I. Smith, A. Baker & O. Warnock, *Smith & Wood's Employment Law*, 14th edn (2019), Ch.10; K. Wedderburn, *Employment Rights in Britain and Europe* (1991); and *Labour Law and Freedom* (1995), Chs 2 and 4; R. Simpson, "The Employment Act 1990 in Context" (1991) 54 M.L.R. 418; H. Carty, "The Employment Act 1990: Still Fighting The Industrial Cold War" (1991) 20 I.L.J. 1; G. Morris, "Industrial Action: Public and Private Interests" (1993) 22 I.L.J. 194; R.