# Exhibit 1



Grafenauweg 6 in 6300 Zug
CHE- 423.067.388
W: www.nchain.com
E: hr@nchain.com

# Consulting Agreement

| | |
|---|---|
| **Full Name** | **Christen Eugen Ager-Hanssen** |
| **Date** | **March 17, 2023** |

## CONSULTING AGREEMENT
## EXECUTION PAGE

**THIS AGREEMENT** is made effective **March 17, 2023** by and between:

### NCHAIN AG

incorporated and registered in Switzerland with company number CHE-423.067.388 whose registered office is at Grafenauweg 6, 6300 Zug, Switzerland ("**Company**")

-and-

### HEH HOLDING AG

incorporated and registered in Liechtenstein with company number FL-2.645.989-5 whose registered office is at Äulestrasse 2, 9490 Vaduz, Liechtenstein
(on behalf of itself and its direct and indirect subsidiaries, the "**Group**")

-and-

### CHRISTEN EUGEN AGER-HANSSEN

of 27 South Eaton Place,
Belgravia, London SW1W 9DF, England  ("**Consultant**")

Signed for and on behalf of
**NCHAIN AG**

Stefan Matthews (Mar 17, 2023 21:08 GMT+1)

Print Name: Stefan Matthews

Signed for and on behalf of
**HEH HOLDING AG**

Stefan Matthews (Mar 17, 2023 21:08 GMT+1)

Print Name: Stefan Matthews

Signed by **CHRISTEN EUGEN AGER-HANSSEN**

Christen Ager-Hanssen (Mar 17, 2023 20:50 GMT)

Witnessed

Print Name:

**CONSULTING AGREEMENT**
**TERM SHEET**

*Consultant Name:*     Christen Eugen Ager-Hanssen

*Position / Title:*     Group Chief Executive Officer

*Commencement Date:*     September 28, 2022

*Consulting Fee:*     GBP 1,500,000 per annum

*Discretionary Bonus:*     GBP 1,500,000 per annum

*Notice Time:*     Twelve (12) months

*Severance Amount:*     Twelve (12) months' basic salary

*Restriction Period:*     Twelve (12) months

## CONSULTING AGREEMENT
## TERMS AND CONDITIONS

1. **INTERPRETATION.**

    1.1.    The definitions and rules of interpretation in this Section apply in this agreement:

        (a)    "**Appointment**" means the engagement of the Consultant by the Company on the terms of this agreement as Chief Executive Officer of the Group.

        (b)    "**Board**" means the board of directors for the time being of the Group or any committee of the Board to which powers have been properly delegated.

        (c)    "**Capacity**" means as agent, consultant, director, employee, owner, partner, shareholder or in any other capacity.

        (d)    "**Chairman**" means the Chair of the Board of Directors of the Group.

        (e)    "**Commencement Date**" means the commencement date identified on the Term Sheet.

        (f)    "**Confidential Information**" means any and all information, technology and materials, in whatever form (whether oral, written, electronic, digital or otherwise), tangible or intangible, whether disclosed to or learned or developed by the Consultant, pertaining in any manner to the business of or used by any Group company or to any other person or entity to whom or which any Group company owes a duty of confidentiality, including any trade secret, technical or business information, know-how, knowledge or data relating to the Group's past, present, planned or foreseeable business or technology. Confidential Information includes all information related to: developments; designs; software (including object code, source code, executables, macros, scripts, libraries, databases, tables, frameworks and files); data; research; methods; Inventions; techniques; processes; customer information; financial information; marketing information; work product, Intellectual Property Rights; schematics; instruments; products; machinery; projects; equipment; documents; files; photographs; computer printouts or outputs; drawings; manuals; sketches; discoveries; ideas; compositions; notes; papers; records; specifications; employee and contractor personnel files and compensation (including details of the Consultant's remuneration and compensation) and other terms of engagement of the Group's contractors, employees and consultants; names and contact information of customers or prospective customers of the Group; names, operating practices, contact information and related data regarding the Group's existing and potential vendors, suppliers, distributors, joint venture partners and affiliates; the marketing methods and plans of the any Group company, licensors, licensees and distributors and related data and prices at which any

4

Group company obtains or has obtained, or at which it sells or has sold, its products; any information which any Group company has a legal obligation to treat as confidential or treats as proprietary or designates as confidential, whether or not owned or developed by the Group company; any modification, derivative, advancement, embodiment or improvement to any of the foregoing; and any other information, ideas or materials relating to the past, present, planned or foreseeable business, products, developments, technology or activities of the Group.  For purposes of this agreement, Confidential Information shall remain as such regardless of whether or not any of same is marked as confidential, proprietary or otherwise.

(g)   "**Engagement IPRs**" Intellectual Property Rights created or contributed to by the Consultant in the course of his or her engagement with the Company or involvement with the Group (whether or not during working hours and whether or not using any Group company premises or resources) but excluding, for the avoidance of doubt, any Intellectual Property Rights created or contributed to by the Consultant in the course of his outside business interests.

(h)   "**Engagement Inventions**" means any Invention, compilation of information or unique work process which is made wholly or partially by the Consultant at any time in the course of his or her engagement with the Company or involvement with the Group (whether or not during working hours or using any Group company premises or resources, and whether or not recorded in material form), but excluding, for the avoidance of doubt, any Invention, compilation of information or unique work process which is made wholly or partially by the Consultant in the course of his outside business interests.

(i)   "**Executive Team**" means the senior management of the Group as more fully set out in Schedule A hereto.

(j)   "**Garden Leave**" means any period during which the Company has exercised its rights under Section 11.

(k)   "**Group**" has the meaning set out on Execution Page and denotes HEH Holding AG and its direct and indirect subsidiary companies (including the Company) as more fully set out in Schedule B hereto, and Group company shall mean any one of them.

(l)   "**Incapacity**" means any disability, sickness or injury which prevents the Consultant from carrying out his or her duties.

(m)   "**Intellectual Property Rights**" means patents, rights to Inventions, copyright and related rights, trademarks, trade names and domain names, rights in get-up, rights in goodwill or to sue for passing off, unfair competition rights, rights in designs, rights in computer software, database rights, topography rights, rights in confidential information (including know-how and trade secrets) and any other intellectual property rights, in each case whether registered or unregistered and including all applications (or rights to apply) for, and renewals or extensions of, such rights and all similar or equivalent rights or forms of

protection which subsist or will subsist now or in the future in any part of the world.

(n)   "**Invention**" means any invention, idea, discovery, development, improvement or innovation, compilation of information or business process whether or not patentable or capable of registration, and whether or not recorded in any medium.

(o)   "**Notice Time**" means the notice period identified on the Term Sheet.

(p)   "**Pre-Contractual Statement**" means any undertaking, promise, assurance, statement, representation, warranty or understanding (whether in writing or not) of any person (whether party to this agreement or not) relating to the Consultant's engagement under this agreement which is not expressly set out in this agreement or any documents referred to in it.

(q)   "**Recognised Investment Exchange**" means, the New York Stock Exchange, NASDAQ Stock Market, Toronto Stock Exchange, the London Stock Exchange Group, Deutsche Börse, the Frankfurt Stock Exchange/Xetra, the SIX Swiss Exchange and any other similar regulated stock exchange in North America, United Kingdom, the European Union or Switzerland.

(r)   "**Restricted Business**" means those parts of the business of any Group company with which the Consultant was involved to a material extent or had reasonably detailed knowledge of in the course of the Appointment.

(s)   "**Restricted Customer**" means any firm, company or person who was a customer or supplier of or in the habit of dealing with any Group company and with whom the Consultant had material contact in the course of the Appointment.

(t)   "**Restricted Person**" means anyone employed or engaged by any Group company and who could materially damage the interests of the such Group company or any other Group company if they were involved in any Capacity in any business concern which competes with any Restricted Business and with whom the Consultant dealt in a material in the course of his or the Appointment.

(u)   "**Restriction Period**" means the period of 12 months immediately following Termination.

(v)   "**Severance**" means the severance identified on the Term Sheet.

(w)   "**Staff Handbook**" means the Company's staff handbook as amended from time to time.

(x)   "**Termination**" means the termination of the Consultant's engagement with the Company however caused including, without limitation, termination by the Company in repudiatory breach of contract.

1.2.   The headings in this agreement are inserted for convenience only and shall not affect its construction.

1.3.   A reference to a particular law is a reference to it as it is in force for the time being taking account of any amendment, extension, or re-enactment and includes any subordinate legislation for the time being in force made under it.

1.4.   Unless the context otherwise requires, a reference to one gender shall include a reference to the other gender.

1.5.   Each of the terms "including", "include" and "includes", when used in this agreement, is not limiting whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto.

1.6.   Unless the context otherwise requires, words in the singular include the plural and in the plural include the singular.

1.7.   The language in all parts of this agreement shall be in all cases construed simply according to its fair meaning and not strictly for or against any of the parties hereto.  Any rule of construction that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this agreement.  Whenever possible, each provision of this agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall be limited to the minimum relevant portions of such provision and will not affect the remainder of the provision or any other provision or any other jurisdiction, but this agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provisions had never been contained herein.

1.8.   The Execution Page, the Term Sheet, Schedule A (Group Senior Management Organization Chart), Schedule B (Group Corporate Structure) and Schedule C (Chief Executive Officer Job Description) to this agreement form part of (and are incorporated into) this agreement.

## 2.   TERM OF APPOINTMENT

2.1.   The Company (on behalf of the Group) hereby engages the Consultant as Chief Executive Officer of the Group as more fully set out in Schedule C hereto and the Consultant shall serve the Company and the Group on the terms of this agreement.  The Company acknowledges on behalf of the Group that the Consultant is an investor running his own business and family office which is not in competition with the business of the Group.  The Consultant shall use his best efforts to avoid any conflict between his personal business, the business of the Group and his obligations under this agreement.  Should a conflict or a potential conflict arise, the Consultant shall notify the Chairman immediately.

2.2.   The Consultant shall report directly to the Chairman and the Board.

2.3. The Appointment shall commence on the Commencement Date and shall continue, subject to the remaining terms of this agreement, until terminated by either party giving the other not less than the Notice Time notice.

2.4. The Consultant represents and warrants to each Group company that, by entering into this agreement or performing any of his or her obligations under it, he or she will not be in breach of any court order or any express or implied terms of any contract or other obligation binding on him or her and undertakes to indemnify the Group against any claims, costs, damages, liabilities or expenses which any Group company may incur as a result if he or she is in breach of any such obligations.

2.5. Notwithstanding Section 21.2, the parties agree that the Consultant may nominate a company forming part of his family office business (the "**Consulting Company**") as a contractual counterpart to this agreement in his place, provided that the Consulting Company shall provide the services of the Consultant on the terms hereunder and the Consultant shall remain personally obligated in the performance of his duties and covenants to the Company and Group hereunder.

## 3. DUTIES

3.1. The Consultant shall serve as Chief Executive Officer of the Group as more fully set out in <u>Schedule C</u> hereto. The Consultant shall, at the Company's request, take on functions or offices in any Group company or in organizations and associations of which the Company or any affiliate is a member; unless specifically agreed to the contrary, no additional compensation shall be owed to the Consultant in this respect. In case of the Termination, the Consultant herby agrees, irrespective of the applicable Notice Time, to immediately resign or terminate such functions and offices upon first request of the Company.

3.2. During the Appointment the Consultant shall:

(a) abide by any statutory, fiduciary or common-law duties applicable to his function within the Group;

(b) at all times act in the best interests of the Group, in the way he considers in good faith, reasonably most likely to promote the success of the Group and its shareholders in accordance with all statutory, fiduciary and/or common law duties applicable to his position(s);

(c) provide support and advice regarding any litigation involving the Group or its Chief Scientist;

(d) comply with all requirements, recommendations or regulations, as amended from time to time and all regulatory authorities relevant to the Group and any policy or code of practice issued by the any Group company (as amended from time to time) relating to the business of such company or the Group or dealing in the securities of any Group company;

(e) diligently exercise such powers and perform such duties as may from time to time be assigned to him or her by the Board;

(f)    comply with all reasonable and lawful directions given to him or her by the Board;

(g)    promptly make such reports to the Board in connection with the affairs of the Group or any Group company on such matters and at such times as are reasonably required;

(h)    report his or her own wrongdoing and any wrongdoing or proposed wrongdoing of any other employee or director of any Group company to the Board immediately on becoming aware of it;

(i)    use his or her best endeavours to promote, protect, develop and extend the business of the Group; and

(j)    comply with any electronic communication systems policy that the Company or the Group may issue from time to time.

3.3.    The Consultant is not authorized to do any of the following actions without obtaining prior Board approval:

(a)    terminate the employment of any member of the Executive Team;

(b)    sell, transfer, dispose or encumber any Intellectual Property Rights of any Group company;

(c)    approve or cause the spending of funds (fiat or digital assets) of any Group company in excess of CHF 500,000 value in a single transaction or group of related transactions; or

(d)    transfer any employees from one Group company to another Group company.

3.4.    The Consultant shall comply with any rules, policies and procedures set out in the Staff Handbook, a copy of which has been given to the Consultant. The Company may amend the Staff Handbook at any time. To the extent that there is any conflict between the terms of this agreement and the Staff Handbook, this agreement shall prevail.

3.5.    All documents, manuals, hardware and software provided for the Consultant's use by the Company, and any data or documents (including copies) produced, maintained or stored on the Company's computer systems or other electronic equipment (including mobile phones), remain the property of the Company.

## 4.  PLACE AND HOURS OF WORK

4.1.    Consultant's primary place of work will be at the offices of the Company in Liechtenstein, Zug, Switzerland and London, UK. Consultant will also have the possibility to work from home, as determined by the Board from time to time. In view of the voluntary nature of such home office, the Company will neither contribute to the Consultant's costs for tools and material, nor to the Consultant's other costs and expenses related to his home office (including rent and ancillary costs).

4.2.   The Consultant agrees to travel on the Group's business as may be required for the proper performance of his or her duties under the Appointment. Expenses for such travel shall be borne by the Company, subject to its expense policies.

4.3.   The Consultant agrees to devote such of his/her working time and attention as reasonably appropriate to carrying out his/her responsibilities as Group Chief executive Officer and he or she shall use his or her best efforts, skills and abilities to further the interests of the Company.

## 5. REMUNERATION

5.1.   In consideration of the Appointment, the Consultant (or the Consulting Company) shall receive the Consulting Fee indicated on the Term Sheet, per annum.

5.2.   The Consulting Fee shall accrue from day to day and be payable gross without any deductions for tax monthly in arrears on or about the 25th of each month as the Consultant directs. The Consultant (or the Consulting Company) shall submit monthly invoices to the Company.

5.3.   The Consultant is an independent contractor. Consultant acknowledges and agrees that this Agreement shall not give or extend to Consultant any rights with respect to contributions by Company to any deferred compensation plan, pension plans or benefits of any kind. Company shall not carry workers' compensation insurance or health or accident insurance to cover Consultant. Company shall not pay any contribution to unemployment insurance, taxes, nor provide any other contribution or benefits which might be expected in an employer/employee relationship. In the event that any applicable regulatory authority should classify the Consultant for any reason as other than an independent contractor, Consultant agrees to indemnify and save harmless Company in respect of any claims made against Company including, without limitation, any employment-related claims or claims based on worker status brought by the Consultant, any claims for failing to withhold or pay any taxes, pension plan contributions or insurance contributions payable by Consultant.

5.4.   The Consultant will be eligible for bonuses based on the following:

(a)   Upon the Group or any Group company receiving cash licence fee (in immediately realizable funds) in relation to intellectual property on deals and transactions sourced and/or negotiated by the Consultant, the Consultant will receive a bonus equal to 5% of the licence fee received. Licence fees paid by or through introduction via any associated or related party are excluded.

(b)   A discretionary bonus of GBP 1,500,000 per annum. The performance of the Consultant will be reviewed on a quarterly basis and a bonus assessment made by the Board.

Bonuses, if applicable, shall be paid in GBP on a quarterly basis.

5.5.   The Consultant shall be entitled to participate in the Company's stock ownership plan based on performance at the discretion of the Board. The Consultant's right to participate will be subject to the rules of the relevant

scheme from time to time. The Consultant shall participate at the same level as the previous Chief Executive Officer.

## 6.  EXPENSES

6.1.   The Company shall reimburse (or procure the reimbursement of) all reasonable expenses wholly, properly and necessarily incurred by the Consultant in the course of the Appointment, subject to production of receipts or other appropriate evidence of payment.

6.2.   The Consultant shall abide by the Company's policies on expenses as communicated to him or her from time to time.

6.3.   Any credit card supplied to the Consultant by the Company shall be used only for expenses incurred by him or her in the course of the Appointment.

## 7.  OUTSIDE INTERESTS

7.1.   During the Appointment the Consultant shall not, except as a representative of a Group company or with the prior written approval of the Company, whether paid or unpaid, be directly or indirectly engaged, concerned or have any financial interest in any Capacity in any other business, trade, profession or occupation (or the setting up of any business, trade, profession or occupation) directly competing with or directly detrimental to the business of any Group company.

7.2.   The Company and Group each acknowledges and agrees that the Consultant is an investor running his own business and family office which is not in competition with the business of the Group or any Group company. Accordingly, and provided always that the Consultant complies with the provisions of Section 7.1, the Consultant shall be free to undertake such investments and be engaged, concerned or have any financial interest in any Capacity in any other business, trade, profession or occupation (or the setting up of any business, trade, profession or occupation) as the Consultant in his discretions deems appropriate.

7.3.   The Consultant agrees to disclose to the Chairman any matters relating to his or her spouse or civil partner (or anyone living as such), children or parents which may, in the reasonable opinion of the Consultant, be considered to interfere, conflict or compete with the proper performance of the Consultant's obligations under this agreement.

## 8.  CONFIDENTIAL INFORMATION

8.1.   The Consultant acknowledges that in the course of the Appointment he or she will have access to Confidential Information. The Consultant acknowledges the importance of maintaining the security and confidentiality of Confidential Information, both during the term of engagement and indefinitely after the engagement ends. The Consultant has therefore agreed to accept the restrictions in this Section 8.

8.2.   The Consultant acknowledges that all information generated, received or maintained by the Consultant on or in connection with the premises or business

11

or using equipment or materials of any Group company (including computer systems, networks and electronic or voice mail systems) is Confidential Information and the exclusive property of the Group.

8.3.   The Consultant shall not (except in the proper course of his or her duties), either during the Appointment or at any time after its Termination (howsoever arising), directly or indirectly, use, disclose, allow access to, transmit, deliver or transfer to any person, company or other organisation whatsoever (and shall use his or her best endeavours to prevent the publication or disclosure of) any Confidential Information.  This shall not apply to:

(a)   any use or disclosure authorised by the Board or required by law, or

(b)   any information which is already in, or comes into, the public domain other than through the Consultant's unauthorised disclosure, or

(c)   any disclosure to a regulator regarding any misconduct, wrongdoing or serious breach of regulatory requirements, or reporting a criminal offence to any law enforcement agency, or

(d)   co-operating with any law enforcement agency regarding a criminal investigation or prosecution.

11.4   The Consultant shall use all reasonable efforts to prevent the unauthorized reproduction, disclosure or use of Confidential Information by others and to promptly notify the Company of any unauthorized acts of which the Consultant becomes aware.

11.5   The Consultant agrees that upon the earlier of a request by the Company or the Termination by either party for any reason, the Consultant shall immediately return to the Company in good condition, all the Group property that is within the Consultant's possession or control, including any information used or distributed by any Group company, equipment, supplies, designs, keys, books, records, reports, files, manuals, all Confidential Information and all documents and data in connection with the Group's activities which are in the Consultant's possession or control.  In addition, the Consultant agrees that, upon the earlier of a request by the Company or the Termination by either party for any reason, the Consultant shall immediately provide the Company with any passwords, codes, etc. relating to any business of the Group.

11.6   The Consultant covenants both during the Appointment and after Termination not to make any adverse or derogatory comment about the Group, its officers, employees or workers and the Consultant shall not do anything which shall, or may, bring any Group company, its officers, employees or workers into disrepute.  The Group shall use reasonable endeavours to ensure that its officers, employees and workers shall not make any adverse or derogatory comment about the Consultant or do anything that shall, or may, bring him or her into disrepute.

## 9.   INTELLECTUAL PROPERTY

9.1.   The Consultant acknowledges that all Engagement IPRs, Engagement Inventions and all materials embodying them shall automatically belong to the Group to the fullest extent permitted by law.   The Board in its absolute

discretion may determine which Group company owns any Engagement IPRs or Engagement Inventions. To the extent that they do not vest in the relevant Group company automatically, the Consultant holds them on trust for the Group company.

9.2.  The Consultant acknowledges that, because of the nature of his or her duties and the particular responsibilities arising from the nature of his or her duties, he or she has, and shall have at all times while he or she is engaged by the Company, a special obligation to further the interests of the Group.

9.3.  To the extent that legal title in any Engagement IPRs or Engagement Inventions does not vest in the relevant Group company by virtue of Section 9.1, the Consultant agrees, immediately upon creation of such rights and Inventions, to assign to the relevant Group company in writing.

9.4.  The Consultant agrees:

(a)  to give the Company full written details of all Engagement Inventions promptly on their creation,

(b)  at the Company's request and in any event on Termination to give to the Company all originals and copies of correspondence, documents, papers and records on all media which record or relate to any of the Engagement IPRs,

(c)  not to attempt to register any Engagement IPR nor patent any Engagement Invention unless requested to do so by the Company, and

(d)  to keep confidential each Engagement Invention unless the Company has consented in writing to its disclosure by the Consultant.

9.5.  The Consultant waives all his or her present and future moral rights and all similar rights in all jurisdictions relating to any copyright which forms part of the Engagement IPRs, and agrees not to support, maintain nor permit any claim for infringement of moral rights in such copyright works.

9.6.  The Consultant acknowledges that, except as provided by law, no further remuneration or compensation other than that provided for in this agreement is or may become due to the Consultant in respect of his or her compliance with this Section.

9.7.  The Consultant shall execute all documents and do all acts both during and after his or her employment by the Company as may, in the opinion of the Board, be necessary or desirable to vest the Engagement IPRs in the relevant Group company, to register them in the name of the relevant Group company and to protect and maintain the Engagement IPRs and the Engagement Inventions. Such documents may, at the Company's request, include waivers of all and any statutory moral rights relating to any copyright works which form part of the Engagement IPRs. The Company agrees to reimburse the Consultant's reasonable expenses of complying with this Section.

9.8.  The Consultant agrees to give all necessary assistance to each Group company to enable it to enforce its Intellectual Property Rights against third parties, to defend claims for infringement of third party Intellectual Property

Rights and to apply for registration of Intellectual Property Rights, where appropriate throughout the world, and for the full term of those rights.

9.9.   The Consultant hereby irrevocably appoints the Company to be his or her attorney to execute and do any such instrument or thing and generally to use his or her name for the purpose of giving the Company or its nominee the benefit of this Section 9. The Consultant acknowledges in favour of a third party that a certificate in writing signed by any Director or the Secretary of the Company that any instrument or act falls within the authority conferred by this Section shall be conclusive evidence that such is the case.

## 10. TERMINATION

10.1.   Notwithstanding Section 2, the Company may, in its sole and absolute discretion, terminate the Appointment at any time and with immediate effect by paying a sum in lieu of notice (**Payment in Lieu**) equal to the Consulting Fee value of contractual benefits through the Notice Time (as at the date of Termination) and any applicable bonus which the Consultant would have been entitled to receive under this agreement up to the date termination notice is provided.  Any Payment in Lieu shall be made in 4 equal monthly payments.

10.2.   The Consultant shall have no right to receive a Payment in Lieu unless the Company has exercised its discretion in Section 10.1. Nothing in this Section 10 shall prevent the Company from terminating the Appointment if the Consultant is breach of this agreement.

10.3.   The Company may also terminate the Appointment with immediate effect without notice and with no liability to make any further payment to the Consultant (other than in respect of amounts accrued due at the date of Termination) if the Consultant:

(a)   is guilty of a serious breach of the rules or regulations as amended from time to time of any regulatory authorities relevant to the Company or the Group or any code of practice issued by the Company or the Group (as amended from time to time), or

(b)   fails or ceases to meet the requirements of any regulatory body whose consent is required to enable him or her to undertake all or any of his or her duties under the Appointment or is guilty of a serious breach of the rules and regulations of such regulatory body or of the compliance manual of the Company or the Group, or

(c)   is guilty of any gross misconduct affecting the business of any Group company, or

(d)   commits any serious or (after having received written warning) repeated breach or repeated non-observance of any of the provisions of this agreement, or

(e)   is declared bankrupt or makes any arrangement with or for the benefit of his or her creditors or has a court administration order made against him or her, or

(f)     is convicted of any criminal offence (other than an offence under any road traffic legislation in the relevant jurisdiction for which a fine or non-custodial penalty is imposed), or

(g)     becomes of unsound mind or a patient under any statute relating to mental health, or

(h)     is guilty of any fraud or dishonesty or acts in any manner which in the reasonable opinion of the Board brings or is likely to bring the Consultant or any Group company into material disrepute, or

(i)     is guilty of a serious breach of any rules issued by the Company or the Group from time to time regarding its electronic communications systems.

10.4.   The rights of the Company under Section 10 are without prejudice to its right to terminate for cause and any other rights that it might have at law to terminate the Appointment or to accept any breach of this agreement by the Consultant as having brought the agreement to an end. Any delay by the Company in exercising its rights to terminate shall not constitute a waiver thereof.

10.5.   If the Appointment is terminated by the Company other than for a reason set out in Section 10.1, 10.3 or 10.4, the Consultant will be entitled to receive the Severance.

10.6.   The Severance is inclusive of any notice pay or any Pay in Lieu paid pursuant to Section 10.1, and will be paid (subject to deductions required by law) within in 4 equal monthly instalments.

10.7.   Any provision of this agreement which expressly states that it is to continue in effect after Termination or expiration of this agreement or the Consultant's engagement, or which by its nature would survive the Termination or expiration of this agreement or the Consultant's engagement, shall do so, regardless of the manner or cause of Termination.

## 11. GARDEN LEAVE

11.1.   Following service of notice to terminate the Appointment by either party, or if the Consultant purports to terminate the Appointment in breach of contract, the Company may by written notice require the Consultant not to perform any services (or to perform only specified services) for the Group until the Termination of the Appointment or a specified date.

11.2.   During any period of Garden Leave the Group shall be under no obligation to provide any work to, or vest any powers in, the Consultant, who shall have no right to perform any services for any Group company.

11.3.   During any period of Garden Leave the Consultant shall:

(a)     continue to receive his or her Consulting Fee and all contractual benefits in the usual way,

(b)     remain engaged by the Company and bound by the terms of this agreement,

(c)     not, without the prior written consent of the Board, attend his or her place of work or any other premises of the Company or the Group,

(d)     not, without the prior written consent of the Board, contact or deal with (or attempt to contact or deal with) any officer, employee, consultant, client, customer, supplier, agent, distributor, shareholder, adviser or other business contact of the Company or the Group, and

(e)     (except during any periods taken as holiday in the usual way) ensure that the Board knows where he or she will be and how he or she can be contacted during each working day and shall comply with any written requests to contact a specified employee of the Group at specified intervals.

## 12. OBLIGATIONS UPON TERMINATION

12.1.    On Termination of the Appointment (howsoever arising) or, if earlier, at the start of a period of Garden Leave or following the service of notice or purported termination of the Appointment by the Consultant, the Consultant shall:

(a)     transfer without payment to the Company or as it may direct any shares or other securities held by him or her in the Company as a nominee or trustee for the Company and deliver to the Company the related certificates,

(b)     immediately deliver to the Company all documents, books, materials, records, correspondence, papers and information (on whatever media and wherever located) relating to the business or affairs of the Group or their business contacts, any keys, credit card and any other property of the Group, which is in his or her possession or under his or her control,

(c)     irretrievably delete any information relating to the business of the Group stored on any magnetic or optical disk or memory and all matter derived from such sources which is in his or her possession or under his or her control outside the Company's premises, and

(d)     provide a signed statement that he or she has complied fully with his or her obligations under this Section 12.

12.2.    Where the Consultant has been placed on Garden Leave he or she shall not be required to return until the end of the Garden Leave period any property provided to him or her as a contractual benefit for use during the Appointment, if any.

12.3.    The Consultant hereby irrevocably appoints the Company to be his or her attorney to execute and do any such instrument or thing and generally to use his or her name for the purpose of giving the Company or its nominee the full benefit of this Section 12.

## 13. POST-TERMINATION RESTRICTIONS

13.1.    In order to protect the Confidential Information, trade secrets and business connections of the Group to which he or she has access as a result of the

Appointment, the Consultant covenants with the Company that he or she shall not on the Consultant's own behalf or on behalf of or in connection with any other person or entity, without the prior written consent of the Company, directly or indirectly, in any capacity whatsoever, alone or in connection with others:

(a)     for a period of time equal to the Restriction Period after Termination solicit or endeavour to entice away any Group company the business or custom of a Restricted Customer with a view to providing goods or services to that Restricted Customer in competition with any Restricted Business, or

(b)     for a period of time equal to the Restriction Period after Termination, offer to employ or engage or otherwise endeavour to entice away from any Group company any Restricted Person, or

(c)     for a period of time equal to the Restriction Period after Termination, be involved in any Capacity with any business concern which is (or intends to be) in competition with any Restricted Business, or

(d)     for a period of time equal to the Restriction Period after Termination be involved with the provision of goods or services to (or otherwise have any business dealings with) any Restricted Customer in the course of any business concern which is in competition with any Restricted Business, or

(e)     at any time after Termination, represent himself or herself as connected with any Group company in any Capacity.

13.2.   None of the restrictions in Section 13.1 shall prevent the Consultant from:

(a)     holding an investment by way of shares or other securities of not more than 5% of the total issued share capital of any company falling within the restrictions of Section 13.1, whether or not it is listed or dealt in on a Recognised Investment Exchange, or

(b)     being engaged or concerned in any business concern falling within the restrictions of Section 13.1 insofar as the Consultant's duties or work shall relate solely to geographical areas where the business concern is not in competition with any Restricted Business, or

(c)     being engaged or concerned in any business concern falling within the restrictions of Section 13.1, provided that the Consultant's duties or work shall relate solely to services or activities of a kind with which the Consultant was not concerned to a material extent prior to Termination.

13.3.   The restrictions imposed on the Consultant by this Section 13 apply to him or her acting:

(a)     directly or indirectly, and

(b)     on his or her own behalf or on behalf of, or in conjunction with, any firm, company or person.

13.4.   The periods for which the restrictions in Section 13.1 apply shall be reduced by any period that the Consultant spends on Garden Leave immediately prior to Termination.

13.5.   If the Consultant receives an offer to be involved in a business concern in any Capacity during the Appointment, or prior to the expiry of the last of the covenants in this Section 13, the Consultant shall give the person making the offer a copy of this Section 13 and shall tell the Chairman the identity of that person prior accepting the offer.

13.6.   The Company and the Consultant entered into the restrictions in this Section 13 having been separately legally advised and acknowledges and confirms the consideration received by the Consultant pursuant to this agreement is sufficient consideration for the restrictions in this Section 13.

13.7.   Each of the restrictions in this Section 13 is intended to be separate and severable.  If any of the restrictions shall be held to be void but would be valid if part of their wording were deleted, such restriction shall apply with such deletion as may be necessary to make it valid or effective.

## 14. DISCIPLINARY AND GRIEVANCE PROCEDURES

14.1.   The Consultant is subject to the Company's disciplinary and grievance procedures, copies of which are contained in the Staff Handbook.

14.2.   If the Consultant wishes to appeal against a disciplinary decision he or she may apply in writing to the Chairman.

14.3.   The Company may at any time suspend the Consultant for such period as is reasonably necessary during which the Company is carrying out a disciplinary investigation into any alleged acts or defaults of the Consultant.  During any period of suspension the Consultant shall continue to receive his or her salary and contractual benefits and bonus.

14.4.   If the Consultant wishes to raise a grievance, he or she may apply in writing to the Board.

## 15. DATA PROTECTION

15.1.   The Consultant hereby acknowledges that:

(a)   the Company and other Group companies will collect and process information about the Consultant, such as the executive's name and contact details, as well as more sensitive information for various purposes in connection with the Appointment, including to manage benefits and payments, to manage expenses, to manage recruitment and on-boarding, to manage absences, for security purposes, to handle with claims and disciplinary actions, to monitor performance and use of the IT systems, to conduct certain background checks and to comply with the Group's legal obligations,

(b)   the Company and other Group companies will collect from the Consultant and store personal data about the Consultant's next of kin, such as their name and contact details, for use in emergency situations,

and the Consultant agrees that he or she will inform such individuals that their details have been provided to the Group,

(c)   the Company and other Group companies may pass the Consultant's information to third parties such as companies for which the Consultant provided services, public authorities, law enforcement agencies, fraud prevention agencies and regulators who use it in connection with the purposes set out above. The Company and other Group companies may also pass the Consultant's information to third party agents who handle it on their behalf, and

(d)   depending on the circumstances, the use of personal data may involve a transfer of data outside the UK and the European Economic Area.

15.2.   The Company's Privacy Notice gives more details of the personal information about the Consultant that the Company collect and process. The Consultant confirms that he has read the notice. The Data Privacy Notice does not form part of the terms and conditions of the Employment, and the Company reserves the right to amend it from time to time and to update the uses of personal data listed above and in the notice.

15.3.   The Consultant shall comply with the relevant Group company policy when handling personal data in the course of the Employment including personal data relating to any employee, customer, client supplier or agent of any Group company.

## 16. COLLECTIVE AGREEMENT

16.1.   There is no collective agreement which directly affects the Appointment.

## 17. RECOGNITION

17.1.   The Consultant expressly recognizes that Sections 3.2(b), 8, 9 and 13 of this agreement are of the essence of this agreement and that the Company would not have entered into this agreement without the inclusion of the said provisions.  The Consultant acknowledges that a breach of any of the aforesaid provisions would cause irreparable harm to the Group, and that damages alone would be an inadequate remedy for any breach or violation thereof and that the Group, in addition to all other remedies at law or in equity, shall be entitled as a matter of right to equitable relief, including the issuance of interim, interlocutory and permanent injunctive relief or other restraining order or to the enforcement of other equitable remedies against the Consultant to compel performance of the terms thereof without the necessity of showing or proving it has sustained any actual damage, to restrain such breach.

17.2.   The Consultant acknowledges that his or her obligations under this agreement are in addition to and not in substitution for any fiduciary or statutory duty that the Consultant may owe to any Group company. The Consultant hereby confirms that the obligations set out herein are fair and reasonable, do not impose an undue hardship on the Consultant and are necessary to protect the business and interests of the Group.

## 18. RECONSTRUCTION AND AMALGAMATION

18.1.   If the Appointment is terminated at any time by reason of any reconstruction or amalgamation of the Company or the Group, whether by winding up or otherwise, and the Consultant is offered employment with any concern or undertaking involved in or resulting from such reconstruction or amalgamation on terms which (considered in their entirety) are no less favourable to any material extent than the terms of this agreement, the Consultant shall have no claim against the Company or any such undertaking arising out of or connected with such Termination.

## 19. NOTICES

19.1.   Any notice given under this agreement shall be in writing and signed by or on behalf of the party giving it and shall be served by delivering it personally, or sending it by pre-paid recorded delivery or registered post to the relevant party at (in the case of the Company) its registered office for the time being and (in the case of the Consultant) his or her last known address. Any such notice shall be deemed to have been received:

(a)   if delivered personally, at the time of delivery, and

(b)   in the case of pre-paid recorded delivery or registered post, 48 hours from the date of posting.

19.2.   In proving such service it shall be sufficient to prove that the envelope containing such notice was addressed to the address of the relevant party and delivered either to that address or into the custody of the postal authorities as a pre-paid recorded delivery or registered post.

## 20. ENTIRE AGREEMENT

20.1.   This agreement, together with any Company or Group policies referred to herein, is the entire agreement between the parties and supersedes any Pre-Contractual Statements, letters of engagement, agreements and arrangements (whether oral or in writing) relating to the subject matter hereof between any Group company and the Consultant, all of which will be deemed to have been terminated by mutual consent.

20.2.   The Company and the Consultant shall from time to time execute and deliver all such further documents and instruments and do all acts and things as may reasonably be required to give full effect to the terms and intent of this agreement.

20.3.   This agreement may be executed in any number of counterparts, including counterparts transmitted by facsimile or email, each of which, when executed and delivered, shall be deemed an original, and all the counterparts together shall constitute one and the same instrument.

## 21. VARIATION AND ASSIGNMENT

21.1.   No variation of this agreement or of any of the documents referred to in it shall be valid unless it is in writing and signed by or on behalf of each of the parties.

21.2.   This agreement shall not be assigned or otherwise transferred by the Consultant (or the Consulting Company), in whole or in part, by operation of law or otherwise, without the prior written consent of the Company and HEH Holding AG. The Company and Group may not assign or otherwise transfer this Agreement, in whole or in part, without the prior written consent of the Consultant other than in the case of an internal group reorganisation or in the case of a sale or other transfer of all or substantially all the Group's assets or equity, whether by sale of assets or stock or by merger or other reorganization (including consolidation, acquisition, amalgamation, arrangement or the like).

## 22. COUNTERPARTS

22.1.   This agreement may be executed in any number of counterparts, including counterparts transmitted by facsimile or email, each of which, when executed and delivered, shall be deemed an original, and all the counterparts together shall constitute one and the same instrument.

## 23. THIRD PARTY RIGHTS

23.1.   No third party rights shall apply to this agreement with respect to the rights of the Consultant and no person other than the Consultant shall have any rights under it with respect thereto.

23.2.   The rights of the Company under this agreement are held for the benefit of the Group and may be enforced by any Group company. The terms of this agreement or any of them may be varied, amended or modified or this agreement may be suspended, cancelled or terminated by agreement in writing between the parties or this agreement may be rescinded (in each case), only with the consent of HEH Holding AG.

## 24. GOVERNING LAW AND JURISDICTION

24.1.   This agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with Swiss law.

24.2.   Place of jurisdiction shall be, at the choice of the claimant, either the place of domicile of the defendant or the place where the Consultant habitually performs his or her work. Notwithstanding the foregoing, the Company reserves the right to take proceedings in any court in any jurisdiction where the Company considers it necessary to protect or preserve its rights under this agreement, including its right, title and interest in and to the Confidential Information and Intellectual Property Rights, or any other of its property.

*The Consultant acknowledges that he or she has carefully read and considered the provisions of this agreement.  The Consultant further acknowledges that he or she has had the opportunity to seek independent legal advice, and has either obtained such independent legal advice with regard to this agreement, or has expressly determined not to seek such advice. The Consultant agrees that the restrictions set forth in this agreement are fair, are reasonably required to protect the interests of the Group, and shall not impair the Consultant's ability to secure employment within the field(s) of his*

*or her choice.  The Consultant further acknowledges that he or she is entering into this agreement with full knowledge of the contents, nature and consequences of this agreement.*

## **Schedule A**
(Group Senior Management Organization Chart)



**Stefan Mathews**
Chairman
1

**Christen Ager-Hanssen**
CEO nChain Group
13

**Robert Alizon**
Chief IP Officer

**Andy Moody**
Group Chief Financial Officer

**Nina Tchitava**
Director of HR

**Aleksander Auseth**
Investment Associate

**Simit Naik**
Director of Commercial & Strategy

**Owen Vaughan**
Chief Science Officer

**David Brookes**
Group General Counsel

**Leandro Nunes**
Chief Revenue Officer

**Craig Wright**
Chief Science Officer

**Endri Gjata**
Director of Business Development...

**Patrick Prinz**
Chief Operating Officer nChain Gr...

**Christine Leong**
Chief Information Officer

**Roman Puhek**
Head of Special Operations - CEO...

NChain

bambo

**Schedule B**
(Group Corporate Structure)

GROUP STRUCTURE



# Shareholders

**DW Discovery Selection Fund LTD**
Reg No:        MC-245708
Location:      Cayman Islands
Shares owned:  8,509,365

**Minority Shareholder**
Reg No:
Location:
Shares owned:  836,000

**Minority Shareholder**
Reg No:
Location:
Shares owned:  1,044,891

**Minority Shareholder**
Reg No:
Location:
Shares owned:  209,000

# HEH Holding Group

**HEH Holding AG**
Reg No:     FL-2.645.989
Location:   Liechtenstein

**HEH Ventures AG**
Reg No:     FL-0002.696.373-6
Location:   Liechtenstein

**nChain AG**
Reg No:     CHE-423.067.388
Location:   Switzerland

**nChain UK LTD**
Reg No:     9823112
Location:   UK

**nChain Licensing AG**
Reg No:     CHE-361.314.417
Location:   Switzerland

**nChain d.o.o**
Reg No:     1662163000
Location:   Slovenia

**Bjorn IP Holdings Ltd**
Reg No:     14436105
Location:   UK

AS AT MAR 2023

NChain

**<u>Schedule C</u>**
(Chief Executive Officer Job Description)

**Chief Executive Officer – nChain  / Position Description**
- Reports To: Board of Directors
- Direct Reports: CFO, COO, CLO, CIPO, CTO, CCO
- Position Status: Permanent full-time

**Company Description:**

The Company is a global blockchain technology company and recently voted one of the Top 100 most innovative firms in the world by LexisNexis.

Founded in 2015, they offer software and technology solutions, consulting services and IP licensing to clients looking to benefit from the security and scalability of the original blockchain. They work across several sectors, including iGaming, supply chain, and financial services.

Their suite of commercial applications and solutions from CBDCs to Data Integrity is underpinned by an industry-leading research portfolio of over *400 patents and related patent families*. They also provide contracted development and support services related to the Bitcoin SV protocol, SVnode software, Teranode, LiteClient and more.

Their mission is to drive the adoption of web 3 solutions and blockchain application development based on a significant IP portfolio. They fundamentally believe micropayments, ownership, privacy, authenticity, financial inclusion and social impact are critical parts of the digital future.

They currently employ more than 230 staff across four offices.


**SUMMARY**: The CEO leads the group and its entities according to the Vision and Mission. It is a visionary, charismatic and seasoned leader in the tech world and creates a culture of passion and pace. The Chief Executive Officer provides leadership for all aspects of the company's operations with an emphasis on long-term goals, growth, profit, and return on investment. This is a fast paced and dynamic industry.

**Supervisory Responsibilities:**
- Oversees the ongoing operations of all divisions in the company.
- Manages and directs the company toward its primary goals and objectives.
- Oversees employment decisions at the executive level of the company.
- Leads a team of executives to consider major decisions including acquisitions, mergers, joint ventures, or large-scale expansion.
- Promotes communication and cooperation among divisions to create a spirit of unity in the organization.

**Essential Responsibilities:**

- Works with the board of directors and other executives to establish short-term objectives and long-range goals, and related plans and policies.
- Sets and corrects strategic priorities within the organisation to achieve the primary goals and objectives.
- Presents regular reports on the status of the company's operations to the board of directors and to company staff.
- Oversees the organization's financial structure, ensuring adequate and sound funding for the mission and goals of the company.
- Reviews the financial results of all operations, comparing them with the company's objectives and taking appropriate measures to correct unsatisfactory performance and results.
- Ensures the company's compliance with all applicable laws, rules, regulations, and standards.
- Negotiates with other companies regarding actions such as mergers, acquisitions, or joint ventures.

- •       Serves as the company's representative to the board of directors, shareholders, employees, customers, the government, and the public.
- •       Performs other related duties to benefit the mission of the organization.
- •       Forms strategic alliances within the eco-system of connected enterprises.
- •       Creates a culture of high performance and oversees all employee related activities.
- •       Is the driving force behind employer brand and talent attraction and retention.

**Initial Priorities:**

- • Understand the company and stakeholder vision
- • Take over the entire management on executive level and align with company vision and mission
- • Review and compile a business strategy for the next 12 months, including all sub-divisions

**Ideal Profile:**

- • Extensive professional experience in leadership roles.
- • Experience in Technology development, sales and business development , Blockchain a significant plus
- • Excellent managerial and financial skills and the ability to take leadership over any business operations area.
- • Superlative communication skills, particularly the ability to communicate as a leader.
- • Demonstrated presentation skills and ability to act as a corporate spokesperson
- • Thorough understanding of management and financial practices in all areas and phases of business operations.
- • Charismatic trustworthy leader
- • Able to form and deliver visionary communication
- • Quick and decisive decision maker
- • Highly connected in Blue chip companies with an ability to convince board rooms
- • Understand Tech use cases and customer requirements

**Key requirements:**

- • Degree in Business Administration, Technology or any related field
- • Proven and very strong track record in very senior leadership positions and roles including prior positions as CEO
- • Proven Track Record in building and training high performing organisations and creating loyal followership

# Christen Ager-Hanssen - Consulting Agreement v7[42]

Final Audit Report                                                    2023-03-17

| | |
|---|---|
| Created: | 2023-03-17 |
| By: | Tianle Yu Weber (tina@taal.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAArVAkZfrAyOO3ihkDXQMgrUcuURSkhfZ_ |

## "Christen Ager-Hanssen - Consulting Agreement v7[42]" History

Document created by Tianle Yu Weber (tina@taal.com)
2023-03-17 - 8:07:16 PM GMT- IP address: 213.55.243.168

Document emailed to Stefan Matthews (stefan@taal.com) for signature
2023-03-17 - 8:07:58 PM GMT

Email viewed by Stefan Matthews (stefan@taal.com)
2023-03-17 - 8:08:12 PM GMT- IP address: 104.47.75.190

Document e-signed by Stefan Matthews (stefan@taal.com)
Signature Date: 2023-03-17 - 8:08:33 PM GMT - Time Source: server- IP address: 188.61.94.237

Document emailed to Christen Ager-Hanssen (cah@custosgroup.com) for signature
2023-03-17 - 8:08:35 PM GMT

Email viewed by Christen Ager-Hanssen (cah@custosgroup.com)
2023-03-17 - 8:49:32 PM GMT- IP address: 31.94.38.25

Document e-signed by Christen Ager-Hanssen (cah@custosgroup.com)
Signature Date: 2023-03-17 - 8:50:58 PM GMT - Time Source: server- IP address: 31.94.38.25

Agreement completed.
2023-03-17 - 8:50:58 PM GMT

Names and email addresses are entered into the Acrobat Sign service by Acrobat Sign users and are unverified unless otherwise noted.

**Adobe Acrobat Sign**