# Exhibit 8



Mr Christen Ager-Hanssen

By Email to:
cah@custosgroup.com;
disputeHEH@custosgroup.com; and
agerhansen@gmail.com

Our Ref
210293.0001

Date
29 April 2024

Dear Sir

**nChain UK Limited & nChain Holding AG -v- Christen Ager-Hanssen & Others**
**LETTER OF CLAIM**

We are instructed by nChain UK Limited (**nChain UK**) and nChain Holding AG formerly HEH Holding AG (**nChain Holding**) (together, **nChain**).

This letter of claim is being sent to you in accordance with paragraph 6 of the Practice Direction on Pre-Action Conduct and Protocols (the **Practice Direction**) contained in the Civil Procedure Rules (**CPR**), a copy of which is **enclosed**. In particular, we refer you to paragraphs 13-16 of the Practice Direction concerning the court's powers to impose sanctions for failing to comply with its provisions. Ignoring this letter may lead to our clients commencing proceedings against you and may increase your liability for costs.

**1      Overview and Basis of Claim**

1.1     Our clients' claim arises from your actions during your engagement with nChain as Group CEO and in particular your support of the false allegation of *inter alia* a criminal conspiracy among certain directors and shareholders of nChain, which was recorded in a document styled as the "Fairway Brief", including your actions in the nChain office on 27 September 2023. You claim to be the author of the Fairway Brief. You had no genuine belief at the time that these particular allegations of a criminal conspiracy on the part of our clients were true. You also knew that the Fairway Brief was prepared with the intention of obtaining confidential information belonging to nChain by unlawful means.

1.2     The claim against you and others is for unlawful means conspiracy. You conspired with your co-conspirators to gain access to confidential information (including but not limited to valuable intellectual property) belonging to nChain for your own benefit. You did so through unlawful means, as set out below.

**Registered Office**
One Bartholomew Close        50/60 Station Road        The Anchorage              Grosvenor House
London                       Cambridge                 34 Bridge Street           Grosvenor Square
EC1A 7BL                     CB1 2JH                    Reading, RG1 2LU           Southampton, SO15 2BE
DX 339401 London Wall        DX 339601 Cambridge 24     DX 146420 Reading 21       DX 38516 Southampton 3

**T** +44 (0)345 222 9222          **W** www.bdbpitmans.com



BDB Pitmans is the trading name of BDB Pitmans LLP which is a limited liability partnership registered in England and Wales with registered number OC320798. Its registered office and principal place of business is One Bartholomew Close, London EC1A 7BL where a list of members' names is available for inspection. BDB Pitmans LLP is authorised and regulated by the Solicitors Regulation Authority (SRA ID no 448617). We use the word partner to refer exclusively to a member of BDB Pitmans LLP.



1.3     The unlawful means deployed by you and your co-conspirators had at its core the preparation, presentation, and deployment of the "Fairway Brief". You represented the Fairway Brief as a whistleblowing report, which it was not, and deployed the false allegations within it to coerce and control others into allowing you and assisting you and your co-conspirators to attempt, during the events of 27 September 2023, to disrupt the operations and proper administration of nChain and unlawfully access and obtain confidential information belonging to our clients. You and your co-conspirators' actions caused nChain to incur significant losses, and you must have known that they would cause nChain to suffer these substantial losses.

1.4     Our clients now intend to pursue a claim against you and your co-conspirators to recover these losses. Accordingly, this letter is to be treated as a formal letter of claim served in accordance with Paragraph 6 of the Practice Direction.

1.5     This letter is necessarily based on the documents and information available to our clients at the time of writing, having taken a proportionate approach to investigations at this early stage of the case. We consequently reserve the right to amend or expand our clients' claims once they have had the opportunity to consider substantive responses and documents provided.

1.6     A summary of definitions is **appended** to this letter for convenience.


**2       Identity of Parties**

2.1     Our clients intend to pursue claims against you, Andy Moody (**AM**), David Brookes (**DB**) and Zafar Ali KC (**ZA**) as we presently consider you to be the main co-conspirators (the **Co-Conspirators**).

2.2     However, our clients reserve their rights to pursue other co-conspirators, should our clients' ongoing investigation show that others have also participated in your conspiracy. We are actively considering whether Endri Gjata (**EG**), Peter Coulson (**PC**) and/or Lars Jacob-Bø (**LJB**) (amongst others) also participated in your conspiracy or otherwise bear responsibility for the losses suffered by our clients as a result of this concerted action.


**3       Background**

Confidential Information of nChain

3.1     You are already facing High Court Proceedings for breach of confidence and unlawfully obtaining and retaining confidential information belonging to our clients, as well as contempt of court. The Court has already granted nChain summary judgment against you in claim number CL-2023-000745. Separately, you and the Co-Conspirators sought to obtain confidential information belonging to our clients. This is likely to have included valuable intellectual property and commercially sensitive material.

Your Role at nChain

3.2     You became aware of nChain and its business in or around 2022 and proceeded to approach individuals related to nChain to obtain an introduction into the business.  You were appointed



as a consultant to nChain with the title "Group Chief Executive Officer" by virtue of the Consultancy Agreement dated 17 March 2023 and entered into between you, nChain AG, and nChain Holding (then HEH Holding AG) (the **Consultancy Agreement**).

3.3    In fact, you worked for nChain in this role since 28 September 2022 as set out in the Consultancy Agreement. The Consultancy Agreement was terminated on 27 September 2023.

3.4    You were also a director of nChain UK between 22 December 2022 and 28 September 2023.

3.5    As a result of these appointments, you owed both fiduciary and statutory duties to nChain UK and contractual duties to nChain Holding and nChain AG and all direct and indirect subsidiary companies. Under the terms of your Consultancy Agreement, those duties included the following:

   3.5.1    To abide by any statutory, fiduciary, or common-law duties applicable to your function within nChain;

   3.5.2    To act at all times in the best interests of the Group, in good faith and in a way reasonably most likely to promote the success of the Group and its shareholders;

   3.5.3    To use your best endeavours to promote, protect, develop, and extend nChain's business; and

   3.5.4    To comply with requirements, recommendation or regulation and all regulatory authorities relevant to nChain and any policy or code of practice issued by nChain;

   3.5.5    To diligently exercise such powers and perform such duties as may from time to time be assigned to you by the Board;

   3.5.6    To comply with all reasonable and lawful directions given to you by the Board;

   3.5.7    To promptly make such reports to the Board in connection with the affairs of the Group or any Group company on such matter and at such times as reasonably required;

   3.5.8    To report your own wrongdoing and any wrongdoing or proposed wrongdoing of any other employee or director of any Group company to the Board immediately on becoming aware of it;

   3.5.9    To comply with any electronic communication systems policy that that nChain may issue.

3.6    Substantially similar duties were also included in AM and DB's contracts.

3.7    Your Consultancy Agreement (as well as AM and DB's employment contracts) also included an obligation to comply with the rules, policies and procedures set out in the Staff Handbook, and confirmed that all documents, manuals, hardware, and software provided for your use and any



data or documents produced, maintained or stored on nChain's systems remained the property of nChain.

3.8     Under the Consultancy Agreement you were explicitly not authorised to do the following:

3.8.1     Terminate the employment of any member of the Executive Team, defined as the senior management of the Group and set out in a Schedule to the agreement;

3.8.2     Sell, transfer, dispose or encumber any Intellectual Property Rights of any Group company;

3.8.3     Approve or cause the spending of funds (fiat or digital assets) of any Group company in excess of CHF 500,000 value in a single transaction or group of related transactions; or

3.8.4     Transfer any employees from one Group company to another Group company.

3.9     As a director of nChain UK Ltd, you owed the following statutory duties pursuant to the Companies Act 2006 (**CA 2006**):

3.9.1     to act within the company' powers and for proper purpose – s.171 CA 2006;

3.9.2     to promote the success of the company – s.172 CA 2006;

3.9.3     to exercise independent judgment – s.173 CA 2006;

3.9.4     to exercise reasonable care, skill, and diligence – s.174 CA 2006;

3.9.5     to avoid conflicts of interest – s.175 CA 2006;

3.9.6     not to accept benefits from third parties – s. 176 CA 2006; and

3.9.7     to declare any interest in a proposed transaction or arrangement with the company – s. 177 CA 2006.

Mock Trial

3.10    You and ZA arranged and participated in a mock trial of the COPA claim which took place between 22 - 24 September 2023 at 6-7 Market Place, London W1W 8AF (the **Mock Trial**).

3.11    On 24 September 2023, the mock judgment was delivered, which declared Dr Craig Wright (**CSW**) a "*compulsive liar and falsifier of documents on a massive scale*", made purported findings of fact against CSW and concluded that COPA had succeeded in their claim (the **Mock Judgment**). The Mock Judgment was identical in all material respects to the wording of the draft judgment that one of the barristers involved in the mock trial circulated on 18 and 20 September 2023, before the start of the Mock Trial. The Mock Judgment could not have reflected the findings of the purported Judge at the Mock Trial as it was pre-written.

30944841.1                                          4



The Fairway Brief and the Chelsea Barracks meeting on 26 September 2023

3.12    You called a meeting of "Group Management of HEH Holding Group" on 26 September 2023 at the Chelsea Barracks (the **Chelsea Barracks meeting**). Notwithstanding its title, that meeting did not include any member of the board of nChain Holding. You brought wine, gin, and champagne to the meeting and invited attendees to drink. No agenda was circulated. You presented the Fairway Brief to attendees. According to an interview you gave to DN Magasinet on 2 October 2023 (published on 27 October 2023) you claimed that you had started work on the Fairway Brief on around 14 August 2023. The Fairway Brief purported to constitute a whistleblowing report uncovering an alleged criminal conspiracy between Calvin Ayre (**CA**), Marco Bianchi (**MB**) and the Fairway Family Office (**FFO**) against the "*stakeholders of HEH Holding AG and its subsidiaries*". The Fairway Brief alleged that contracts dated 17 July 2023 giving managerial oversight to FFO and providing a CHF100 million loan from Indigo IP Holdings Ltd (**Indigo**) to nChain secured by a guarantee from nChain Licensing in respect of its IP in the event of default (the **17 July Agreements**) were part of a "*conspiracy to defraud HEH Holding, nChain Group and its stakeholders*".

3.13    You instructed DB to prepare the minutes of the Chelsea Barracks meeting (**Minutes**) one day prior, on 25 September. That version of the Minutes only referred to the 17 July Agreements. An updated version of the Minutes was circulated at the Chelsea Barracks meeting, having been updated prior to the meeting, which referred to the COPA claim, the Mock Trial, the Fairway Brief and the attendance of ZA and James Marchant (**JM**) at the meeting.

3.14    As recorded in the Minutes of the Chelsea Barracks meeting, you invited ZA to attend the meeting as "*he would be able to elaborate and answer questions on the issues raised by the Judgment and the Whistleblowing Report*". However, you knew that during this meeting ZA was giving advice based on false information, including the false information set out below in relation to the financial needs of nChain.

3.15    During the Chelsea Barracks meeting you reported on the Mock Trial and ZA read out the Mock Judgment, misrepresenting it as an independent judgment reached by a judge, rather than as a pre-written script. The Minutes record that "*CAH reported that the Judgment was a disaster as the judge found that Craig "is a compulsive liar and falsifier of documents on a massive scale"*". You were well aware that this was not a legitimate judgment made by a judge in good faith containing genuine findings of fact based on CSW's evidence during the Mock Trial. You failed to explain that the Mock Judgment was a sham as it had been written in advance of the Mock Trial and was merely read out by the person purporting to be the judge at the Mock Trial.

3.16    At the meeting, you and ZA misrepresented the Fairway Brief as a legitimate whistleblowing report containing genuine allegations of a criminal conspiracy without a reasonable belief that the allegations were genuine. ZA informed the attendees that they had three options: i) carry on as usual but if they did they would be part of the criminal conspiracy; ii) sign the Minutes with the list of actions or iii) resign from nChain and leave. In doing so, you knew they were being misled as to the options legally open to them in an attempt to pressure them to sign the Minutes and give further credibility to the Fairway Brief.



3.17    By signing the Minutes, you recorded your agreement with them and misrepresented that their contents were true.

3.18    The Fairway Brief was intended to further the aims of your conspiracy, in particular extracting confidential information belonging to nChain and causing harm to nChain. Paragraph 31 of the Minutes shows that the Fairway Brief was intended as a basis to confer authority on you to access confidential information, in particular the emails of Robert Alizon (**RA**) and "*all parties involved in the 17 July Transaction*".

3.19    At the Chelsea Barracks meeting you and your Co-Conspirators agreed that you and AM would be going into the office the next day to issue directions to further your plan, in your capacity as directors of nChain UK.

<u>Intimidation of nChain employees and attempt to extract confidential information 27 September 2023</u>

3.20    On 27 September 2023, you made a series of false representations in order to lend credibility to the Fairway Brief and to intimidate Ajay Patel (**AP**), Head of Corporate IT of nChain, to provide access to email servers of senior individuals at nChain:

    3.20.1    Early on the morning of 27 September 2023, you met with PC and EG. We infer that at that meeting you instructed EG and PC to assist you in your subsequent attempts to use intimidation and false representations to extract confidential information;

    3.20.2    At approximately 11:30am, you convened a meeting in the Peer-to-Peer meeting room at nChain UK's London office with AP, PC, and EG, with ZA joining by telephone. You mentioned that a serious incident had occurred at nChain that you and ZA wanted to report and explained it was in relation to alleged criminal activity and CSW lying and defrauding nChain;

    3.20.3    You introduced ZA as your legal counsel assisting with the purported whistleblowing case. Later in the meeting, ZA said that he had been brought in to assist nChain and that he had advised you to proceed with the whistleblowing report;

    3.20.4    You and ZA represented to AP that it was a criminal case, thereby misrepresenting that this was already a criminal case or that the Fairway Brief contained clear evidence to substantiate a criminal case. You and ZA threatened AP not to discuss the matter with anyone else otherwise he could be breaking the law. ZA told AP that he could not share details of who he was "*whistleblowing against*";

    3.20.5    You instructed AP to download the mailboxes of RA, Stefan Matthews (**SM**), Patrick Stein (**PS**), AM, PC and Olga Fernandez (**OF**). You told AP that you and your Co-Conspirators needed to "*secure the evidence and some emails*". You also asked AM to send AP an email putting your request to download the said mailboxes in writing. AM did so;



3.20.6   You instructed PC to keep AP in the Peer-to-Peer meeting room, in an attempt to intimidate him.

3.21   You continued your acts of intimidation in order to obtain confidential information and cause losses to nChain later on 27 September by your actions towards PS:

3.21.1   At around 14:15 you went to PS's office and told him to "*get up to the boardroom or get the f\*\*\* out*";

3.21.2   PS then came with you to the boardroom, where PC and EG were already seated, and ZA joined shortly afterwards. ZA introduced himself to PS as a KC (by saying "*I am one of His Majesty's Counsel*") and purported to give "*free advice*" to PS;

3.21.3   You asked PS if he had been colluding and conspiring with the FFO. You then tried to intimidate him by going up-close to his face and shouting at him;

3.21.4   ZA then falsely represented to PS that if he shared information about the Fairway Brief with anyone other than those present in the room, he would be committing a criminal offence. The words he used were objectively intended to intimidate;

3.21.5   You then told PS to leave and instructed EG to escort him downstairs.

3.22   You then continued with your intimidation of AP in order to use him to obtain nChain's confidential information:

3.22.1   At about 14:30 you took AP (alongside ZA, PC and EG) to a restaurant near the nChain office. At the restaurant, you and ZA repeatedly told AP that by failing to comply with their request to download the mailboxes, AP was breaking the law and could be arrested or prosecuted. Those representations were false and you had no genuine belief that they were true. They were designed to intimidate AP into complying with your demand to provide the confidential contents of the mailboxes;

3.22.2   You and ZA also tried to intimidate AP to hand over his personal phone. AP refused but handed over his company phone.

3.23   Your Co-Conspirators continued to intimidate nChain employees, cause disturbances in the office or otherwise act unlawfully as part of the conspiracy throughout the rest of 27 September. For example:

3.23.1   AM and EG attempted to force access to the 'Communications Room' which houses the nChain servers, including kicking on the door, and shouting at those present in the office that they needed access. When access was finally granted, they attempted to gain unauthorised access to the servers themselves, presumably to access the email accounts, or other confidential information, directly;

3.23.2   AM and others were involved in the covering and attempted disabling of the CCTV cameras in the nChain offices in London;



3.23.3   Meanwhile, DB was shredding documents and later removed documents from the nChain office;

3.23.4   AM was seen on CCTV in the nChain office until late on 27 September 2023 looking for documents;

3.23.5   EG was seen stealing AP's laptop, presumably in an attempt to obtain the confidential information contained therein.

**4      Unlawful Means Conspiracy**

4.1     It is nChain's case that you and your Co-Conspirators conspired together to (1) obtain confidential information belonging to nChain and its officers and / or employees with an intention to cause harm to nChain and (2) harm the company (the **Conspiracy**).

<u>Agreement</u>

4.2     The agreement between you and your Co-Conspirators can be inferred from your conduct and the events set out above.

4.3     The agreements between you and the Co-Conspirators (irrespective of whether they had been made separately to one another) had the same intention and object; namely, you agreed to pursue an unlawful course of action with the object of extracting confidential information from nChain and to cause nChain to incur loss and suffer damage.

4.4     Your agreement must have predated the so-called "Group Management" meeting of 26 September 2023. During that meeting, you, the Co-Conspirators and others signed a set of pre-prepared "Minutes", confirming agreement with the findings of, and statements made in the Fairway Brief, and to pursuing various specific actions against nChain and its leadership, such as the dismissal of RA (Chief Intellectual Property Officer), the removal of MB from the boards of nChain, gaining access to a number of IT and email accounts, and the interference with the operation of the 17 July Agreements. We infer prior agreement based on the following:

(a)     Your relationship with DB and ZA predates your involvement with nChain. You had been employing DB for some years as legal counsel at your company, Custos Group;

(b)     DB made up an excuse in order to miss a two-day workshop focusing on corporate governance held in Lichtenstein on 19-20 September 2023 in order to assist you with the Fairway Brief.

(c)     As for ZA, you arranged for him to receive a significant remuneration soon after your appointment s Group CEO of nChain. ZA accompanied you on a number of occasions to meetings where you introduced him to others as King's Counsel although he was not acting in his capacity as a criminal barrister. It can be inferred that you and DB and ZA have a strong

30944841.1                                              8



understanding of, and appreciation for, each other's business aims and the methods usually used to achieve them;

(d)      Shortly after you joined nChain you began a close friendship with AM. You quickly raised his salary in 2022 to £225,000 pa, despite ostensibly no change in his role (other than a nominal change in title);

(e)      On 2 August 2023, AM started helping you with the Fairway Brief by sharing with you his alleged concerns about the agreements mentioned in the Fairway Brief;

(f)      On 11-13 September 2023 you, ZA and EG flew to Mallorca on flights which you arranged to be paid for by nChain. SM was in Mallorca to meet with the CEO of Gate2Chain Ltd During this trip to Mallorca you covertly recorded conversations with SM;

4.5      This agreement to the so called "*Request for Action*" plan set out in the purported "Minutes" (through collective signature of the purported "Minutes") is alone sufficient evidence of your, and the Co-Conspirators', agreement to the aims of the Conspiracy. However, we believe that this agreement also existed prior to this event, as part of the planned strategy to manufacture evidence and agree upon the nature and deployment of your false representations.

Common Intention and Concerted Action

4.6      The common intention to benefit from obtaining confidential information belonging to nChain for personal financial gain or greater control or influence is shown by the concerted actions by you and others to achieve this aim.

4.7      It is clear that there was a common intention between you and some or all of the Co-Conspirators to present the Fairway Brief as an honest whistleblowing report, which it was not, and to use it to coerce others into granting you greater control and influence over nChain and its operations and, importantly, access to confidential information. The intention was to obtain valuable confidential information (such as intellectual property) for your own benefit and not bona fide in the best interests of nChain.

4.8      In addition, you and your Co-Conspirators sought to mutually benefit from an increase in your influence and control of nChain and a corresponding reduction in the same on the part of the FFO who had been appointed by the nChain board as set out below in an agreement which was signed by you among others. In part, the benefit that you and others would obtain from this was a greater and unfettered ability to profit at the expense of those funding the nChain group, through inflated salaries, remuneration and benefits in kind.

4.9      You took the following concerted action in furtherance of the agreement:

4.9.1      You prepared the Fairway Brief and agreed that it would be presented to the "management board" i.e., the Chelsea Barracks Meeting, and subsequently to other employees of nChain, to persuade them to give access to confidential information.



**BDB PITMANS**

4.9.2   You convened the Chelsea Barracks meeting on 26 September 2023 and set in motion the events of 27 September 2023. We reiterate your actions set out in section 3 above. In particular:

(a)   You and ZA falsely represented the Mock Judgment to the other attendees as if it were a legitimate judgment made by a suitably qualified person in good faith containing genuine findings of fact based on CSW's evidence during the Mock Trial. You failed to explain that the Mock Judgment was a sham as it had been written in advance of the Mock Trial and was merely read out by the person purporting to be the judge at the Mock Trial. This was a further attempt to legitimise the Fairway Brief. It was designed to support the allegations in the Fairway Brief (in particular paragraph 57) that a defeat in the prospective trial of CSW could constitute a default under covenant 4(c) of the 17 July Licence Agreement, thereby causing losses to nChain.

(b)   At the Chelsea Barracks meeting, you misrepresented the Fairway Brief as a legitimate whistleblowing report containing genuine allegations of a criminal conspiracy without a reasonable belief that the allegations were genuine. You and ZA informed the attendees that they had three options: i) carry on as usual but if they did they would be part of the criminal conspiracy; ii) sign the Minutes with the list of actions or iii) resign from nChain and leave. This was objectively misleading.

(c)   You sought to intimidate AP in order to get him to download the mailboxes of senior individuals at nChain.

(d)   You sought to intimidate PS.

4.10   As to the false allegations in the Fairway Brief:

4.10.1   You and others were aware of the fact that nChain required the credit facility referred to in the Fairway Brief. Despite this, the Fairway Brief contained false representations to those to whom it was presented that this facility was not required. In particular, you and your co-conspirators knew that you had already drawn down on the credit facility in order to meet nChain's increased financial burdens (resulting from *inter alia* the onboarding of numerous new employees and inflation of existing salaries). You would have been aware that this would have influenced the attendees (other than your co-conspirators) in your attempts to persuade them to provide access to confidential information. Further, you used this false information to induce others into signing the minutes and supporting the publication of the Fairway Brief.

4.10.2   All of this supported the ultimate aim of 'legitimising' the attempt to access the company's confidential information. Indeed, on 27 September 2023, after these "Minutes" had been signed, you and others used the purported authority contained within them to attempt to access and obtain confidential information belonging to nChain. As set out above, these actions included *inter alia*: attempting to access the email accounts of senior nChain and FFO personnel; breaking into the



Communications server room presumably to access directly the data held on the servers; locating, obtaining, and retaining a hard drive and USB stick; and taping over CCTV cameras in order to conceal these actions. Investigations into whether confidential information belonging to nChain was taken are ongoing.

<u>Unlawful Means</u>

4.11    You and your Co-Conspirators used some or all of the following unlawful means to carry out your conspiracy.

4.12    **Misrepresentation**

    4.12.1    You made false representations, knowing that these were false and/or without a genuine belief that they were true and so reckless as to whether these were true. You did so with an intention that these be acted upon and cause nChain to suffer losses. In particular:

        (a)    We refer to the misrepresentations contained in the Fairway Brief and made about it at the Chelsea Barracks meeting and throughout 27 September 2023. Paragraph 8: You stated that you had concluded that CA, MB, and the FFO had perpetrated a criminal conspiracy by which they had put in place a sophisticated mechanism through a set of contrived and authorised transactions solely for the purpose of extracting and taking over nChain's IP at a significant undervalue. You must have known that the facts set out in the Fairway Brief which are said to have given rise to this criminal conspiracy were false. In particular, you knew that the credit facility was needed as AM had already drawn down on it.

        (b)    You must have known that the representations about the Mock Judgment being a legitimate judgment were false, as you were well aware that the Mock Judgment was pre-written.

    4.12.2    These misrepresentations were intended to be relied upon by (i) the other attendees of the Chelsea Barracks meeting, and (ii) the nChain employees that you approached throughout 27 September 2023 in an attempt to induce them to grant you access to confidential nChain information. For example, you intended to induce AP to download the inboxes of various employees and hand over to you and/or the Co-Conspirators confidential information.

4.13    **Breach of confidence and/or procuring a breach of confidence.**

    4.13.1    nChain is plainly the owner of the confidential information that you sought to obtain.

    4.13.2    Your Co-Conspirators sought to obtain this confidential information on 27 September 2023, including through acts of intimidation and misrepresentations perpetrated by them and you. Your acts of intimidation are set out above.

30944841.1                                                          11



4.13.3   You did not have nChain's consent to do so and no lawful or reasonable reason for doing so.

4.13.4   Further or alternatively, you and your Co-Conspirators procured a breach of confidence by making false representations and/or intimidating nChain employees to hand you over this confidential information.

4.14   **Breach of fiduciary duty by you and AM.** You and AM acted in breach of your fiduciary duties as directors by a combination to make false allegations in the Fairway Brief, extracting confidential information, intending to injure nChain and intimidating nChain employees with the intention for them to hand over this confidential information.

4.15   **Breach of contract and procuring a breach of contract by you and your Co-Conspirators.**

4.15.1   Your actions also amount to a breach of contract and/or procuring a breach of contract. In particular, your, AM and DB's contracts included the obligations set out in section 3 above.

4.15.2   You clearly used the unlawful means of breach of contract and/or procuring a breach of contract as part of your conspiracy.

4.15.3   You and your Co-Conspirators intended to extract confidential information and cause losses to nChain. This is contrary to your duties to promote, protect and develop nChain.

4.15.4   The "Minutes" included agreement to dismiss RA. Your contract explicitly prohibited you from doing so. Doing so would not have been justified and would have caused nChain loss and damage, including by incurring a liability to RA.

4.15.5   The conduct set out above amounting to breach of confidence is clearly also non-compliant with the nChain's Email policy and Employee Handbook.

4.15.6   The intimidating conduct towards nChain employees is contrary to the duties to promote, protect and develop nChain but also clearly against the rules set out in the Employee Handbook.

4.16   The allegations in the Fairway Brief are misconceived and incorrect in fact and law.  They were plainly not put forward in good faith. We will not address each and every allegation in this letter, but will deal with the principal complaints with regard to nChain group, which were as follows:

4.16.1   that nChain Holding did not properly enter into the 17 July Agreements;

4.16.2   that nChain did not require the revolving credit facility;

4.16.3   that the Licence Agreement should not have been approved and included terms which were for the sole benefit of Indigo (and as such were a "criminal conspiracy"); and



4.16.4     that the Services Agreement established preferential treatment of one shareholder above the others and gave that minority shareholder day-to-day control (and the ability to trigger a breach of covenant in the license agreement for its own benefit).

4.17     In fact:

4.17.1     The board resolution of nChain Holding confirming the decision to enter into the 17 July Agreements was properly and correctly passed in accordance with the laws of Liechtenstein and the constitution of the company. This board resolution was subsequently ratified by all shareholders of nChain Holding;

4.17.2     The revolving credit agreement was required by nChain; in particular, nChain UK was unable to pay its debts as they felt due. AM requested a drawdown of funds under the credit facility on 14 September 2023 and at least you and AM were aware that nChain UK Ltd was unable to pay its debts as they fell due without relying on external credit facilities;

4.17.3     The Licence Agreement was properly entered into and was on terms agreed by the board of nChain Holding. In the circumstances, where Indigo was contributing CHF60 million for the licence fees and granting a CHF100 million facility, the terms were reasonable, and board and shareholder approval was properly obtained;

4.17.4     The Services Agreement reflected the desire of the board for advice to be provided on the management of its business operations and those of its subsidiaries. As with the other agreements, it had approval of the shareholders. Indeed, you signed the agreement on behalf of nChain AG;

4.17.5     You conspicuously did not seek to explain what crime you alleged the parties were conspiring to commit (nor in which jurisdiction it is said to have taken place). In any event, there was no conspiracy, nothing undertaken would or could have been criminal, and the 17 July Agreements were all lawfully and properly entered into by nChain Group.

4.17.6     You had an opportunity to raise any concerns at or before the board meeting of nChain Holding on 22 August but did not do. Instead, according to an interview given to DN Magasinet you claimed that you had started work on the Fairway Brief since 14 August 2023.

4.18     The Fairway Brief therefore contained multiple false and unjustified allegations, which were wrong and misleading in fact and law, and you knew them to be so or, at least, had no genuine belief that they were true. In addition to the incorrect allegations set out below, you also misrepresented yourself in the Fairway Brief as a shareholder of nChain, which you were not.

4.19     As set out above, a meeting of "Group Management of HEH Holding Group" was called on 26 September 2023 i.e., the Chelsea Barracks Meeting. Notwithstanding its title, that meeting did not include any member of the board of nChain Holding.

30944841.1                                



4.20    "Minutes" of that meeting had been drafted in advance and were circulated. Those minutes included similar allegations to those in the Fairway Brief (and appeared to be copied and pasted from it). You signed the minutes, indicating that you agreed with them. In particular:

    4.20.1    Paragraph 8: You stated that you had concluded that CA, MB, and the FFO had perpetrated a criminal conspiracy by which they had put in place a sophisticated mechanism through a set of contrived and authorised transactions solely for the purpose of extracting and taking over nChain Group's IP at a significant undervalue. Given, for example, the need for nChain UK to draw down funds under the Credit Facility you and others knew that this allegation was false and / or had no genuine belief that they were true.

    4.20.2    Paragraph 9: The directors representing CA, and who presented the agreements to the board for approval, had deliberately deceived and manipulated the rest of the board into approving the 17 July Agreements by failing to disclose all relevant details. You had no basis whatsoever to support that allegation and you were aware that the 17 July Agreements had been considered and approved by the board of nChain Holding. You had no genuine belief that it was true either.

    4.20.3    Paragraph 16: You alleged that as urgent financing was not required, the main purpose of the Credit Facility agreement was to put in place a financial obligation which nChain Licensing would guarantee. However, as you were aware, nChain UK's financial position was such that it had already needed to draw down on that facility and was in need of significant ongoing funding.

4.21    After presenting these and other untrue allegations, the Co-Conspirators signed the minutes and in so doing signalled their support for a demand *inter alia*:

    4.21.1    that IT give Management access to the emails of the Chief Intellectual Property Officer, RA, and all parties involved in the 17 July Agreements for the purported aim of investigating the conspiracy further;

    4.21.2    that the 17 July Agreements be voided / cancelled;

    4.21.3    that MB step down from the board;

    4.21.4    that the chief IP officer should be dismissed for gross misconduct; and

    4.21.5    that a report of wrongdoing should be submitted to FINMA, the regulator of the FFO.

4.22    Such demands were inappropriate, were based on false allegations contained in the Fairway Brief, and were intended to cause harm to nChain. Nevertheless, the Co-Conspirators sought to rely on them and, the following day, attempted to use them as the basis of an unjustified and unlawful attempt to extract confidential information and influence others at nChain to facilitate this.



**BDB PITMANS**

**5        Loss**

5.1     Although your attempts to access confidential information on 27 September failed in whole or in part these still caused material losses to nChain and its business. The actions of you and your Co-Conspirators on that day caused significant disruption to the business of nChain and, in addition, compelled it to undertake a proper and comprehensive investigation report into the so-called whistleblowing (privilege in such report not being waived). nChain's losses continue to be investigated and are accruing. Given your attempts to cover up your conspiracy to extract confidential information (including by you and others refusing to return your devices) it is not yet clear how much confidential information your conspiracy has managed to obtain. These losses will be particularised in full in due course. However, as a minimum, the cost of nChain's investigations into the allegations set out in the Fairway Brief, the costs of restoring and preserving company documents, and all losses to and consequences of the disruption to the business are directly attributable to you and your Co-Conspirators.

**6        Preservation of Documents**

6.1     In addition to outlining the claims that our clients have against you, this letter provides you with formal notice that you may become a party to proceedings initiated by our clients. As a result, we draw your attention to your obligations to preserve documents under Practice Direction 57AD of the Civil Procedure Rules. Paragraph 3.1 of Practice Direction 57AD provides that:

"*A person who knows that it is or may become a party to proceedings that have been commenced or who knows that it may become a party to proceedings that may be commenced is under the following duties ('the Disclosure Duties') to the court—*

*(1)        to take reasonable steps to preserve documents in its control that may be relevant to any issue in the proceedings ….*"

6.2     A copy of Practice Direction 57AD is **enclosed**, which you should read carefully.

6.3     For the purposes of disclosure, "*the term "document" includes any record of any description containing information…*" (paragraph 2.2). "*A "document" may take any form including but not limited to paper or electronic; it may be held by computer or on portable devices such as memory sticks or mobile phones or within databases; it includes e-mail and other electronic communications such as text messages, webmail, social media and voicemail, audio or visual recordings.*" (paragraph 2.5). "*In addition to information that is readily accessible from computer systems and other electronic devices and media, the term "document" extends to information that is stored on servers and back-up systems and electronic information that has been 'deleted'.  It also extends to metadata, and other embedded data which is not typically visible on screen or a printout.*" (paragraph 2.6)

6.4     As a prospective party to the intended proceedings, you are required to take steps to preserve and not destroy documents that may be disclosable in the prospective proceedings. The Disclosure Duties include:



6.4.1    An obligation to suspend any relevant document deletion or destruction processes for the duration of the proceedings;

6.4.2    An obligation to send a written notification in any form to any relevant employees and former employees of any one of the parties where there are reasonable grounds for believing that the employee or former employee may be in possession of disclosable documents which are not also in the that party's possession; and

6.4.3    An obligation to take reasonable steps so that agents or third parties who may hold documents on the party's behalf do not delete or destroy documents that may be relevant to an issue in the proceedings.

6.5    We draw your attention to paragraph 4.3 of Practice Direction 57AD which sets out the form of written notice required.

6.6    If you have already destroyed any documents that would have been disclosable in the prospective proceedings, please provide details of the documents that have been destroyed and when you did so.

## 7    Conclusion

7.1    As noted above, this letter of claim has been prepared in accordance with the Practice Direction.

7.2    Pursuant to paragraph 6(b) of the Practice Direction, we expect a response to this letter within a reasonable time. We consider that 21 days is a reasonable time in the circumstances of this case. Accordingly, we require your response to this letter **by 20 May 2024**. Your reply should include confirmation as to whether the claim is accepted and, if it is not accepted, the reasons why, together with an explanation as to which facts and parts of the claim are disputed.

7.3    We request that you ensure that all correspondence in this matter is addressed to this firm under cover of the reference given above.

7.4    Once we receive your response to this letter, we will consider whether negotiation or any other form of ADR might enable us to settle this dispute without commencing proceedings.

7.5    In the absence of a full response by that date, we may be instructed to issue and serve proceedings without further notice.

7.6    Our clients reserve all their rights, including the right to commence proceedings against you and your Co-Conspirators (without further reference to you should that prove necessary) for unlawful means conspiracy and to seek an order for damages plus interest and costs.

7.7    As set out above, ignoring this letter may lead to our clients starting proceedings against you and may increase your liability for costs.

7.8    If you consider that, for any reasons, this letter of claim does not comply with the Practice Direction, please inform us why you consider it to be non-compliant and what further information you claim to require in order to respond.



7.9     We look forward to hearing from you accordingly.


Yours faithfully

**BDB Pitmans LLP**
E    nChain@BDBPitmans.com

enc          i. Practice Direction on Pre-Action Conduct and Protocols
             ii. Dramatis Personae
             iii. Practice Direction 57AD