# Exhibit 9



Mr Andrew Moody
57 Lewis Road
Welling
Greater London
DA16 1SD

Our Ref
210293.0001

Date
29 April 2024

By Email to andy.a.moody@gmail.com and By Post

Dear Sir

**nChain UK Limited & nChain Holding AG -v- Christen Ager-Hanssen, Andrew Moody & Others**
**LETTER OF CLAIM**

We are instructed by nChain UK Limited (**nChain UK**) and nChain Holding AG formerly HEH Holding AG (**nChain Holding**) (together, **nChain**).

This letter of claim is being sent to you in accordance with paragraph 6 of the Practice Direction on Pre-Action Conduct and Protocols (the **Practice Direction**) contained in the Civil Procedure Rule (**CPR**), a copy of which is **enclosed**. In particular, we refer you to paragraphs 13-16 of the Practice Direction concerning the court's powers to impose sanctions for failing to comply with its provisions. Ignoring this letter may lead to our clients commencing proceedings against you and may increase your liability for costs.

**1        Overview and Basis of Claim**

1.1      Our clients' claim arises from your actions during your employment by nChain as Chief Financial Officer and in particular your support of the false allegation of *inter alia* a criminal conspiracy among certain directors and shareholders of nChain, which was recorded in a document styled as the "Fairway Brief", including your actions in the nChain office on 27 September 2023. The Fairway Brief is said to have been authored by Christen Ager-Hanssen (**CAH**), the former nChain Group CEO (although we are actively investigating the involvement of others, including yourself in writing it). You had no genuine belief at the time that these particular allegations of a criminal conspiracy on the part of our clients were true. You also knew that the Fairway Brief was prepared with the intention of obtaining confidential information belonging to nChain by unlawful means.



**Registered Office**
One Bartholomew Close        50/60 Station Road        The Anchorage              Grosvenor House
London                                    Cambridge                        34 Bridge Street              Grosvenor Square
EC1A 7BL                              CB1 2JH                              Reading, RG1 2LU          Southampton, SO15 2BE
DX 339401 London Wall    DX 339601 Cambridge 24    DX 146420 Reading 21    DX 38516 Southampton 3

**T** +44 (0)345 222 9222        **W** www.bdbpitmans.com

BDB Pitmans is the trading name of BDB Pitmans LLP which is a limited liability partnership registered in England and Wales with registered number OC320798. Its registered office and principal place of business is One Bartholomew Close, London EC1A 7BL where a list of members' names is available for inspection. BDB Pitmans LLP is authorised and regulated by the Solicitors Regulation Authority (SRA ID no 448617). We use the word partner to refer exclusively to a member of BDB Pitmans LLP.

Please reply to: One Bartholomew Close

30944679.1



1.2  The claim against you and others is for unlawful means conspiracy. You conspired with your co-conspirators to gain access to confidential information (including but not limited to valuable intellectual property) belonging to nChain for your own benefit. You did so through unlawful means, as set out below.

1.3  The unlawful means deployed by you and your co-conspirators had at its core the preparation, presentation, and deployment of the Fairway Brief. You supported and represented the Fairway Brief as a whistleblowing report, which it was not, and deployed the false allegations within to coerce and control others into allowing you and assisting you to attempt, during the events of 27 September 2023, to disrupt the operations and proper administration of nChain and unlawfully access and obtain confidential information belonging to our clients. You and your co-conspirators' actions caused nChain to incur significant losses. and you must have known that they would cause nChain to suffer these substantial losses.

1.4  Our clients now intend to pursue a claim against you and your co-conspirators to recover these losses. Accordingly, this letter is to be treated as a formal letter of claim served in accordance with Paragraph 6 of the Practice Direction.

1.5  This letter is necessarily based on the documents and information available to our clients at the time of writing, having taken a proportionate approach to investigations at this early stage of the case. We consequently reserve the right to amend or expand our clients' claims once they have had the opportunity to consider substantive responses and documents provided.

1.6  A summary of definitions is also **appended** to this letter for convenience.

**2  Identity of Parties**

2.1  Our clients intend to pursue claims against you, CAH, David Brookes (**DB**) and Zafar Ali KC (**ZA**) as we presently consider you to be the main co-conspirators (the **Co-Conspirators**).

2.2  However, our clients reserve their rights to pursue other co-conspirators, should our clients' ongoing investigation show that others have also participated in your conspiracy. We are actively considering whether Endri Gjata (**EG**), Peter Coulson (**PC**) and/or Lars Jacob-Bø (**LJB**) (amongst others) also participated in your conspiracy or otherwise bear responsibility for the losses suffered by our clients as a result of this concerted action.

**3  Background**

Confidential Information of nChain

3.1  As you are aware, CAH is already facing High Court Proceedings for breach of confidence and unlawfully obtaining and retaining confidential information belonging to our clients. You and the Co-Conspirators sought to obtain confidential information belonging to our clients. This is likely to have included valuable intellectual property and commercially sensitive material.



Your Role at nChain

3.2 You joined nChain in 2017 as Finance Manager and became Chief Financial Officer on 1 January 2022. You were appointed as Group Chief Financial Officer (**CFO**) by virtue of the Employment Contract dated 1 January 2023 and entered into between you and nChain UK (the **Employment Contract**).

3.3 You were appointed as a director of nChain UK on 7 March 2018.

3.4 We are instructed that shortly after CAH joined nChain, you and he began a close friendship. In fact, it was shortly after CAH joining nChain in late 2022 that your salary was significantly increased to £225,000 pa, despite ostensibly no change in your role (other than a nominal change in title). We discuss this increase in salary further below.

3.5 As a result of these appointments, you owed both fiduciary and statutory duties to nChain UK and contractual duties to nChain UK and nChain AG and all direct and indirect subsidiary companies . Under the terms of your Employment Contract, those duties included the following:

    3.5.1 To abide by any statutory, fiduciary or common-law duties to nChain;

    3.5.2 To comply with requirements, recommendation or regulation and all regulatory authorities relevant to nChain and any policy or code of practice issued by nChain;

    3.5.3 Unless prevented by incapacity, to devote the whole of your time, attention and abilities to nChain' business;

    3.5.4 To use your best endeavours to promote, protect, develop and extend nChain's business;

    3.5.5 To consent to nChain monitoring and recording any use that you made of the Company's electronic communications systems for the purpose of ensuring that nChain's rules were being complied with; and

    3.5.6 To comply with any electronic communication systems policy that that nChain may issue.

3.6 Substantially similar duties were also included in CAH's contract.

3.7 The Employment Contract (as well as CAH's contract) also included an obligation for you to comply with the rules, policies and procedures set out in the Employee Handbook, and confirmed that all documents, manuals, hardware and software provided for your use and any data or documents produced, maintained or stored on nChain's systems remained the property of nChain.

3.8 As a director of nChain UK Ltd, you owed the following statutory duties pursuant to the Companies Act 2006 (**CA 2006**):

    3.8.1 to act within the company' powers and for proper purpose – s.171 CA 2006;



    3.8.2    to promote the success of the company – s.172 CA 2006;

    3.8.3    to exercise independent judgment – s.173 CA 2006;

    3.8.4    to exercise reasonable care, skill and diligence – s.174 CA 2006;

    3.8.5    to avoid conflicts of interest – s.175 CA 2006;

    3.8.6    not to accept benefits from third parties – s. 176 CA 2006; and

    3.8.7    to declare any interest in a proposed transaction or arrangement with the company – s. 177 CA 2006.

3.9    You were intrinsically involved with regard to the events of 27th September 2023, (and indeed subsequently dismissed by nChain for gross misconduct as a result of this involvement). In particular:

    3.9.1    We understand that you had some involvement in the preparation of the Fairway Brief. We note that as part of your disciplinary interviews you admitted that you had been helping CAH since at least 2 August 2023 by sharing with him your alleged concerns about the agreements mentioned in the Fairway Brief. You have also accepted that you were aware that the report was being drafted since at least August;

    3.9.2    You were present at and participated in the meeting at Chelsea Barracks on 26 September 2023 at which you and others purported to resolve to take steps to investigate the matters set out in the Fairway Brief, including by instructing IT personnel to provide access to confidential information;

    3.9.3    Your support of the Fairway Brief was intended to further the aims of your conspiracy, in particular extracting confidential information belonging to nChain and causing harm to nChain. Paragraph 31 of the Minutes shows that the Fairway Brief was intended as a basis to confer authority on CAH to access confidential information, in particular the emails of RA and "all parties involved in the 17 July Transaction", referring to the contracts dated 17 July 2023 giving managerial oversight to FFO and providing a CHF100 million loan from Indigo IP Holdings Limited (**Indigo**) to nChain secured by a guarantee from nChain Licensing in respect of its IP in the event of default (the **17 July Agreements**);

    3.9.4    At the Chelsea Barracks meeting you agreed that you and CAH would be going into the office the next day to issue directions to further your plan, given that you were the only nChain UK directors present at that meeting. You were present during and a participant in various discussions or meetings with Ajay Patel (**AP**), Head of Corporate IT, on 27 September 2023, in which AP was instructed to grant you and your co-conspirators access to email inboxes of a number of senior nChain and Fairway Family Office (**FFO**) personnel. These discussions were carried out in a way that intimidated and concerned AP, yet you continued to support the instructions given to him. You confirmed the instructions given by CAH in the meeting to AP in writing;



3.9.5     You were involved in the covering and attempted disabling of the CCTV cameras in the nChain offices in London. You have since suggested that this was carried out as there was suspicion that the company was being 'hacked'. That is simply a pretext. This supposed 'hack' was not reported to the police, despite this being the accepted guidance regarding cyber-attacks. The proper inference is that you wished to conceal the actions that you and others were taking at that time;

3.9.6     You, along with EG, attempted to force access to the 'Communications Room' which houses the nChain servers, including kicking on the door, and shouting at those present in the office that you needed access. When access was finally granted you attempted to gain unauthorised access to the servers themselves, presumably to access the email accounts, or other confidential information, directly;

3.9.7     You were aware of documents being shredded by DB, and did nothing to stop these actions. Whilst you have previously suggested that he explained to you that the documents being destroyed were old drafts and therefore of little importance, given the remarkable nature of the events leading up to DB's shredding of documents, it is to be inferred that these were important documents. The fact that you did not prevent these documents from being shredded, and claim not to have enquired in detail with DB as to their exact nature, leads to the further inference that you were aware of the content of the documents and stood to benefit in some way from their destruction;

3.9.8     You were seen on CCTV in the nChain office until late on 27 September 2023 looking for documents. This was despite you and/or your Co-Conspirators' attempts to cover-up the CCTV cameras.

3.10     It is clear that in choosing to ally yourself with CAH and accepting the increased salary included in the Employment Contract, you allowed CAH to interfere with your decisions, and from that point onwards you acted in tandem with him to pursue your joint goals. In doing so, you breached your duties under the Employment Contract and as a director, and nChain will be seeking damages from you occasioned by your conduct in this respect.

**4**     **Unlawful Means Conspiracy**

4.1     It is nChain's case that you and your Co-Conspirators conspired together to (1) obtain confidential information belonging to nChain and its officers and / or employees with an intention to cause harm to nChain and (2) to harm the company (the **Conspiracy**).

<u>Agreement</u>

4.2     The agreement between you and your Co-Conspirators can be inferred from your conduct and the events set out above.

4.3     The agreements between you and your Co-Conspirators (irrespective of whether they had been made separately to one another) had the same intention and object; namely you agreed to pursue an unlawful course of action with the object of extracting confidential information from nChain and to cause nChain to incur loss and suffer damage.



4.4 Your agreement must have predated the so-called "Group Management" meeting of 26 September 2023.. During that meeting, the Co-Conspirators and others signed a set of pre-prepared "Minutes", confirming your agreement to the findings of, and statements made in the Fairway Brief, and to pursuing various specific actions against nChain and its leadership, such as the dismissal of Robert Alizon (**RA**) (Chief Intellectual Property Officer), the removal of Marco Bianchi (**MB**) from the boards of the nChain Group, gaining access to a number of IT and email accounts, and the interference with the operation of the 17 July Agreements.

4.5 This agreement to these actions (through collective signature of the purported "Minutes") is alone sufficient evidence of your, and the Co-Conspirators', agreement to the aims of the Conspiracy. However, we believe that this agreement also existed prior to this event, as part of the planned strategy to manufacture evidence and agree upon the nature and deployment of your false representations regarding, in particular, the need for the credit facility and the fact that you had already needed to draw down on the credit facility to meet nChain's financial obligations (see 4.10 below). We understand that this agreement was reached by at least August 2023, when you discussed with CAH your alleged concerns about the Fairway Brief.

4.6 The following day, 27 September 2023, you, CAH, ZA and others sought, wrongfully, to instruct nChain's IT personnel, and in particular AP, to give you and your Co-Conspirators unlimited and unauthorised access to the email accounts of a number of senior nChain and FFO personnel, including Stefan Matthews (**SM**), RA, Dr. Craig Wright, Patrick Stein and Olga Fernandez.

Common Intention and Concerted Action

4.7 Your common intention was to benefit from obtaining confidential information belonging to nChain for personal financial gain or greater control or influence over nChain. This is shown by the concerted actions by you and others to achieve this aim.

4.8 It is clear that there was a common intention between you and some or all of the Co-Conspirators to present the Fairway Brief as an honest whistleblowing report, which it was not, and to use it to coerce others into granting you greater control and influence and, importantly, access to confidential information. The intention was to obtain valuable confidential information (such as intellectual property) for your own benefit and not bona fide in the best interests of nChain.

4.9 In addition, you and your Co-Conspirators sought to mutually benefit from an increase in your influence and control of nChain and a corresponding reduction in the same on the part of the FFO who had been appointed by the nChain board as set out below in an agreement which was signed by you among others. In part, the benefit that you and others would obtain from this was a greater and unfettered ability to profit at the expense of those funding the nChain group, through inflated salaries, remuneration and benefits in kind.

4.10 You and others were aware of the fact that nChain required the credit facility referred to in the Fairway Brief. Despite this, the Fairway Brief contained false representations to those to whom it was presented that this facility was not required. In particular, you and your co-conspirators knew that you had already drawn down on the credit facility in order to meet nChain's increased financial burdens (resulting from *inter alia* the onboarding of numerous new employees and



inflation of existing salaries). You would have been aware that this would have influenced the attendees (other than your co-conspirators) in your attempts to persuade them to provide access to confidential information. Further, you used this false information to induce others into signing the minutes and supporting the publication of the Fairway Brief.

4.11    All of this supported the ultimate aim of 'legitimising' the attempt to access the company's confidential information. Indeed, on 27 September 2023, after these 'minutes' had been signed, you and others used the purported authority contained within them to attempt to access and obtain confidential information belonging to nChain. As set out above, these actions included *inter alia*: attempting to access the email accounts of senior nChain and FFO personnel; breaking into the Communications server room presumably to access directly the data held on the servers; locating, obtaining and retaining a hard drive and USB stick; and taping over CCTV cameras in order to conceal these actions. Investigations into what confidential information belonging to nChain was taken are ongoing.

Unlawful Means

4.12    You and your Co-Conspirators used some or all of the following unlawful means to carry out your conspiracy.

4.13    **Breach of confidence and/or procuring a breach of confidence.**

    4.13.1    nChain is plainly the owner of the confidential information that you sought to obtain.

    4.13.2    You and your Co-Conspirators sought to obtain this confidential information on 27 September 2023, including through acts of intimidation and misrepresentations perpetrated by them and you. Your acts of intimidation are set out above.

    4.13.3    You did not have nChain's consent to do so.

    4.13.4    Further or alternatively, you and your Co-Conspirators procured a breach of confidence by making false representations and/or intimidating nChain employees to hand you over this confidential information.

4.14    **Breach of fiduciary duty by you and CAH.** You and CAH acted in breach of your fiduciary duties as directors by a combination to make false allegations in the Fairway Brief, extracting confidential information, intending to injure nChain and intimidating nChain employees with the intention for them to hand over this confidential information.

4.15    **Breach of contract and procuring a breach of contract by you and your Co-Conspirators.**

    4.15.1    Your actions also amount to a breach of contract and/or procuring a breach of contract. In particular, your and CAH's contracts included the obligations set out in section 3 above.

    4.15.2    You clearly used the unlawful means of breach of contract and/or procuring a breach of contract as part of your conspiracy.



    4.15.3    You and CAH intended to extract confidential information and cause losses to nChain. This is contrary to your duties to promote, protect and develop nChain.

    4.15.4    The Minutes included agreement to dismiss RA. CAH's contract explicitly prohibited CAH from doing so. Doing so would not have been justified and would have caused nChain loss and damage, including by incurring a liability to RA.

    4.15.5    The conduct set out above amounting to breach of confidence is clearly also non-compliant with the electronic communication systems policy and nChain's handbooks.

    4.15.6    The intimidating conduct towards nChain employees is contrary to the duties to promote, protect and develop nChain but also clearly against the rules set out in the Employee Handbook.

4.16    The allegations in the Fairway Brief are misconceived and incorrect in fact and law.  They were plainly not put forward in good faith. We will not address each and every allegation in this letter, but will deal with the principal complaints with regard to nChain group, which were as follows:

    4.16.1    that nChain Holding did not properly enter into the 17 July Agreements;

    4.16.2    that nChain Group did not require the revolving credit facility;

    4.16.3    that the Licence Agreement should not have been approved and included terms which were for the sole benefit of Indigo (and as such were a "criminal conspiracy"); and

    4.16.4    that the services agreement between nChain and FFO established preferential treatment of one shareholder above the others, and gave that minority shareholder day-to-day control (and that shareholder may trigger a breach of covenant in the license agreement for its own benefit).

4.17    In fact:

    4.17.1    The board resolution of nChain Holding confirming the decision to enter into the 17 July Agreements was properly and correctly passed in accordance with the laws of Lichtenstein and the constitution of the company This board resolution was subsequently ratified by all shareholders of nChain Holding;

    4.17.2    The revolving credit agreement was required by nChain, and, in particular, nChain UK was unable to pay its debts as they felt due. You yourself requested a drawdown of funds under the credit facility on 14 September 2023 and were aware that nChain UK was unable to pay its debts as they fell due without relying on external credit facilities;

    4.17.3    The Licence Agreement was properly entered into and was on terms agreed by the board of nChain Holdings. In the circumstances, where Indigo was contributing



|   |   |   |
|---|---|---|
|   |   | CHF60 million for the licence fees and granting a CHF100 million facility, the terms were reasonable, and board and shareholder approval was properly obtained; |
|   | 4.17.4 | The services agreement between nChain and FFO reflected the desire of the board for advice to be provided on the management of its business operations and those of its subsidiaries. As with the other agreements, it had approval of the shareholders. |
|   | 4.17.5 | You conspicuously did not seek to explain what crime you alleged the parties were conspiring to commit (nor in which jurisdiction, it is said to have taken place). In any event, there was no conspiracy, nothing undertaken would or could have been criminal and the 17 July Agreements were all lawfully and properly entered into by nChain. |
| 4.18 | | The Fairway Brief therefore contained multiple incorrect and unjustified allegations, which were wrong and misleading in fact and law, and you knew them to be so or, at least, had no genuine belief that they were true. |
| 4.19 | | A meeting of "Group Management of HEH Holding Group" was called on 26 September 2023. Notwithstanding its title, that meeting did not include any member of the board of nChain Holdings. |
| 4.20 | | Minutes of that meeting had been drafted in advance and were circulated. Those minutes included similar allegations to those in the Fairway Brief (and appeared to be copied and pasted from it). You signed the minutes, indicating that you agreed with them. In particular: |
|   | 4.20.1 | Paragraph 8: You stated that you had concluded that CA, MB, and the FFO had perpetrated a criminal conspiracy by which they had put in place a sophisticated mechanism through a set of contrived and authorised transactions solely for the purpose of extracting and taking over nChain's IP at a significant undervalue. Given, for example, the need for nChain UK to draw down funds under the credit facility you and others knew that this allegation was false and / or had no genuine belief that they were true. |
|   | 4.20.2 | Paragraph 9: The directors representing CA, and who presented the agreements to the board for approval, had deliberately deceived and manipulated the rest of the board into approving the 17 July Agreements by failing to disclose all relevant details. You had no basis whatsoever to support that allegation and you were aware that the 17 July Agreements had been considered and approved by the board of nChain Holdings. You had no genuine belief that it was true either. |
|   | 4.20.3 | Paragraph 16: You alleged that as urgent financing was not required, the main purpose of the credit facility agreement was to put in place a financial obligation which nChain Licensing would guarantee. However, as you were aware, nChain UK's financial position was such that it had already needed to draw down on that facility and was in need of significant ongoing funding. |
| 4.21 | | After presenting these and other untrue allegations, the Co-Conspirators signed the minutes and in so doing signalled their support for a demand *inter alia*: |



    4.21.1    that IT give Management access to the emails of the Chief Intellectual Property Officer RA, and all parties involved in the 17 July Agreements for the purported aim of investigating the conspiracy further;

    4.21.2    that the 17 July Agreements be voided / cancelled;

    4.21.3    that MB step down from the board;

    4.21.4    that RA should be dismissed for gross misconduct; and

    4.21.5    that a report of wrongdoing should be submitted to FINMA, the regulator of the FFO.

4.22    Such demands were inappropriate, were based on false allegations contained in the Fairway Brief, and were intended to cause harm to nChain. Nevertheless, the Co-Conspirators sought to rely on them and, the following day, attempted to use them as the basis of an unjustified and unlawful attempt to extract confidential information and influence others at nChain to facilitate this.

## 5    Loss

5.1    Although your attempts to access confidential information on 27 September failed in whole or in part these still caused material losses to nChain. The actions of you and your Co-Conspirators on that day caused significant disruption to the business of nChain and, in addition, compelled it to undertake a proper and comprehensive investigation report into the so-called whistleblowing (privilege in such report not being waived). nChain's losses continue to be investigated and are accruing. Given your attempts to cover up your conspiracy to extract confidential information (including by CAH and others refusing to return their devices) it is not yet clear how much confidential information your conspiracy has managed to obtain. These losses will be particularised in full in due course. However, as a minimum, the cost of nChain's investigations into the allegations set out in the Fairway Brief, along with the costs of restoring and preserving company documents, and all losses to and consequences of the disruption to the business are directly attributable to you and your Co-Conspirators.

## 6    Preservation of Documents

6.1    In addition to outlining the claims that our clients have against you, this letter provides you with formal notice that you may become a party to proceedings initiated by our clients. As a result, we draw your attention to your obligations to preserve documents under Practice Direction 57AD of the Civil Procedure Rules. Paragraph 3.1 of Practice Direction 57AD provides that:

"*A person who knows that it is or may become a party to proceedings that have been commenced or who knows that it may become a party to proceedings that may be commenced is under the following duties ('the Disclosure Duties') to the court—*

*(1)    to take reasonable steps to preserve documents in its control that may be relevant to any issue in the proceedings ….*"



6.2 A copy of Practice Direction 57AD is **enclosed**, which you should read carefully.

6.3 For the purposes of disclosure, "*the term "document" includes any record of any description containing information…*" (paragraph 2.2). "*A "document" may take any form including but not limited to paper or electronic; it may be held by computer or on portable devices such as memory sticks or mobile phones or within databases; it includes e-mail and other electronic communications such as text messages, webmail, social media and voicemail, audio or visual recordings.*" (paragraph 2.5). "*In addition to information that is readily accessible from computer systems and other electronic devices and media, the term "document" extends to information that is stored on servers and back-up systems and electronic information that has been 'deleted'. It also extends to metadata, and other embedded data which is not typically visible on screen or a printout.*" (paragraph 2.6)

6.4 As a prospective party to the intended proceedings, you are required to take steps to preserve and not destroy documents that may be disclosable in the prospective proceedings. The Disclosure Duties include:

    6.4.1 An obligation to suspend any relevant document deletion or destruction processes for the duration of the proceedings;

    6.4.2 An obligation to send a written notification in any form to any relevant employees and former employees of any one of the parties where there are reasonable grounds for believing that the employee or former employee may be in possession of disclosable documents which are not also in the that party's possession; and

    6.4.3 An obligation to take reasonable steps so that agents or third parties who may hold documents on the party's behalf do not delete or destroy documents that may be relevant to an issue in the proceedings.

6.5 We draw your attention to paragraph 4.3 of Practice Direction 57AD which sets out the form of written notice required.

6.6 If you have already destroyed any documents that would have been disclosable in the prospective proceedings, please provide details of the documents that have been destroyed and when you did so.

**7 Conclusion**

7.1 As noted above, this letter of claim has been prepared in accordance with the Practice Direction.

7.2 Pursuant to paragraph 6(b) of the Practice Direction, we expect a response to this letter within a reasonable time. We consider that 21 days is a reasonable time in the circumstances of this case. Accordingly, we require your response to this letter **by 20 May 2024**. Your reply should include confirmation as to whether the claim is accepted and, if it is not accepted, the reasons why, together with an explanation as to which facts and parts of the claim are disputed.



7.3 We request that you ensure that all correspondence in this matter is addressed to this firm under cover of the reference given above.

7.4 Once we receive your response to this letter, we will consider whether negotiation or any other form of ADR might enable us to settle this dispute without commencing proceedings.

7.5 In the absence of a full response by that date, we may be instructed to issue and serve proceedings without further notice.

7.6 Our clients reserve all their rights, including the right to commence proceedings against you and your Co-Conspirators (without further reference to you should that prove necessary) for unlawful means conspiracy and to seek an order for damages plus interest and costs.

7.7 As set out above, ignoring this letter may lead to our clients starting proceedings against you and may increase your liability for costs.

7.8 If you consider that, for any reasons, this letter of claim does not comply with the Practice Direction, please inform us why you consider it to be non-compliant and what further information you claim to require in order to respond.

7.9 We look forward to hearing from you accordingly.

Yours faithfully

*BDB Pitmans LLP*

**BDB Pitmans LLP**
E    nChain@BDBPitmans.com

enc      i. Practice Direction on Pre-Action Conduct and Protocols
         ii. Dramatis Personae
         iii. Practice Direction 57AD