# Exhibit 10



Mr David Brookes
9 Bevin Square
Beechcroft Road
London
SW17 7BB

Our Ref
210293.0001

Date
29 April 2024

**By Email to david.ag.brookes@hotmail.com and By Post**

Dear Sir

**nChain UK Limited & nChain Holding AG -v- Christen Ager-Hanssen, David Brookes & Others
LETTER OF CLAIM**

We are instructed by nChain UK Limited (**nChain UK**) and nChain Holding AG formerly HEH Holding AG (**nChain Holding**) (together, **nChain**).

This letter of claim is being sent to you in accordance with paragraph 6 of the Practice Direction on Pre-Action Conduct and Protocols (the **Practice Direction**) contained in the Civil Procedure Rules (**CPR**) a copy of which is **enclosed**. In particular, we refer you to paragraphs 13-16 of the Practice Direction concerning the court's powers to impose sanctions for failing to comply with its provisions. Ignoring this letter may lead to our clients commencing proceedings against you and may increase your liability for costs.

**1    Overview and Basis of Claim**

1.1    Our clients' claim arises from your actions during your employment by nChain as Group General Counsel and in particular your support of the false allegation of *inter alia* a criminal conspiracy among certain directors and shareholders of nChain, which was recorded in a document styled as the "Fairway Brief", including your actions in the nChain office on 27 September 2023. You admitted to being a co-author of the Fairway Brief, alongside Christen Ager-Hanssen (**CAH**), the former nChain Group CEO. You had no genuine belief at the time that the factual allegations behind these particular allegations of a criminal conspiracy on the part of our clients were true. You also knew that the Fairway Brief was prepared with the intention of obtaining confidential information belonging to nChain by unlawful means.

1.2    The claim against you and others is for unlawful means conspiracy. You conspired with your co-conspirators to gain access to confidential information (including but not limited to valuable



**Registered Office**
One Bartholomew Close          50/60 Station Road          The Anchorage              4 Grosvenor Square
London                          Cambridge                  34 Bridge Street            Southampton,
EC1A 7BL                        CB1 2JH                    Reading, RG1 2LU            SO15 2BE
DX 339401 London Wall           DX 339601 Cambridge 24     DX 146420 Reading 21        DX 38516 Southampton 3

**T** +44 (0)345 222 9222        **W** www.bdbpitmans.com

BDB Pitmans is the trading name of BDB Pitmans LLP which is a limited liability partnership registered in England and Wales with registered number OC320798. Its registered office and principal place of business is One Bartholomew Close, London EC1A 7BL where a list of members' names is available for inspection. BDB Pitmans LLP is authorised and regulated by the Solicitors Regulation Authority (SRA ID no 448617). We use the word partner to refer exclusively to a member of BDB Pitmans LLP.

Please reply to: One Bartholomew Close

30944729.1



intellectual property) belonging to nChain for your own benefit. You did so through unlawful means, as set out below.

1.3  The unlawful means deployed by you and your co-conspirators had at its core the preparation, presentation, and deployment of the Fairway Brief. You supported and represented the Fairway Brief as a whistleblowing report, which it was not, and deployed the false allegations within it to coerce and control others into allowing you and assisting you to attempt, during the events of 27 September 2023, to disrupt the operations and proper administration of nChain and unlawfully access and obtain confidential information belonging to our clients. You and your co-conspirators' actions caused nChain to incur significant losses and you must have known that they would cause nChain to suffer these substantial losses.

1.4  Our clients now intend to pursue a claim against you and your co-conspirators to recover these losses. Accordingly, this letter is to be treated as a formal letter of claim served in accordance with Paragraph 6 of the Practice Direction.

1.5  This letter is necessarily based on the documents and information available to our clients at the time of writing, having taken a proportionate approach to investigations at this early stage of the case. We consequently reserve the right to amend or expand our clients' claims once they have had the opportunity to consider substantive responses and documents provided.

1.6  A summary of definitions is also **appended** to this letter for convenience.

## 2       Identity of Parties

2.1  Our clients intend to pursue claims against you, CAH, Andrew Moody (**AM**) and Zafar Ali KC (**ZA**) as we presently consider you to be the main co-conspirators (the **Co-Conspirators**).

2.2  However, our clients reserve their rights to pursue other co-conspirators, should our client's investigation show that others have also participated in your conspiracy. We are actively considering whether Peter Coulson (**PC**), Lars Jacob-Bø (**LJB**) and/or Endri Gjata (**EG**) (amongst others) also participated in your conspiracy or otherwise bear responsibility for the losses suffered by our clients as a result of this concerted action.

## 3       Background

Confidential Information of nChain

3.1  As you are aware, CAH is already facing High Court Proceedings for breach of confidence and unlawfully obtaining and retaining confidential information belonging to our clients. You and the Co-Conspirators sought to obtain confidential information belonging to our clients. This is likely to have included valuable intellectual property and commercially sensitive material.



Your Role at nChain

3.2    You joined nChain on about 1 January 2023 and you were appointed as Group General Counsel by virtue of the Employment Contract dated 1 January 2023 and entered into between you and nChain UK (the **Employment Contract**).

3.3    Between June 2018 and December 2022, you were general counsel at Custos Holdings Ltd, a company controlled by Christen Ager-Hanssen, and you continued to provide services to that company during your employment with nChain, notwithstanding the express obligation in the Employment Contract to devote the whole of your time to the business of nChain. On 10 February 2020 you were appointed as a director of Addreax Group Ltd which is also a company controlled by Christen Ager-Hanssen. This gave rise to the possibility of conflicts between your duties as an employee of nChain and your work for, and duties to, these companies to whom you continued to provide services.

3.4    Under the terms of your Employment Contract, you agreed:

   3.4.1    To abide by any statutory, fiduciary, or common-law duties to nChain;

   3.4.2    To comply with requirements, recommendation or regulation and all regulatory authorities relevant to nChain and any policy or code of practice issued by nChain;

   3.4.3    Unless prevented by incapacity, to devote the whole of your time, attention, and abilities to nChain' business;

   3.4.4    To use your best endeavours to promote, protect, develop, and extend nChain's business;

   3.4.5    To consent to nChain monitoring and recording any use that you made of the Company's electronic communications systems for the purpose of ensuring that nChain's rules were being complied with; and

   3.4.6    To comply with any electronic communication systems policy that that nChain may issue.

3.5    Substantially similar duties were also included in CAH and AM's contracts.

3.6    The Employment Contract (as well as CAH's and AM's contracts) also included an obligation for you to comply with the rules, policies and procedures set out in the Employee Handbook, and confirmed that all documents, manuals, hardware, and software provided for your use and any data or documents produced, maintained or stored on nChain's systems remained the property of nChain.

3.7    You were intrinsically involved with regard to the events of 26th and 27th September 2023, (and indeed subsequently dismissed by nChain for gross misconduct as a result of this involvement). In particular:



3.7.1  From around August 2023, you assisted CAH in the preparation of the so called whistleblowing report styled the "Fairway Brief" (details of which are described in paragraph 3.7.5 below). In the Details of Complaint, you have filed at the Employment Tribunal you claim that you co-authored the Fairway Brief with CAH.

3.7.2  A two-day workshop had been arranged in Liechtenstein on 19-20 September 2023 to focus on corporate governance in nChain. You and CAH were expected to attend, and it was obviously important that you did so given your roles. However, you did not attend this workshop. Instead, you invented an excuse in order to assist CAH to prepare the Fairway Brief. You had also discussed the issues in the Fairway Brief with others including AM.

3.7.3  On 25th September 2023 CAH asked you to prepare the minutes of the "HEH Group Management Meeting" that he was calling to be held at Chelsea Barracks on 26th September 2023 (the **Chelsea Barracks Meeting**). You emailed a draft to CAH at his Custos email address at 18.01 on 25th September. The text of the minutes was wholly consistent with the allegations in, and was in parts copy-pasted from, the Fairway Brief. The document also did not represent minutes of the meeting at all but was a script for CAH to present his conclusions to the meeting.

3.7.4  CAH subsequently asked you to create an updated version of the minutes which appeared to refer specifically to the Fairway Brief and the so-called mock trial against Craig Wright (**CSW**), and also to the attendance of ZA to elaborate and answer questions raised by the mock judgment and the Fairway Brief.

3.7.5  At 21:00 on 26 September 2023, you attended an "HEH Group Management" meeting at the Chelsea Barracks (i.e., the Chelsea Barracks meeting), which was called by CAH. Also in attendance were James Marchant (**JM**), PC, AM, LJB and ZA. Notwithstanding its title, that meeting did not include any member of the board of HEH Holdings. CAH brought wine, gin, and champagne to the meeting and invited attendees to drink. No agenda was circulated in advance. CAH presented the document entitled "The Fairway Brief" dated 26 September 2023 (the **Fairway Brief**) to attendees. According to media interviews conducted by CAH, he had been working on the Fairway Brief since at least 14 August 2023. You admitted having been involved in the Fairway Brief since or around August 2023. The Fairway Brief purported to constitute a whistleblowing report uncovering an alleged criminal conspiracy between Calvin Ayre (**CA**), Marco Bianchi (**MB**) and the Fairway Family Office (**FFO**) against the "stakeholders of HEH Holding AG and its subsidiaries". The Fairway Brief alleged that contracts dated 17 July 2023 giving managerial oversight to FFO and providing a CHF100 million loan from Indigo IP Holdings Limited (**Indigo**) to nChain secured by a guarantee from nChain Licensing in respect of its IP in the event of default (the **17 July Agreements**) were part of a "conspiracy to defraud HEH Holding, nChain Group and its stakeholders". You had been involved in the drafting of the 17 July Agreements.

3.7.6  At the meeting, CAH and ZA misrepresented the Fairway Brief as a legitimate whistleblowing report containing genuine allegations of a criminal conspiracy without



a reasonable belief that the allegations were genuine. As an experienced solicitor you also would not have reasonably believed that the allegations were genuine. ZA and CAH informed the attendees that they had three options: i) carry on as usual but if they did they would be part of the criminal conspiracy; ii) sign the Minutes with the list of actions or iii) resign from nChain and leave. In doing so, he purported to be advising them on their legal options and misled them as to the options legally open to them in an attempt to pressure them to sign the Minutes and give further credibility to the Fairway Brief. As an experienced solicitor and as general counsel you would have known that ZA was giving false advice and / or that he was purporting to give advice based on false information contained in the Fairway Brief.

3.7.7   Also during the Chelsea Barracks meeting, attendees were informed that the Fairway Brief was "GDPR compliant". As an experienced solicitor, you would have had no genuine belief that this statement was true and did not correct it.

3.7.8   After these untrue allegations, the attendees signed the Minutes in support of demands *inter alia*:

   (a)   that IT give Management access to the emails of the Chief Intellectual Property Officer Robert Alizon (**RA**) and all parties involved in the 17 July Agreements for the purported aim of investigating the conspiracy further;

   (b)   that the 17 July Agreements be voided / cancelled;

   (c)   that MB step down from the board;

   (d)   that RA be dismissed for gross misconduct; and

   (e)   that a report of wrongdoing be submitted to FINMA, the regulator of the FFO.

3.7.9   Such demands were inappropriate, were based on false allegations contained in the Fairway Brief and were intended to cause harm to nChain. Nevertheless, the Co-Conspirators sought to rely on them and, the following day, attempted to use them as the basis of an unjustified and unlawful attempt to extract confidential information, in breach of confidence, and influence others at nChain to facilitate this.

3.7.10  Your preparation and support of the Fairway Brief were intended to further the aims of the conspiracy, in particular extracting confidential information belonging to nChain and causing harm to nChain. Paragraph 31 of the Minutes shows that the Fairway Brief was intended as a basis to confer authority on CAH to access confidential information, in particular the emails of RA and "all parties involved in the 17 July Transaction".

3.7.11  You were aware that the following day your Co-Conspirators sought to intimidate nChain's IT Team into providing access to confidential information. In your disciplinary meeting on 16 November 2023, you admitted that when your Co-Conspirators sought to gain access to confidential information (by intimidating nChain IT staff) things "*were not properly handled*" and as the Group General Counsel you



    should have taken responsibility and acted to prevent the intimidation of staff and unlawful attempts to obtain confidential information which you knew would follow the agreement of the Chelsea Barracks Minutes. However, you failed to intervene during the events of 26-27 September 2023. In any event, the actions of your Co-Conspirators on those days were undertaken pursuant to a conspiracy between you to obtain confidential information.

    3.7.12    As part of the attempts to obtain confidential information the Co-Conspirators were involved in the covering and attempted disabling of the CCTV cameras in the nChain offices in London as well as revoking access to the office for certain senior people and hiring additional security staff. As set out below, during the time when the CCTV cameras were covered you were shredding nChain documents. The proper inference is that you and your Co-Conspirators wished to conceal your actions on the day. Had you genuinely thought nChain was at risk of a hack, you would have contacted the Chairman of the Company and/or the Board of nChain Holding; you failed to do so, from which the inference is that you, too, wished to conceal the actions of you and your Co-Conspirators.

    3.7.13    In your 16 November 2023 interview you said that were there were old draft nChain documents that were "rubbish". You also mentioned that these included the "Lichtenstein Drafts". We understand that PC, the COO, told you not to do so but that you continued and apparently contended that the material you were shredding related to Addreax Group Ltd or Custos Group and that you had been meaning to do so for some time. As well as shredding documents, you also removed documents and papers from the offices of nChain. Given the remarkable nature of the events leading up your shredding of documents, it is to be inferred that these were important documents. The fact that AM, who was aware of your actions, did not prevent these documents from being shredded leads to the further inference that the Co-Conspirators, or some of them, were aware of the content of the documents and stood to benefit in some way from their destruction and / or removal from nChain. Our client's investigations are ongoing, however, should it be confirmed that you were shredding important documents, we infer that you may well have intended to conceal the fact that you had full knowledge of the preparation of those Agreements, contrary to what was stated in the Fairway Brief.

3.8    It is clear that in choosing to ally yourself with CAH, you allowed CAH to interfere with your decisions, and that you acted in tandem with him to pursue your joint goals. In doing so, you breached your duties under the Employment Contract, and nChain will be seeking damages from you occasioned by your conduct in this respect.

4    **Unlawful Means Conspiracy**

4.1    It is nChain's case that you and your Co-Conspirators conspired together to (1) obtain confidential information belonging to nChain and its officers and / or employees with an intention to cause harm to nChain and (2) to harm the company (the **Conspiracy**).



Agreement

4.2   The agreement between you and your Co-Conspirators can be inferred from your conduct and the events set out above.

4.3   The agreements between you and your Co-Conspirators (irrespective of whether they had been made separately to one another), had the same intention and object; namely you agreed to pursue an unlawful course of action with the object of extracting confidential information from nChain and to cause nChain to incur loss and suffer damage.

4.4   Your agreement must have predated the so-called "Group Management" meeting of 26 September 2023. During that meeting, the Co-Conspirators and others signed a set of pre-prepared "Minutes", confirming your agreement to the findings of, and statements made in the Fairway Brief, and to pursuing various specific actions against nChain and its leadership, such as the dismissal of RA, the removal of MB from the boards of the nChain Group, gaining access to a number of IT and email accounts, and the interference with the operation of the "17 July Transactions" documents. As set out above, you and CAH had pre-written the "Minutes" handed out at the Chelsea Barracks Meeting. We infer from this that your agreement predates the Chelsea Barracks Meeting.

4.5   This agreement to these actions (through collective signature of the purported "Minutes") is alone sufficient evidence of your, and the Co-Conspirators', agreement to the aims of the Conspiracy. However, we believe that this agreement also existed prior to this event, and it appears to have been reached in August 2023 when you assisted CAH with the preparation of the Fairway Brief and discussed it with him and AM and potentially others. AM would also have been aware that nChain had already drawn down funds under the Credit Facility before the meeting on 26th September, thereby knowing that, contrary to the allegations in the Fairway Brief, nChain UK Ltd was unable to pay its debts as they fell due without relying on external credit facilities.

4.6   On 27th September 2023, the day after the Chelsea Barracks meeting, your Co-Conspirators sought, wrongfully, to instruct nChain's IT personnel and in particular Ajay Patel to give you and your Co-Conspirators unlimited and unauthorised access to the email accounts of a number of senior nChain and FFO personnel, including Stefan Matthews (**SM**), RA, CSW, Patrick Stein and Olga Fernandez. You were part of the group that decided to tell the nChain employees that there was a hack. We infer from this that you used this as an excuse to facilitate your attempts to obtain confidential information and/or cover-up your previous actions by shredding documents. To the same end, you told nChain staff to go home, so that you and your Co-Conspirators could take control of the office.

Common Intention and Concerted Action

4.7   Your common intention was to benefit from obtaining confidential information belonging to nChain for personal financial gain or greater control or influence over nChain. This is shown by the concerted actions by you and others to achieve this aim.



4.8   It is clear that there was a common intention between you and some or all of the Co-Conspirators to present the Fairway Brief as an honest whistleblowing report, which it was not, and to use it to coerce others into granting you greater control and influence and, importantly, access to confidential information. The intention was to obtain valuable confidential information (such as intellectual property) for your own benefit and not bona fide in the best interests of nChain.

4.9   In addition, you and your Co-Conspirators sought to mutually benefit from an increase in your influence and control of nChain and a corresponding reduction in the same on the part of the FFO who had been appointed by the nChain board as set out below in an agreement which was signed by you among others. In part, the benefit that you and others would obtain from this was a greater and unfettered ability to profit at the expense of those funding the nChain group, through inflated salaries, remuneration and benefits in kind.

4.10   You and others were aware, or should have been aware, of the fact that the documents referred to in the Fairway Brief were properly authorised and executed. Despite this, the Fairway Brief contained false representations to those to whom it was presented that the 17 July Agreements were somehow entered into behind the backs of nChain UK's board and that these documents evidenced a wider criminal conspiracy. You would have known that your support of this document, as an experienced solicitor and General Counsel, would have influenced and induced the attendees (other than your Co-Conspirators) into signing the minutes and supporting the publication of the Fairway Brief, and therefore your attempts to access confidential information.

4.11   All of this supported the ultimate aim of 'legitimising' the attempt to access the company's confidential information. Indeed, on 27 September 2023, after these "Minutes" had been signed, you and your Co-Conspirators used the purported authority contained within them to attempt to access and obtain confidential information belonging to nChain. Investigations into what confidential information belonging to nChain was taken are ongoing.

<u>Unlawful Means</u>

4.12   You and your Co-Conspirators used some or all of the following unlawful means to carry out your conspiracy.

4.13   **Misrepresentation**

   4.13.1   As a co-author of the Fairway brief, you made false representations contained in the Fairway Brief and made about it at the Chelsea Barracks meeting and throughout 27 September 2023, knowing that these were false and/or without a genuine belief that they were true and so reckless as to whether these were true. You did so with an intention that these be acted upon and cause nChain to suffer losses.

   4.13.2   Paragraph 8 stated that CAH had concluded that CA, MB, and Calvin's FFO had perpetrated a criminal conspiracy by which they had put in place a sophisticated mechanism through a set of contrived and authorised transactions solely for the purpose of extracting and taking over nChain's IP at a significant undervalue. You



must have known that the facts set out in the Fairway Brief which are said to have given rise to this criminal conspiracy were false.

4.14   **Breach of confidence and/or procuring a breach of confidence.**

4.14.1   nChain is plainly the owner of the confidential information that you and your Co-Conspirators sought to obtain.

4.14.2   You and your Co-Conspirators sought to obtain this confidential information on 27 September 2023, including through acts of intimidation and misrepresentations perpetrated by them and which you failed to take any steps to prevent.

4.14.3   You and your Co-Conspirators did not have nChain's consent to do so.

4.14.4   Further or alternatively, you and your Co-Conspirators procured a breach of confidence by making false representations and/or intimidating nChain employees to hand you over this confidential information.

4.15   **Breach of fiduciary duty by AM and CAH.** AM and CAH acted in breach of their fiduciary duties as directors, and you procured such breach, by a combination to make false allegations in the Fairway Brief, extracting confidential information, intending to injure nChain and intimidating nChain employees with the intention for them to hand over this confidential information.

4.16   **Breach of contract and procuring a breach of contract by you and your Co-Conspirators.**

4.16.1   Your actions also amount to a breach of contract and/or procuring a breach of contract. In particular, your contracts included the obligations set out in section 3 above.

4.16.2   You clearly used the unlawful means of breach of contract and/or procuring a breach of contract as part of your conspiracy.

4.16.3   You, CAH, and others intended to extract confidential information and cause losses to nChain. This is contrary to your duties to promote, protect and develop nChain.

4.16.4   The Minutes included agreement to dismiss RA. CAH's contract explicitly prohibited CAH from doing so. Doing so would not have been justified and would have caused nChain loss and damage, including by incurring a liability to RA.

4.16.5   The conduct set out above amounting to breach of confidence is clearly also non-compliant with the electronic communication systems policy and nChain's handbooks.

4.17   The allegations in the Fairway Brief are misconceived and incorrect in fact and law. They were plainly not put forward in good faith. We will not address each and every allegation in this letter, but will deal with the principal complaints with regard to nChain group, which included the following:



4.17.1   that nChain Holding did not properly enter into the 17 July Agreements;

4.17.2   that nChain Group did not require the revolving credit facility;

4.17.3   that the Licence Agreement should not have been approved and included terms which were for the sole benefit of Indigo (and as such were a "criminal conspiracy"); and

4.17.4   that the services agreement between nChain and FFO established preferential treatment of one shareholder above the others and gave that minority shareholder day-to-day control (and the ability to trigger a breach of covenant in the license agreement for its own benefit).

4.18   In fact:

4.18.1   The board resolution of nChain Holdings confirming the decision to enter into the 17 July Agreements was properly and correctly passed in accordance with the laws of Liechtenstein and the constitution of the company. This board resolution was subsequently ratified by all shareholders of nChain Holdings;

4.18.2   The revolving credit agreement was required by nChain; in particular, nChain UK was unable to pay its debts as they felt due. AM requested a drawdown of funds under the credit facility on 14 September 2023 and was aware that nChain UK was unable to pay its debts as they fell due without relying on external credit facilities;

4.18.3   The Licence Agreement was properly entered into and was on terms agreed by the board of nChain Holding. In the circumstances, where Indigo was contributing CHF60 million for the licence fees and granting a CHF100 million facility, the terms were reasonable, and board and shareholder approval was properly obtained;

4.18.4   The services agreement between nChain and FFO reflected the desire of the board for advice to be provided on the management of its business operations and those of its subsidiaries. As with the other agreements, it had approval of the shareholders;

4.18.5   You were closely involved in the drafting of the 17 July Agreements. You therefore must have known that these were not entered into behind the backs of nChain's board.

4.18.6   You conspicuously did not seek to explain what crime you alleged the parties were conspiring to commit (nor in which jurisdiction, it is said to have taken place). In any event, there was no conspiracy, nothing undertaken would or could have been criminal and the 17 July Agreements were all lawfully and properly entered into by nChain Group.

4.19   The Fairway Brief therefore contained multiple incorrect and unjustified allegations, which were wrong and misleading in fact and law, and you knew them to be so or, at least, had no genuine belief that they were true.



4.20  A meeting of "Group Management of HEH Holding Group" was called on 26 September 2023. Notwithstanding its title, that meeting did not include any member of the board of nChain Holding.

4.21  "Minutes" of that meeting had been drafted in advance by you and CAH and were circulated. Those minutes included similar allegations to those in the Fairway Brief (and appeared to be copied and pasted from it). You signed the minutes, indicating that you agreed with them. In particular:

    4.21.1  Paragraph 8: You stated that you had concluded that Calvin Ayre, Marco Bianchi, and Calvin's Family Office had perpetrated a criminal conspiracy by which they had put in place a sophisticated mechanism through a set of contrived and authorised transactions solely for the purpose of extracting and taking over nChain's IP at a significant undervalue. Given, for example, the need for nChain UK to draw down funds under the credit facility you and others knew or should have known that this allegation was false and / or had no genuine belief that they were true.

    4.21.2  Paragraph 9: The directors representing Calvin Ayre, and who presented the agreements to the board for approval, had deliberately deceived and manipulated the rest of the board into approving the 17 July Agreements by failing to disclose all relevant details. You had no basis whatsoever to support that allegation and you were aware that the 17 July Agreements had been considered and approved by the board of nChain Holdings. You had no genuine belief that it was true either.

    4.21.3  Paragraph 16: You alleged that as urgent financing was not required, the main purpose of the credit facility agreement was to put in place a financial obligation which nChain Licensing would guarantee. However, nChain UK's financial position was such that it had already needed to draw down on that facility and was in need of significant ongoing funding.

4.22  After presenting these and other untrue allegations, the Co-Conspirators signed the minutes and in so doing signalled their support for a demand *inter alia*:

    4.22.1  that IT give Management access to the emails of RA and all parties involved in the 17 July Agreements for the purported aim of investigating the conspiracy further;

    4.22.2  that the 17 July Agreements be voided / cancelled;

    4.22.3  that MB step down from the board;

    4.22.4  that RA should be dismissed for gross misconduct; and

    4.22.5  that a report of wrongdoing should be submitted to FINMA, the regulator of the FFO.

4.23  Such demands were inappropriate, were based on false allegations contained in the Fairway Brief, and were intended to cause harm to nChain. Nevertheless, the Co-Conspirators sought to rely on them and, the following day, attempted to use them as the basis of an unjustified and



unlawful attempt to extract confidential information and influence others at nChain to facilitate this.

**5        Loss**

5.1     Although your attempts to access confidential information on 27 September failed in whole or in part these still caused material losses to nChain. The actions of you and your Co-Conspirators on that day caused significant disruption to the business of nChain and, in addition, compelled it to undertake a proper and comprehensive investigation report into the so-called whistleblowing (privilege in such report not being waived). nChain's losses continue to be investigated and are accruing. Given your attempts to cover up your conspiracy to extract confidential information (including by CAH and others refusing to return their devices) it is not yet clear how much confidential information your conspiracy has managed to obtain. These losses will be particularised in full in due course. However, as a minimum, the cost of nChain's investigations into the allegations set out in the Fairway Brief, along with the costs of restoring and preserving company documents, and all losses to and consequences of the disruption to the business are directly attributable to you and your Co-Conspirators.

**6        Preservation of Documents**

6.1     In addition to outlining the claims that our clients have against you, this letter provides you with formal notice that you may become a party to proceedings initiated by our clients. As a result, we draw your attention to your obligations to preserve documents under Practice Direction 57AD of the Civil Procedure Rules. Paragraph 3.1 of Practice Direction 57AD provides that:

"*A person who knows that it is or may become a party to proceedings that have been commenced or who knows that it may become a party to proceedings that may be commenced is under the following duties ('the Disclosure Duties') to the court—*

*(1)       to take reasonable steps to preserve documents in its control that may be relevant to any issue in the proceedings ….*"

6.2     A copy of Practice Direction 57AD is **enclosed**, which you should read carefully.

6.3     For the purposes of disclosure, "*the term "document" includes any record of any description containing information…*" (paragraph 2.2). "*A "document" may take any form including but not limited to paper or electronic; it may be held by computer or on portable devices such as memory sticks or mobile phones or within databases; it includes e-mail and other electronic communications such as text messages, webmail, social media and voicemail, audio, or visual recordings.*" (paragraph 2.5). "*In addition to information that is readily accessible from computer systems and other electronic devices and media, the term "document" extends to information that is stored on servers and back-up systems and electronic information that has been 'deleted'.  It also extends to metadata, and other embedded data which is not typically visible on screen or a printout.*" (paragraph 2.6)



6.4    As a prospective party to the intended proceedings, you are required to take steps to preserve and not destroy documents that may be disclosable in the prospective proceedings. The Disclosure Duties include:

   6.4.1   An obligation to suspend any relevant document deletion or destruction processes for the duration of the proceedings;

   6.4.2   An obligation to send a written notification in any form to any relevant employees and former employees of any one of the parties where there are reasonable grounds for believing that the employee or former employee may be in possession of disclosable documents which are not also in the that party's possession; and

   6.4.3   An obligation to take reasonable steps so that agents or third parties who may hold documents on the party's behalf do not delete or destroy documents that may be relevant to an issue in the proceedings.

6.5    We draw your attention to paragraph 4.3 of Practice Direction 57AD which sets out the form of written notice required.

6.6    If you have already destroyed any documents that would have been disclosable in the prospective proceedings, please provide details of the documents that have been destroyed and when you did so.

**7    Conclusion**

7.1    As noted above, this letter of claim has been prepared in accordance with the Practice Direction.

7.2    Pursuant to paragraph 6(b) of the Practice Direction, we expect a response to this letter within a reasonable time. We consider that 21 days is a reasonable time in the circumstances of this case. Accordingly, we require your response to this letter **by 20 May 2024**. Your reply should include confirmation as to whether the claim is accepted and, if it is not accepted, the reasons why, together with an explanation as to which facts and parts of the claim are disputed.

7.3    We request that you ensure that all correspondence in this matter is addressed to this firm under cover of the reference given above.

7.4    Once we receive your response to this letter, we will consider whether negotiation or any other form of ADR might enable us to settle this dispute without commencing proceedings.

7.5    In the absence of a full response by that date, we may be instructed to issue and serve proceedings without further notice.

7.6    Our clients reserve all their rights, including the right to commence proceedings against you and your Co-Conspirators (without further reference to you should that prove necessary) for unlawful means conspiracy and to seek an order for damages plus interest and costs.

7.7    As set out above, ignoring this letter may lead to our clients starting proceedings against you and may increase your liability for costs.



7.8   If you consider that, for any reasons, this letter of claim does not comply with the Practice Direction, please inform us why you consider it to be non-compliant and what further information you claim to require in order to respond.

7.9   We look forward to hearing from you accordingly.

Yours faithfully

**BDB Pitmans LLP**
E    nChain@BDBPitmans.com

enc   i. Practice Direction on Pre-Action Conduct and Protocols
ii. Dramatis Personae
iii. Practice Direction 57AD