# Exhibit 11



Zafar Ali KC
Flat 4
5 Sheffield Terrace
London W8 7NG

Our Ref
210293.0001

Date
29 April 2024

By Post and By Email: zaqc@me.com

Dear Sir

**nChain UK Limited & nChain Holding AG -v- Christen Ager-Hanssen & Others**
**LETTER OF CLAIM**

We are instructed by nChain UK Limited (**nChain UK**) and nChain Holding AG formerly HEH Holding AG (**nChain Holding**) (together, **nChain**).

This letter of claim is being sent to you in accordance with paragraph 6 of the Practice Direction on Pre-Action Conduct and Protocols (the **Practice Direction**) contained in the Civil Procedure Rules (**CPR**), a copy of which is **enclosed**. In particular, we refer you to paragraphs 13-16 of the Practice Direction concerning the court's powers to impose sanctions for failing to comply with its provisions. Ignoring this letter may lead to our clients commencing proceedings against you and may increase your liability for costs.

**1    Overview and basis of claim**

1.1    Our clients' claim against you arises in connection with your actions at a meeting at Chelsea Barracks on 26 September 2023 and at nChain's London office on 27 September 2023 in relation to a document styled as the "Fairway Brief", and your intimidation of third parties. Christen Ager-Hanssen (**CAH**) the former nChain Group CEO claims that he authored the Fairway Brief. The Fairway Brief, alleges (inter alia) that there was a criminal conspiracy among certain directors and shareholders of nChain. We are continuing to investigate your role in drafting the Fairway Brief. You had no genuine belief at the time that the allegations in the Fairway Brief established the existence of a criminal conspiracy.

1.2    The claim against you and your co-conspirators is for unlawful means conspiracy. You conspired with them to deploy false allegations against nChain and use intimidation in order to extract confidential information belonging to nChain for your own benefit and in order to cause harm to nChain. You did so through unlawful means, as set out below.



**Registered Office**
One Bartholomew Close
London
EC1A 7BL
DX 339401 London Wall

50/60 Station Road
Cambridge
CB1 2JH
DX 339601 Cambridge 24

The Anchorage
34 Bridge Street
Reading, RG1 2LU
DX 146420 Reading 21

Grosvenor House
Grosvenor Square
Southampton, SO15 2BE
DX 38516 Southampton 3

**T** +44 (0)345 222 9222          **W** www.bdbpitmans.com

BDB Pitmans is the trading name of BDB Pitmans LLP which is a limited liability partnership registered in England and Wales with registered number OC320798. Its registered office and principal place of business is One Bartholomew Close, London EC1A 7BL where a list of members' names is available for inspection. BDB Pitmans LLP is authorised and regulated by the Solicitors Regulation Authority (SRA ID no 448617). We use the word partner to refer exclusively to a member of BDB Pitmans LLP.

Please reply to: One Bartholomew Close

30944139.1



1.3    The unlawful means deployed by you and your co-conspirators had at its core the preparation, presentation, and deployment of the "Fairway Brief". You represented the Fairway Brief as a whistleblowing report, which it was not, and deployed the false allegations within it to coerce and control others into allowing you and assisting you and your co-conspirators to attempt, during the events of 27 September 2023, to disrupt the operations and proper administration of nChain and unlawfully access and obtain confidential information belonging to our clients. Your attendance at meetings on 26 and 27 September 2023 and assertions that you were a criminal defence barrister and a KC and that you were providing attendees with free advice were designed not only to lend credibility to the allegations in the Fairway Brief but also to intimidate them into signing the Minutes and actioning the demands listed therein. You and your co-conspirators' actions caused nChain to incur significant losses, and you must have known that they would cause nChain to suffer these substantial losses.

1.4    Our clients now intend to pursue a claim against you and your co-conspirators to recover these losses. Accordingly, this letter is to be treated as a formal letter of claim served in accordance with Paragraph 6 of the Practice Direction.

1.5    This letter is necessarily based on the documents and information available to our clients at the time of writing, having taken a proportionate approach to investigations at this early stage of the case. We consequently reserve the right to amend or expand our clients' claims once they have had the opportunity to consider substantive responses and documents provided.

1.6    A summary of definitions is **appended** to this letter for convenience.

**2    Identity of parties**

2.1    Our clients intend to pursue claims against you, CAH, Andrew Moody (**AM**) and David Brookes (**DB**) as we presently consider you to be the main co-conspirators (the **Co-Conspirators**).

2.2    However, our clients reserve their rights to pursue other co-conspirators, should our clients' ongoing investigation show that others have also participated in your conspiracy. We are actively considering whether Endri Gjata (**EG**), Peter Coulson (**PC**) and/or Lars Jacob-Bø (**LJB**) (amongst others) also participated in your conspiracy or otherwise bear responsibility for the losses suffered by our clients as a result of this concerted action.

**3    Background**

Confidential Information of nChain

3.1    As you may be aware, CAH is already facing High Court proceedings for breach of confidence and unlawfully obtaining and retaining confidential information belonging to our clients. You and the Co-Conspirators sought to obtain confidential information belonging to our clients. This is likely to have included valuable intellectual property and commercially sensitive material.

Your professional background

3.2    You are a barrister regulated by the Bar Standards Board (**BSB**). You were called to the bar in 1994 and practise from 23 Essex Street Chambers (**23ES**) and St Philips Chambers. Your 23ES profile describes you as a "*Specialist in serious crime with an emphasis on white collar matters*



*such as money laundering and complex fraud including commercial tax fraud against HMRC and pensions fraud*". You took silk in 2012. You are also a Recorder of the Crown Court.

Background to your relationship with CAH and involvement with nChain

3.3   CAH started work as Group CEO for nChain on 28 September 2022, prior to CAH formally being appointed to the role by virtue of a Consultancy Agreement dated 17 March 2023 (the **Consultancy Agreement**) with nChain AG and nChain Holding (then HEH Holding AG). CAH was appointed as a director of nChain UK on 22 December 2022.

3.4   It is understood that you and CAH met prior to CAH being formally appointed as nChain's Group CEO under the Consultancy Agreement and that CAH initially instructed you to advise him on a direct access basis.

3.5   On 14 July 2023, you had dinner with CAH. On 15 July 2023, you incorporated ZAKC Consulting Ltd (company no. 15005412) together with your wife Melissa Gilani. On 16 July 2023, you emailed CAH to inform him that you had called "the company" ZAKC Consulting Ltd, indicating a prior discussion between you and CAH.

3.6   The purported secondment between 24 July 2023 to 31 October 2023 was proposed in a letter from your clerk at 23ES to CAH as CEO of nChain dated 1 February 2023, which was sent to CAH's Custos Group email address. That letter said that you would charge a fee of £75,000 plus VAT per calendar month for working 5 days per week for 8 hours per day, and that your fees were payable to 23ES (although we note that subsequently invoices came from ZAKC Consulting). The scope of the work that you would be required to carry out was not described. On 16 May 2023, your clerk at 23ES emailed CAH at his Custos Group email address stating that your secondment would commence between 22 May 2023 and 16 June 2023.

3.7   On 3, 14, 15 and 25 August 2023, you attended calls / meetings with Ted Loveday (**TL**) and the "*Custos team*", according to TL's Fee Note. By 18 August 2023, you had become affiliated with Custos Group Limited, of which CAH was the sole shareholder and director, and were sending out emails from zafar@custosgroup.com. On 25 August 2023, you attended lunch with CAH and a Travers Smith partner. On 27 August 2023, you attended a meeting with CAH and Stefan Matthews (**SM**).

3.8   As a result of CAH's introduction, you became a legal adviser to Dr. Craig Wright (**CSW**) in respect of the Nakamoto proceedings (**COPA claim**). On 29 August 2023, you attended an early morning meeting with CAH before attending a meeting with CAH, CSW and CSW's wife. You produced an "Opinion for Steering Committee" bearing the date of 29 August 2023, which set out your view that CSW was likely to lose the Identity Claim unless he carried out particular steps. The "Steering Committee" was a group set up by you and CAH consisting of you, CAH, Calvin Ayre (**CA**) and SM.

3.9   On 2 September 2023, your wife sent a WhatsApp to CAH asking if CAH wanted her to issue the September invoice differently – for 3 months, the rest of 2023, or the entire amount. CAH sent a response to your wife by WhatsApp instructing your wife to "*issue the whole amount and I will pay it in two or three instalments.*" On 5 September 2023, ZAKC Consulting Ltd raised an invoice to CSW for £1.65 million.



3.10   Also on 5 September 2023, you and CAH flew to Switzerland to obtain documents from Niederer Kraft Frey, a Swiss law firm, on flights funded by nChain.

3.11   Between 11 – 13 September 2023, you and CAH flew to Mallorca on flights which CAH arranged to be paid for by nChain. SM was in Mallorca to meet with the CEO of Gate2Chain Ltd and your attendance in Mallorca came as a surprise to SM. It is not clear in what capacity you attended this meeting, but we understand that you were described as CAH's legal adviser. You are no doubt aware that during this trip to Mallorca, CAH covertly recorded conversations with SM. We continue to investigate your role in facilitating or producing these recordings without SM's consent.

**4   Mock Trial**

4.1   In clear breach of the rules set out in the BSB Handbook, you arranged and participated in a mock trial of the COPA claim which took place between 22 - 24 September 2023 at 6-7 Market Place, London W1W 8AF (the **Mock Trial**). At the Mock Trial, you purported to act as Counsel for COPA. You also arranged for someone to act as a judge. You have so far refused to disclose the identity of this "judge". We reiterate our request for you to provide this information.

4.2   On 24 September 2023, the mock judgment was delivered, which declared CSW a "*compulsive liar and falsifier of documents on a massive scale*", made purported findings of fact against CSW and concluded that COPA had succeeded in their claim (the **Mock Judgment**). The Mock Judgment was identical in all material respects to the wording of the draft judgment that your "opposing counsel" in the Mock Trial, TL, circulated on 18 and 20 September 2023, before the start of the Mock Trial. The Mock Judgment could not have reflected the findings of the purported Judge at the Mock Trial as it was pre-written by you alone or acting in concert with CAH and others.

**5   The Fairway Brief and the Chelsea Barracks meeting on 26 September 2023**

5.1   At 21:00, you attended an "*HEH Group Management*" meeting at the Chelsea Barracks (the "**Chelsea Barracks meeting**"), which was held by CAH. Notwithstanding its title, that meeting did not include any member of the board of nChain Holding. Also in attendance were James Marchant (**JM**), PC, AM, LJB and DB. CAH brought wine, gin and champagne to the meeting and invited attendees to drink. No agenda was circulated. CAH presented a document entitled "The Fairway Brief" dated 26 September 2023 (the **Fairway Brief**) to attendees. According to a media interview conducted by CAH, CAH had been working on the Fairway Brief since at least 14 August 2023. The Fairway Brief purported to constitute a whistleblowing report uncovering an alleged criminal conspiracy between CA, Marco Bianchi (**MB**) and the Fairway Family Office (**FFO**) against the "*stakeholders of HEH Holding AG and its subsidiaries*". The Fairway Brief alleged that contracts dated 17 July 2023 (the **17 July Agreements**) giving managerial oversight to FFO and providing a CHF100 million loan from Indigo IP Holding Limited to nChain secured by a guarantee from nChain Licensing AG in respect of its IP in the event of default were part of a "*conspiracy to defraud HEH Holding, nChain Group and its stakeholders*". Attachment 12 to the Fairway Brief is your advice entitled "*Opinion by Zafar Ali KC dated 29 August 2023 regarding CSW case*".

5.2   CAH had instructed DB to prepare the Minutes of the Chelsea Barracks meeting one day prior, on 25 September. That version of the Minutes only referred to the 17 July Agreements. An updated version of the Minutes was circulated at the Chelsea Barracks meeting, having been



updated prior to the meeting, which referred to the COPA claim, the Mock Trial, the Fairway Brief and the attendance of you and JM at the meeting.

5.3   You used your status as a barrister at the Chelsea Barracks meetings in a context that was irrelevant to your work as a criminal barrister. This was designed to influence and/or intimidate the attendees of the Chelsea Barracks meeting. Your conduct also constitutes a breach of your professional obligations under the BSB Handbook (see in particular CD 3 and 5, rC8, rC9, gC25.8 and gC26).

5.4   During the Chelsea Barracks meeting, CAH reported on the Mock Trial and you read out the Mock Judgment, misrepresenting it as something other than a pre-written script. The Minutes record that "*CAH reported that the Judgment was a disaster as the judge found that Craig "is a compulsive liar and falsifier of documents on a massive scale"*". You were well aware that this was not a legitimate judgment made by a judge in good faith containing genuine findings of fact based on CSW's evidence during the Mock Trial. You failed to explain that the Mock Judgment was a sham as it had been written in advance of the Mock Trial and was merely read out by the person purporting to be the judge at the Mock Trial.

5.5   As recorded in the Minutes of the Chelsea Barracks meeting, you had been invited to attend as you "*would be able to elaborate and answer questions on the issues raised by the Judgment and the Whistleblowing Report*". You were held out as someone who had knowledge of, and could advise on, the alleged criminal conspiracy advanced in the Fairway Brief. We have seen no evidence of you having satisfied yourself that the allegations set out in the Fairway Brief were true before advising on their legal consequences.

5.6   At the meeting, you and CAH misrepresented the Fairway Brief as a legitimate whistleblowing report containing genuine allegations of a criminal conspiracy without a reasonable belief that the allegations established the existence of a criminal conspiracy. You informed the attendees that they had three options: i) carry on as usual but if they did they would be part of the criminal conspiracy; ii) sign the Minutes with the list of actions or iii) resign from nChain and leave. In doing so, you purported to be advising them on their legal options. In doing so, you misled them as to the options legally open to them in an attempt to pressure them to sign the Minutes and give further credibility to the Fairway Brief.

5.7   Also during the Chelsea Barracks meeting, in response to questions, you informed attendees that the Fairway Brief was "GDPR compliant". You also said that it was lawful for the management team to access employee emails to investigate the conspiracy. You had no genuine belief that that statement was true.

5.8   You signed the Minutes declaring "*I have been present and have comprehensively answered questions posed to me*". By signing the Minutes, you recorded your agreement with them and misrepresented that their contents were true. This declaration further confirmed that, prior to the Chelsea Barrack meeting, you had read the Fairway Brief and had agreed with CAH that it would be presented at the meeting with a view to procuring the attendees' agreement to the Minutes.

5.9   After presenting these untrue allegations, the attendees signed the Minutes in support of demands *inter alia*:

30944139.1                                                                5



    5.9.1    that IT give Management access to the emails of the Chief Intellectual Property Officer Robert Alizon, (**RA**) and all parties involved in the 17 July Agreements for the purported aim of investigating the conspiracy further;

    5.9.2    that the 17 July Agreements be voided / cancelled;

    5.9.3    that MB step down from the board;

    5.9.4    that the chief IP officer be dismissed for gross misconduct; and

    5.9.5    that a report of wrongdoing be submitted to FINMA, the regulator of the FFO.

5.10    Such demands were inappropriate, were based on false allegations contained in the Fairway Brief and were intended to cause harm to nChain. Nevertheless, the Co-Conspirators sought to rely on them and, the following day, attempted to use them as the basis of an unjustified and unlawful attempt to extract confidential information in breach of confidence and influence others at nChain to facilitate this.

5.11    Your support of the Fairway Brief was intended to further the aims of your conspiracy, in particular extracting confidential information belonging to nChain and causing harm to nChain. Paragraph 31 of the Minutes shows that the Fairway Brief was intended as a basis to confer authority on CAH to access confidential information, in particular the emails of RA and "*all parties involved in the 17 July Transaction*".

**6**    **Intimidation of nChain employees and attempt to extract confidential information 27 September 2023**

6.1    On 27 September 2023, you made a series of false representations in conjunction with CAH in order to lend credibility to the Fairway Brief and to intimidate Ajay Patel (**AP**), Head of Corporate IT of nChain, to provide access to email servers of senior individuals at nChain.

    6.1.1    At approximately 11:30, you joined a meeting by telephone that was taking place in the Peer-to-Peer meeting room at nChain UK's London office between AP, PC, CAH and EG. At that meeting, CAH introduced you as his legal counsel assisting with the purported whistleblowing case. Later on in the meeting, CAH said that you had been brought in to assist nChain and you had advised CAH to proceed with the whistleblowing report.

    6.1.2    On the call, you represented to AP that it was a criminal case, thereby misrepresenting that this was already a criminal case or that the Fairway Brief contained clear evidence to substantiate a criminal case. You told AP that he was not permitted to discuss the contents of the Fairway Brief with anyone and that AP was obliged to do what PC and CAH instructed him to do. You threatened AP that if he told anyone about what he was told to do, he would be breaking the law. You told AP that he could not share details of who he was "whistleblowing against". You made those false representations to intimidate AP to cede to CAH's request to download the mailboxes of RA, SM, Patrick Stein (**PS**), AM, PC and Olga Fernandez (**OF**).

6.2    You continued your acts of intimidation in order to obtain confidential information and cause losses to nChain later on 27 September by your actions towards PS.



    6.2.1    At 14:15, you attended a meeting at nChain's London office in which you introduced yourself to PS as a KC (by saying "I am one of His Majesty's Counsel"), although you did not say for whom you were acting, and purported to give "free advice" to PS.

    6.2.2    You falsely represented to PS that if he shared information about the Fairway Brief with anyone other than those present in the room, he would be committing a criminal offence. The words you used were objectively intended to intimidate. You said:

> "*I am a KC, criminal defence barrister. I am also a member of the chartered institute of arbitrators. We have reason to believe that there is a possible conspiracy to defraud, criminal case, by various people…Let's explain, if you omit to do something then that is as bad as being involved. There is a duty on the board to investigate things because if they don't they can then be considered by the authorities, by the crown prosecution service to have been involved in the conspiracy. They have to unfold any evidence and pass it on to the authorities… Can I suggest to you that you do not communicate and you leave this office. This is free advice to you. If you do, and it is proven that you have been communicating within this office with alleged conspirators. Do you understand that? You cannot speak to anyone when you leave this office. I have told you in front of witnesses and I am one of His Majesty's Counsel. If you do, then you are breaching what I have told you. You cannot say "I didn't know, I contacted XYZ". I have told you in front of three witnesses. That is the law, you must remain silent now. That means no communication. Anyone communicates with you, you must say "I cannot answer any questions because I don't want to incriminate myself". You will be incriminated. That is free advice to you*".

6.3    You then continued with your intimidation of AP in order to use him to obtain nChain's confidential information.

    6.3.1    At about 14:30, you met CAH and AP at nChain's London office and went to a nearby restaurant with PC and EG. At the restaurant, you repeatedly told AP that by failing to comply with their request to download the mailboxes, AP was breaking the law and could be arrested or prosecuted. Those representations were false, and you had no genuine belief that they were true. They were designed to intimidate AP into complying with your demand to provide the confidential contents of the mailboxes.

    6.3.2    You also tried to intimidate AP to hand over his personal phone. AP refused but handed over his company phone.

**7    Unlawful Means Conspiracy**

7.1    It is nChain's case that you and your Co-Conspirators conspired together to (1) obtain confidential information belonging to nChain and its officers and / or employees with an intention to cause harm to nChain and (2) harm the company (the **Conspiracy**).

<u>Agreement</u>

7.2    The agreement between you can be inferred from your conduct and the events set out above.

7.3    The agreements between you and the Co-Conspirators (irrespective of whether they had been made separately to one another) had the same intention and object; namely you agreed to



pursue an unlawful course of action with the object of extracting confidential information from nChain and to cause nChain to incur loss and suffer damage.

7.4 It is clear that you played an important role in giving legitimacy to CAH's unlawful actions during his time as CEO at nChain. The *modus operandi* was for you or CAH to use your status as King's Counsel (and sometimes as a judge) to intimidate others into following CAH's directions. This was to further your common objective. The instances set out above are some examples of this *modus operandi*.

7.5 Your relationship with CAH pre-dates your involvement with nChain. As set out above, CAH arranged for you to receive a significant remuneration soon after his appointment as Group CEO of nChain. It can be inferred that you and CAH have a strong understanding of, and appreciation for, each other's business aims and the methods usually used to achieve them. It can be inferred at this time that you understood, supported and acted in pursuit of CAH's intention to unlawfully obtain nChain's confidential information. In addition to the examples set out above, we note that during his time as CEO at nChain you previously accompanied CAH to meetings where he introduced you to others as King's Counsel although you were not acting in your capacity as a barrister. On at least one occasion CAH falsely misrepresented your background with your approval by stating in your presence that you had been offered a job of being a "supreme judge" but that you refused it. CAH said to others in your presence that he had promised to "make you rich".

7.6 Your agreement must have predated the so-called "Group Management" meeting of 26 September 2023. During that meeting, you, the Co-Conspirators and others signed a set of pre-prepared "Minutes" confirming your agreement with the findings of, and statements made in the Fairway Brief, and to pursuing various specific actions against nChain and its leadership, such as the dismissal of RA (Chief Intellectual Property Officer), the removal of MB from the boards of the nChain Group, gaining access to a number IT and email accounts, and the interference with the 17 July Agreements documents. We reiterate your involvement in the trip to Mallorca on 11-13 September 2023, from which we infer that the agreement between you and CAH is likely to have been entered into on or before that meeting.

7.7 This agreement to these actions (through collective signature of the purported "Minutes") is alone sufficient evidence of your, and the Co-Conspirators', agreement to the aims of the Conspiracy. However, we believe that this agreement also existed prior to this event, as part of the planned strategy to manufacture evidence and agree upon the nature and deployment of your false representations. Amongst other matters, you would not have been presented as being able to answer questions on the Fairway Brief if you had not already read it and so agreed to its presentation at the meeting.

7.8 The following day, 27 September 2023, you and CAH and others sought, wrongfully, to instruct nChain's IT personnel and in particular AP to give you and the Co-Conspirators unlimited and unauthorised access to the email accounts of a number of senior nChain personnel, including SM, RA, CSW, PS and OF. As described above, you repeatedly told AP that by failing to comply with their request to download the mailboxes, AP was breaking the law and could be arrested or prosecuted. You were thereby seeking to secure AP's submission to your demands through intimidation.



Common Intention and Concerted Action

7.9 Your common intention was to benefit from obtaining confidential information belonging to nChain and cause harm to nChain.

7.10 It is clear that there was a common intention between you and CAH to present the Fairway Brief incorporating the Mock Judgment as an honest whistleblowing report, which it was not, and which you did not genuinely believe it to be. You did this to coerce others into signing the Minutes to assist CAH and others to access confidential information belonging to nChain.

7.11 You took the following concerted action in furtherance of the agreement:

7.11.1 You agreed that the Fairway Brief would be presented to the "management board" at a meeting, which took place at the Chelsea Barracks, and subsequently to other employees of nChain, to persuade them to give access to confidential information.

7.11.2 You attended the Chelsea Barracks meeting on 26 September 2023 for the express purpose of "*elaborate[ing] and answer[ing] questions on the issues raised by the Judgment and the Whistleblowing Report*". You therefore allowed yourself to be held out as someone who had knowledge of, and could advise on, the alleged criminal conspiracy advanced in the Fairway Brief. You used your status as a barrister as King's Counsel to give legitimacy to this meeting, including the pre-written minutes and to encourage the participants to sign them.

7.11.3 At the Chelsea Barracks meeting, CAH reported on the Mock Trial and you read out the Mock Judgment, implicitly presenting it as something other than a pre-written script. The Minutes record that "*CAH reported that the Judgment was a disaster as the judge found that Craig "is a compulsive liar and falsifier of documents on a massive scale"*". You also used the misleading labels "Pre-Trial and Judgment" instead of presenting it as a "mock trial". You and CAH falsely represented the Mock Judgment to the other attendees as if it were a legitimate judgment made by a suitably qualified person in good faith containing genuine findings of fact based on CSW's evidence during the Mock Trial. You failed to explain that the Mock Judgment was a sham as it had been written in advance of the Mock Trial and was merely read out by the person purporting to be the judge at the Mock Trial. This was a further attempt to legitimise the Fairway Brief. It was designed to support the allegations in the Fairway Brief (in particular paragraph 57) that a defeat in the prospective trial of CSW could constitute a default under covenant 4(c) of the 17 July Licence Agreement, thereby causing losses to nChain.

7.11.4 At the Chelsea Barracks meeting, you misrepresented the Fairway Brief as a legitimate whistleblowing report containing genuine allegations of a criminal conspiracy without a reasonable belief that the allegations established the existence of a criminal conspiracy. You informed the attendees that they had three options: i) carry on as usual but if they did they would be part of the criminal conspiracy; ii) sign the Minutes with the list of actions or iii) resign from nChain and leave. This was objectively misleading. Your support, as a very senior barrister, was crucial for lending credibility to the false representations that were being made and also to the overall success of the Conspiracy to obtain and exploit nChain's confidential information. Without your involvement, the allegations of a criminal conspiracy may not have been believed.



    7.11.5    You then falsely maintained in correspondence from your solicitors that you were unaware of the Fairway Brief before that meeting. You signed the Minutes declaring "*I have been present and have comprehensively answered questions posed to me*". From this, it is clear that you were aware of the Fairway Brief before the Chelsea Barracks meeting.

    7.11.6    You advised the people attending the Chelsea Barracks meeting that the Fairway Brief justified the release of confidential information to CAH and others when, in reality, it would have amounted to a breach of confidence. You had no genuine belief that such disclosure was justified.

    7.11.7    On 27 September 2023, you repeatedly told AP that he needed to download the mailboxes of senior individuals at nChain and that he could not discuss the matter with anyone, otherwise he would be breaking the law. Similarly, you told PS on that date that if PS shared information about the Fairway Brief with anyone else at nChain, he would be committing a criminal offence. Your representations to AP and PS were false and it is inconceivable that you did not know that they were false. You made those representations in the context of asserting that you were a criminal defence barrister and a KC, after having making AP and PS aware of your status at the first opportunity. Your representations were clearly designed not only to try to legitimise the attempt to access the company's confidential information but also to intimidate AP and PS into submission. You made them in an attempt to further the Conspiracy by concealing it.

<u>Unlawful means</u>

7.12    You and Co-Conspirators used some or all of the following unlawful means to carry out your Conspiracy.

7.13    **Misrepresentations**.

    7.13.1    You made false representations, knowing that these were false and / or without a genuine belief that they were true and so reckless as to whether these were true. You did so with an intention that these be acted upon and cause nChain to suffer losses.

    7.13.2    We refer to the misrepresentations contained in the Fairway Brief and made about it at the Chelsea Barracks meeting and throughout 27 September 2023. Paragraph 8: You stated that you had concluded that CA, MB, and FFO had perpetrated a criminal conspiracy by which they had put in place a sophisticated mechanism through a set of contrived and authorised transactions solely for the purpose of extracting and taking over nChain Group's IP at a significant undervalue. You must have also known that the allegations in the Fairway Brief did not give rise to the so called "criminal conspiracy" and / or were reckless as to their truth.

    7.13.3    You must have known that the representations about the Mock Judgment being a legitimate judgment were false.

    7.13.4    After presenting these and other untrue allegations, the Co-Conspirators signed the minutes and in so doing signalled their support for a demand *inter alia*:



    (a)    that IT give Management access to the emails of the Chief Intellectual Property Officer RA, and all parties involved in the 17 July Agreements for the purported aim of investigating the conspiracy further;

    (b)    that the 17 July Agreements be voided / cancelled;

    (c)    that MB step down from the board;

    (d)    that the chief IP officer should be dismissed for gross misconduct; and

    (e)    that a report of wrongdoing should be submitted to FINMA, the regulator of the FFO.

7.13.5    These misrepresentations were intended to be relied upon by (i) the other attendees of the Chelsea Barracks meeting and (ii) the nChain employees that you approached throughout 27 September 2023 in an attempt to induce them to grant you access to confidential nChain information. For example, you intended to induce AP to download the inboxes of various employees and hand over to CAH and/or the Co-conspirators confidential information.

7.14    **Breach of confidence and/or procuring a breach of confidence.**

7.14.1    nChain is plainly the owner of the confidential information that you and your Co-Conspirators sought to obtain.

7.14.2    You and your Co-Conspirators sought to obtain this confidential information on 27 September 2023, including through acts of intimidation and misrepresentations perpetrated by them and you. Your acts of intimidation are set out above.

7.14.3    You and your Co-Conspirators did not have nChain's consent to do so.

7.14.4    Further or alternatively, you and your Co-Conspirators procured a breach of confidence by making false representations and/or intimidating nChain employees to hand you over this confidential information.

7.15    **Breach of fiduciary duty by CAH and AM.**

7.15.1    CAH and AM were both directors of nChain at the relevant time. They owed nChain fiduciary duties, which are codified in the Companies Act 2006 ("**CA 2006**") and incorporated into their contracts (for CAH this being the Consultancy Agreement whereas AM had an employment contract). The relevant duties are as follows:

    (a)    to act within the company' powers and for proper purpose – s.171 CA 2006;
    (b)    to promote the success of the company – s.172 CA 2006;
    (c)    to exercise independent judgment – s.173 CA 2006;
    (d)    to exercise reasonable care, skill and diligence – s.174 CA 2006;
    (e)    to avoid conflicts of interest – s.175 CA 2006;
    (f)    not to accept benefits from third parties – s. 176 CA 2006; and
    (g)    to declare any interest in a proposed transaction or arrangement with the company – s. 177 CA 2006.



    7.15.2    CAH and/or AM acted in breach of these fiduciary duties by a combination to make false allegations in the Fairway Brief, extracting confidential information, intending to injure nChain and intimidating nChain employees with the intention for them to hand over this confidential information.

    7.15.3    Further or alternatively you agreed to and / or procured these breaches of fiduciary duty through your conduct set out above, in particular your misrepresentations about the Fairway Brief, your presence at the various meetings and your acts intended to intimidate nChain employees.

## 8    Loss

8.1    Although your attempts to access confidential information on 27 September failed in whole or in part these still caused material losses to nChain. The actions of you and your Co-Conspirators on that day caused significant disruption to the business of nChain and, in addition, compelled it to undertake a proper and comprehensive investigation report into the so-called whistleblowing (privilege in such report not being waived). nChain's losses continue to be investigated and are accruing. Given your attempts to cover up your Conspiracy to extract confidential information (including by CAH and others refusing to return their devices) it is not yet clear how much confidential information your Conspiracy has managed to obtain. These losses will be particularised in full in due course. However, as a minimum, the cost of nChain's investigations into the allegations set out in the Fairway Brief, the costs of restoring and preserving company documents, and all losses to and consequences of the disruption to the business are directly attributable to you and your Co-Conspirators.

## 9    Preservation of Documents

9.1    In addition to outlining the claims that our clients have against you, this letter provides you with formal notice that you may become a party to proceedings initiated by our clients. As a result, we draw your attention to your obligations to preserve documents under Practice Direction 57AD of the Civil Procedure Rules. Paragraph 3.1 of Practice Direction 57AD provides that:

"*A person who knows that it is or may become a party to proceedings that have been commenced or who knows that it may become a party to proceedings that may be commenced is under the following duties ('the Disclosure Duties') to the court—*

*(1)    to take reasonable steps to preserve documents in its control that may be relevant to any issue in the proceedings ….*"

9.2    A copy of Practice Direction 57AD is **enclosed**, which you should read carefully.

9.3    For the purposes of disclosure, "the term "document" includes any record of any description containing information…" (paragraph 2.2). "A "document" may take any form including but not limited to paper or electronic; it may be held by computer or on portable devices such as memory sticks or mobile phones or within databases; it includes e-mail and other electronic communications such as text messages, webmail, social media and voicemail, audio or visual recordings." (paragraph 2.5). "In addition to information that is readily accessible from computer systems and other electronic devices and media, the term "document" extends to information that is stored on servers and back-up systems and electronic information that has been



'deleted'. It also extends to metadata, and other embedded data which is not typically visible on screen or a printout." (paragraph 2.6)

9.4  As a prospective party to the intended proceedings, you are required to take steps to preserve and not destroy documents that may be disclosable in the prospective proceedings. The Disclosure Duties include:

9.4.1  An obligation to suspend any relevant document deletion or destruction processes for the duration of the proceedings;

9.4.2  An obligation to send a written notification in any form to any relevant employees and former employees of any one of the parties where there are reasonable grounds for believing that the employee or former employee may be in possession of disclosable documents which are not also in the that party's possession; and

9.4.3  An obligation to take reasonable steps so that agents or third parties who may hold documents on the party's behalf do not delete or destroy documents that may be relevant to an issue in the proceedings.

9.5  We draw your attention to paragraph 4.3 of Practice Direction 57AD which sets out the form of written notice required.

9.6  If you have already destroyed any documents that would have been disclosable in the prospective proceedings, please provide details of the documents that have been destroyed and when you did so.

**10  Conclusion**

10.1  As noted above, this Letter of Claim has been prepared and sent to you in accordance with the Practice Direction.

10.2  Pursuant to paragraph 6(b) of the Practice Direction, we expect a response to this letter within a reasonable time. We consider that 21 days is a reasonable time in the circumstances of this case. Accordingly, we require your response to this letter **by 20 May 2024**. Your reply should include confirmation as to whether the claim is accepted and, if it is not accepted, the reasons why, together with an explanation as to which facts and parts of the claim are disputed.

10.3  We request that you ensure that all correspondence in this matter is addressed to this firm under cover of the reference given above.

10.4  Once we receive your response to this letter, we will consider whether negotiation or any other form of ADR might enable us to settle this dispute without commencing proceedings.

10.5  In the absence of a full response by that date, we may be instructed to issue and serve proceedings without further notice.

10.6  Our clients reserve all their rights, including the right to commence proceedings against you and your Co-Conspirators (without further reference to you should that prove necessary) for unlawful means conspiracy and to seek an order for damages plus interest and costs.



10.7  As set out above, ignoring this letter may lead to our clients starting proceedings against you and may increase your liability for costs.

10.8  If you consider that, for any reason, this letter of claim does not comply with the Practice Direction, please inform us why you consider this to be the case and what further information you reasonably require in order to respond.

10.9  You should consider whether you need to report this to your insurers.

10.10  We look forward to hearing from you accordingly.

Yours faithfully

*BDB Pitmans LLP*

**BDB Pitmans LLP**
E    nChain@BDBPitmans.com

enc    i. Practice Direction on Pre-Action Conduct and Protocols
       ii. Dramatis Personae
       iii. Practice Direction 57AD