FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Aug 20 2024

**KEVIN P. WEIMER** , Clerk

By: Kari Butler
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE:<br>APPLICATION OF<br>NCHAIN HOLDING AG<br>FOR AN ORDER PURSUANT TO<br>28 U.S.C. § 1782 DIRECTING<br>DISCOVERY FOR USE IN<br>PROCEEDINGS IN THE UNITED<br>KINGDOM | CIVIL ACTION FILE NO.<br><br>1:24-MI-00068-MHC-WEJ |

## <u>ORDER</u>

This matter is before the Court on the Ex Parte Application of nChain Holding AG for an Order Pursuant to 28 U.S.C. § 1782 Directing Discovery for Use in Proceedings in the United Kingdom [1] ("Application"). For the reasons stated below, the Application is **GRANTED**.

## I. **FACTUAL BACKGROUND**

Applicant, nChain Holding AG ("nChain" or "Applicant"), is a blockchain technology, IP licensing, and consulting services company registered in Liechtenstein and operating in the United Kingdom. nChain brings this Application to obtain evidence of an alleged conspiracy led by its former CEO, Christen Ager-Hanssen, from Eric Finnerud, a music producer residing in this

District.  nChain seeks an Order pursuant to 28 U.S.C. § 1782 to obtain limited discovery from Mr. Finnerud for use in civil conspiracy and injunction proceedings against Mr. Ager-Hanssen, Mr. Ager-Hanssen's alleged co-conspirators, and his company in the High Court of England and Wales in London, United Kingdom.  In support of its Application, nChain has submitted declarations, court documents from prior foreign proceedings, and various communications and records involving Mr. Ager-Hanssen.  Upon careful review of Applicant's Brief [1-1], supporting documents [1-2 through 1-30], and proposed subpoenas [1-31 through 1-32], the Court makes the following findings for purposes of this Application.

### A. Appointment of Mr. Ager-Hanssen and Confidentiality Breach

nChain entered into a Consulting Agreement with Mr. Ager-Hanssen in November 2022, appointing him as CEO of its subsidiary companies, known collectively as the nChain Group.  (Matthews Decl. [1-4] ¶ 5 & Ex. 1 [1-8] (Consulting Agreement).)  At the time, nChain Group was known as HEH Holding AG ("HEH").  (Id. ¶¶ 2, 4.)  Upon his appointment, Mr. Ager-Hanssen hired several of his close confidants from his other business ventures known as the Custos Group Limited ("Custos") and AddReax family of companies.  (Id. ¶¶ 6-7.)  Mr. Ager-

Hanssen still manages these companies.[1]  (Id. ¶ 6.)  During his tenure as CEO, Mr. Ager-Hanssen hired several of his family members, friends, business associates, and Custos and AddReax employees.  (Id. ¶ 16.)  For example, according to nChain, Mr. Ager-Hanssen paid his son £127,436 (approximately $160,000) through nChain without evidence of him performing any work.  (Id. ¶ 17.)

On September 27, 2023, Mr. Ager-Hanssen sent an email to Stefan Matthews, the co-founder of nChain,[2] containing a purported whistleblower report titled "the Fairway Brief," authored by Mr. Ager-Hanssen.  (Matthews Decl. ¶¶ 2, 8; see also Anderson Decl. [1-5] ¶ 6.)  The Fairway Brief contained nChain's confidential information and allegations that nChain's directors attempted to defraud the company.  (Matthews Decl. ¶¶ 8, 13.)  The information included excerpts of communications supposedly between nChain directors and executives and private agreements supposedly involving nChain.  (Id. ¶ 8.)  Mr. Ager-Hanssen alleged that such supposed agreements and other corporate governance matters

---

[1] Mr. Ager-Hanssen is the sole registered director and majority shareholder of Custos, which is incorporated in England and Wales.  (Anderson Decl. [1-5] ¶ 24.)

[2] Mr. Matthews currently serves as the Executive Chairman and CEO of the nChain Group.  (Matthews Decl. ¶ 2.)

amounted to a criminal conspiracy and fraud on the shareholders and option holders. (Id.)

In addition to the Fairway Brief, Mr. Ager-Hanssen's email contained an attachment titled "minutes of a meeting of Group Management of HEH Holding Group held on 26 September 2023." (Matthews Decl. ¶ 9.) Mr. Ager-Hanssen held a "management" meeting that day, but no members of the HEH attended. (Id.) Rather, Mr. Ager-Hanssen held this meeting with various individuals he hired after becoming CEO, including Zafar Ali, a King's Counsel. (Id. ¶¶ 7, 9, 15.) At the meeting, Mr. Ager-Hanssen presented the Fairway Brief as a valid whistleblower report, claiming its contents provided a basis to remove senior nChain officers and directors. (Id. ¶ 10.) Such actions would have given Mr. Ager-Hanssen de facto control of the company. (Id.) Mr. Ali, whom nChain refers to as Mr. Ager-Hanssen's co-conspirator,[3] lent credibility to the presentation, instructing attendees that they would face legal risks if they did not comply with Mr. Ager-Hanssen's

_____

[3] Other alleged conspirators, most of whom Mr. Ager-Hanssen hired, in attendance at the meeting include David Brookes (General Counsel of one of the Custos entities), Endri Gjata (Custos's Chief Technology Officer), Lars Bo (a longtime associate of Mr. Ager-Hanssen), Peter Coulson (a former officer in the British Navy), and Andrew Moody (nChain's then-CFO). (See Matthews Decl. ¶¶ 7, 9, 11; Anderson Decl. ¶ 18.)

4

demands.  (Id. ¶¶ 10, 15.)  Mr. Ager-Hanssen instructed the attendees to sign pre-written minutes of the meeting purportedly authorizing nChain's information technology ("IT") department to grant Mr. Ager-Hanssen and others access to: emails of nChain's Chief Intellectual Property Officer, Robert Alizon; emails of all parties involved in the private agreements alleged in the Fairway Brief; and various other disclosures of confidential information.  (Id. ¶¶ 10, 15.)

On the same day of this email to Mr. Matthews, September 27, 2023, Mr. Ager-Hanssen and his alleged co-conspirators sought to take over nChain's London offices, accessing various email accounts and confidential information without authorization. (Matthews Decl. ¶ 11.)  Once Mr. Matthews learned of the situation, he immediately emailed Mr. Ager-Hanssen stating that such access requires approval from HEH's board, which had not been granted.  (Id.)  By 4:00pm that afternoon, the board terminated Mr. Ager-Hanssen's Consulting Agreement for cause, thereby terminating his employment and removing him as a director.  (Id. ¶¶ 5, 12 & Ex. 2 [1-10] (nChain Company Statement on Ager-Hanssen Termination).)

After terminating Mr. Ager-Hanssen, nChain commissioned an independent investigation into the Fairway Brief's allegations.  (Matthews Decl. ¶ 13.)  nChain found the allegations unsubstantiated and concluded that Mr. Ager-Hanssen could

5

not have reasonably believed the information he disclosed was true.  (Id.)  nChain also investigated the events of September 26 and 27, 2023, as well as Mr. Ager-Hanssen's activities throughout his tenue as CEO.  (Id. ¶ 14.)  nChain later discovered that Mr. Ager-Hanssen forwarded thousands of emails from his nChain email account to his Custos email account during his time as CEO, some containing nChain's confidential information.  (Anderson Decl. ¶ 24.)  nChain is still investigating such matters, and is unsure what Mr. Ager-Hanssen's family members, friends, and business associates from Custos and AddReax were hired to do, if anything.  (Matthews Decl. ¶ 16.)

### B. Prior Proceedings in the High Court

nChain's counsel contacted Mr. Ager-Hanssen in the days following his termination informing him of his confidentiality obligations to nChain and requesting that he return all of nChain's property and information.  (Anderson Decl. ¶ 4 & Ex. 1 [1-6] (CMS Sept. 30, 2023 Letter to Ager-Hanssen).)[4]  However, Mr. Ager-Hanssen then posted excerpts of the Fairway Brief on X (formerly Twitter),

---

[4] William Anderson is a partner in the Edinburgh office of the law firm CMS Cameron McKenna Nabarro Olswang, United Kingdom ("CMS"), and represents nChain in proceedings against Mr. Ager-Hanssen in the High Court of Justice in London.  (Anderson Decl. ¶¶ 2-3.)  Mr. Anderson is also assisting nChain in bringing new conspiracy related claims.  (Id. ¶ 18.)

as well as redacted versions of and links to the Fairway Brief. (Id. ¶¶ 6-7.) Mr. Ager-Hanssen also posted that he intended to publish recordings and other materials on X that supposedly verify the Fairway Brief's allegations. (Id. ¶ 7.)

Shortly thereafter, on October 13, 2023, nChain sought an ex parte injunction against Mr. Ager-Hanssen in the High Court to prevent further dissemination of the Fairway Brief. (Anderson Decl. ¶ 8.) nChain's injunction application asserted that Mr. Ager-Hanssen's online posts concerning the Fairway Brief violated his duty of confidence as CEO and the Consulting Agreement's prohibition against Mr. Ager-Hanssen disclosing the company's "confidential information" under the agreement. (Id.; see also Consulting Agreement [1-8] at 4-5, 11-12, 16 (defining and governing confidential information, including in the domains of intellectual property, trade secrets, business connections, etc.).) The High Court granted the request the same day and issued a temporary injunction. (Anderson Decl. ¶ 9 & Ex. 2 [1-9] (Oct. 13, 2023 Injunction).) The injunction prohibited Mr. Ager-Hanssen from publishing the Fairway Brief and any other confidential information, and required him to remove the posts discussed above. The High Court continued its injunction on October 27, 2023 until trial or further order. (Id. ¶ 10 & Ex. 3 [1-12] (Oct. 27, 2023 Injunction).)

In January 2024, the High Court ordered Mr. Ager-Hanssen to return nChain's devices, deliver his personal devises to an IT expert to delete all confidential information, and provide an IT expert access to his Custos email account (to which he forwarded confidential information from his nChain email) for the IT expert to delete the information.  (Anderson Decl. ¶ 13 & Exs. 4 [1-14] (Device Return Order of Jan. 19, 2024), 19 [1-30] (CMS April 12, 2024 Letter to Custos).)  Mr. Ager-Hanssen did not respond to or comply with the injunction proceedings, and the High Court made the injunction permanent on April 19, 2024.  (Id. ¶¶ 15-16 & Ex. 5 [1-16] (Permanent Injunction Order of Apr. 19, 2024).)  The High Court then held Mr. Ager-Hanssen in contempt and sentenced him to ten months in prison.  (Id. ¶ 17 & Exs. 6 [1-17] (Contempt Order of May 3, 2024), 7 [1-18] (Contempt Judgment Entered).)

### C. nChain's Planned High Court Proceedings

nChain avers that it has submitted "notices of claim" to Mr. Ager-Hanssen informing him of its intent to bring "unlawful means conspiracy" claims against him and his co-conspirators in the High Court pursuant to English procedural

requirements.[5]  (Anderson Decl. ¶¶ 18-21 & Exs. 8 [1-19] through 14 [1-25]

(Letters of Claim).)  nChain sets forth their goals for these proceedings as follows:

> nChain intends to show in the High Court that the co-conspirators
> agreed to use the spurious allegations in the Fairway Brief to coerce
> nChain staff into giving them access to company information and
> documents, and then to use the false allegations as a reason to remove
> nChain officers so they could take over the company.  As set forth in
> the Notice of Claim to Ager-Hanssen, nChain is prepared to establish
> that the conspirators used a number of unlawful means to accomplish
> their conspiracy, including misrepresentations of fact in the Fairway
> Brief, breaches of confidence (including through intimidation of
> nChain staff), breaches of fiduciary duty, and breaches of contract.

(Appl. Mem. [1-1] 9 (citing Anderson Decl. ¶ 23 & Ex. 8 [19-1] (Letter of Claim

to Ager-Hanssen)).)

In addition to asserting these claims against Mr. Ager-Hanssen and his co-

conspirators, nChain intends to seek injunctive relief in the High Court against

Custos.  (Appl. Mem. 9 (citing Anderson Decl. ¶¶ 24-26 & Ex. 19 [1-30] (CMS

Apr. 12, 2024 Letter to Custos)).)  Seeing that Mr. Ager-Hanssen has thus far failed

---

[5] According to nChain's proffered English treatise, the tort of unlawful
means conspiracy "is committed where two or more persons combine and take
action which is unlawful in itself with the intent of causing damage to a claimant
who does incur the intended damage."  (Appl. Attach. 1 [1-2] at 23-108 (Clerk &
Lindsell on Torts (24th Ed.)) (footnote omitted).)  The injured party need not
"prove that causing him damage was the main or predominate purpose of the
combination[,] but that purpose must be part of the combiners' intentions."  (Id.)

9

to comply with the High Court's injunctions against him, nChain plans to seek a mirroring injunction against Custos.  (Id. (citing Anderson Decl. ¶¶ 13, 15).) Specifically, nChain hopes this injunction will prohibit disclosures, require Custos to delete the confidential information under its control (such as the emails Mr. Ager-Hanssen sent to his Custos account), and provide a forensic IT expert with access to Custos's data to ensure compliance.  (Id. (citing Anderson Dec. ¶ 26).)

### D. Evidence Held by Eric Finnerud

During the High Court's injunction proceedings against Mr. Ager-Hanssen, nChain received a letter from an attorney representing Eric Finnerud.  (Anderson Decl. ¶ 27 & Ex. 15 [1-26] (Jan. 29, 2024 Finnerud Letter to nChain).)   Mr. Finnerud is an Atlanta-based music producer, known professionally as "E. Smitty," who appears to be associated with Mr. Ager-Hanssen.  (Id. ¶ 27.)

In the letter, Mr. Finnerud claimed he entered into an "oral agreement" with nChain in February 2023 while Mr. Ager-Hanssen served as CEO.  (Anderson Decl. Ex. 15 at 1.)  Mr. Finnerud alleged that nChain breached this supposed agreement and demanded through counsel that nChain pay $100 million in damages within 30 days.  (Id.)  According to nChain, this claim is baseless, and Mr. Finnerud refused to answer its questions about the purported contract and about his relationship with Mr. Ager-Hanssen.  (See Appl. Mem. 10-11 & n.5; Anderson Decl. ¶ 34.)

10

During this exchange, however, Mr. Finnerud claimed to possess confidential and privileged information belonging to nChain, including "evidence of many details" asserted in the Fairway Brief, audio recordings of nChain's developers and attorneys, and testimony from nChain attorneys (both in-house and outside counsel) and executives, including Mr. Ager-Hanssen. (Anderson Decl. ¶¶ 28-30 & Exs. 16 [1-27] (Feb. 27, 2024 nChain Letter to Finnerud), 17 [1-28] (Feb. 27, 2024 Finnerud Letter to nChain).)   Indeed, nChain states that "Finnerud's February 27th letter attached a *fully unredacted* copy of the [Fairway] Brief[.]" (Appl. Mem. 11 (citing Anderson Decl. ¶¶ 7, 31).)  Mr. Finnerud further appeared to have threatened nChain, expressing his belief that "the public revelation of these unlawful claims and the associated information will be catastrophic for the BSV blockchain, nChain and the nChain Group . . ."  (Anderson Decl. Ex. 17 at 1.)

According to nChain, it is unclear how Mr. Finnerud obtained this confidential material other than communications with Mr. Ager Hanssen, one of his co-conspirators, or someone from Custos.  (Anderson Dec. ¶ 35; see also Matthews Decl. ¶ 18 (averring he is unaware of any legitimate business purpose for Mr. Finnerud's possession of these confidential and commercially sensitive materials).)  nChain seeks discovery from Mr. Finnerud, including his contacts with

Mr. Ager-Hanssen and the information shared between them, believing this will provide critical evidence for its claims in the High Court.

## II.   DISCUSSION

Under 28 U.S.C. § 1782, federal courts may assist interested parties in foreign legal proceedings to obtain documents and other tangible evidence from entities or individuals within the district.  Section 1782 provides in relevant part as follows:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation.  The order may be made pursuant to letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.  By virtue of his appointment, the person appointed has the power to administer any necessary oath and take the testimony or statement.  The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal for taking the testimony or statement or producing the document or other thing.  To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.
>
> A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

28 U.S.C. § 1782(a).

A district court has the authority to grant an application for judicial assistance under Section 1782 if four statutory requirements are met:  "(1) the request must be made by a foreign or international tribunal, or by any interested person; (2) the request must seek evidence, whether it be the testimony or statement of a person or the production of a document or other thing; (3) the evidence must be for use in a proceeding in a foreign or international tribunal; and (4) the person from whom discovery is sought must reside or be found in the district of the district court ruling on the application for assistance."   In re Consorcio Ecuatoriano de Telecomunicaciones, S.A. v. JAS Forwarding (USA) Inc., 747 F.3d 1262, 1269 (11th Cir. 2014) (internal quotation marks and citations omitted).

In the instant case, this Court has the authority to grant nChain's Application for judicial assistance because each of the four statutory requirements appear to be met.  Based on the declarations and attachments filed by nChain, it is apparent that the requests for discovery meet the first statutory requirement because they have been made by an interested person.  As for the second requirement, nChain seeks evidence (whether testimony or the production of documents or other things).  See In re Sergeeva, No. 1:13-CV-03437-SCJ-RGV, 2013 WL 12169388, at *4 (N.D.

13

Ga. Nov. 22, 2013) (noting it was undisputed that application seeking deposition testimony and document production satisfied the requirement that the request must seek evidence).   As for the third requirement, the requested documents and deposition testimony seek evidence that Mr. Finnerud appears to have in his possession relevant to the anticipated High Court conspiracy and injunction proceedings.   Additionally, nChain's proffered declarations of Messrs. Matthews and Anderson and the claim notices sent to the alleged conspirators and Custos provide "reliable indications of the likelihood that proceedings will be instituted within a reasonable time."   In re Consorcio, 747 F.3d at 1270 (citations omitted).   Thus, nChain has shown that its unlawful means conspiracy claims against Mr. Ager-Hanssen and his co-conspirators, as well as the injunctive relief it will seek against Custos, are well "within reasonable contemplation."   Id. (holding that "contemplated proceedings satisfy section 1782") (quoting Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 259 (2004)).

Finally, the Application meets the fourth statutory requirement because Mr. Finnerud resides or can be found in this District.   nChain has submitted invoices Mr. Finnerud sent to it for purported consulting services from his music company, Sound Alive Enterprise, LLC.   (Baker Decl. [1-3] ¶¶ 4-5 & Exs. 3 [1-13] and 4 [1-

14

15] (Sound Alive Enterprise Consulting Invoices for Jan. & Feb. 2024).)[6]  The

company, operating as Sound Alive Records, has a mailing address in Roswell,

Georgia, and its principal office in Atlanta.  (See id. Exs. 3-4, 2 [1-11] (Sound Alive

Enterprise Georgia Secretary of State Business Search).)  Mr. Finnerud's LinkedIn

profile also states that he is based in Atlanta and serves as Sound Alive Record's

CEO, record executive, audio engineer, and super producer.  (Id. ¶ 3 & Ex. 1 [1-7]

(E. Smitty LinkedIn Profile).)

Once the aforementioned statutory requirements have been met, the Court

must then determine whether to exercise its discretion to grant the discovery

request.  In re Consorcio, 747 F.3d at 1271; Kang v. Noro-Moseley Partners, 246

F. App'x 662, 663-64 (11th Cir. 2007) (per curiam).  In doing so, the Court should

consider the following factors:

> (1) whether the person from whom discovery is sought is a participant
> in the foreign proceeding, because the need for § 1782(a) aid generally
> is not as apparent as it ordinarily is when evidence is sought from a
> nonparticipant; (2) the nature of the foreign tribunal, the character of
> the proceedings underway abroad, and the receptivity of the foreign
> government or the court or agency abroad to U.S. federal-court
> judicial assistance; (3) whether the § 1782(a) request conceals an
> attempt to circumvent foreign proof-gathering restrictions or other

---

[6] Rollo C. Baker IV is a partner at Elsberg, Baker & Maruri, PLLC, a New
York City-based law firm, and counsel to nChain.  (Baker Decl. ¶ 2.)

policies of a foreign country or the United States; and (4) whether the request is otherwise unduly intrusive or burdensome.

In re Consorcio, 747 F.3d at 1271-72 (internal quotation marks and citations omitted); see also Kang, 246 F. App'x at 663-64. "[U]nduly intrusive or burdensome requests may be rejected or trimmed." In re Consorcio, 747 F.3d at 1272 (citations omitted).

Based on the information presented to this Court by nChain, these factors militate in favor of granting its request. First, nChain states that it does not expect Mr. Finnerud to participate in the High Court proceedings against Mr. Ager-Hanssen, his co-conspirators, and Custos. (Appl. Mem. 16; see also Anderson Decl. ¶ 34.) Moreover, it does not appear that nChain sent Mr. Finnerud or his record company a notice of claim for the contemplated High Court proceedings, which further suggests he will not be a party to them. (See Anderson Decl. ¶¶ 21-24.) Because "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach," as Mr. Finnerud is here, his "evidence, available in the United States, may be unobtainable absent § 1782(a) aid." Intel Corp., 542 U.S. at 264. As such, the first factor—whether the person from whom discovery sought is a participant—weighs in favor of granting this Application. See, e.g., In re Roz Trading Ltd., 469 F. Supp. 2d 1221, 1223 (N.D. Ga. 2006) (concluding the first

16

factor weighed in favor of granting the § 1782 application where respondents were not parties to the relevant foreign proceeding).

Second, the High Court of England and Wales in London is likely to receive the evidence sought, weighing in favor of granting this Application.  This factor weighs "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance."  Intel Corp., 542 U.S. at 264.  It weighs in favor of granting an application absent authoritative proof that a foreign tribunal would reject evidence obtained with the aid of § 1782.  See id.; see also In re Sociedad Militar Seguro de Vida, 985 F. Supp. 2d 1375, 1380 (N.D. Ga. 2013) (concluding that this factor weighed in favor of granting discovery because the court was "aware of nothing to suggest that the Court of First Instance in Curaçao would not be receptive to judicial assistance from this Court").  Here too, there is no such proof.  In fact, "there is ample evidence that courts in the United Kingdom are receptive to Section 1782 discovery," so this factor is especially favorable as it relates to the contemplated civil actions in the U.K.  See In re Tel. Media Grp. Ltd., No. 23-MC-215 (JGLC), 2023 WL 5770115, at *8 (S.D.N.Y. Sept. 6, 2023) (noting that "courts in the United Kingdom . . . are [] receptive to

Section 1782 discovery") (citation omitted).  In any event, a court may grant a Section 1782 request even if the specific foreign tribunal would not order similar discovery or ultimately decides not to accept the specific discovery.  In re Chevron Corp., No. 1:10-MI-0076-TWT-GGB, 2010 WL 8767265, at *4 (N.D. Ga. Mar. 2, 2010); see also Intel Corp., 542 U.S. at 265 (finding that Section 1782 petition could still be proper even if the foreign tribunal states "that it does not need or want the District Court's assistance").

Third, nChain shows that this Application is not an attempt to circumvent the proof-gathering restrictions of the High Court.  Courts are encouraged to grant Section 1782 discovery requests absent a persuasive showing that the applicant is actively seeking to circumvent the foreign tribunal's discovery methods and restrictions.  See Sergeeva, 2013 WL 12169388, at *11.  The Court agrees with nChain that there are no proof-gathering restrictions of the High Court preventing the acquisition of the requested documents and testimony.  (See Appl. Mem. 17 (citing Fed. R. Civ. P. 26; England and Wales Civil Procedure Rules Part 31; Anderson Decl. ¶ 38 (averring nChain is not subject to any court order that prohibits it from pursuing the discovery sought with this Application).)

Fourth, nChain shows that the discovery sought is targeted, narrowly tailored from the time of the confidentiality breach, proportional, and not unduly burdensome. The Proposed Deposition Subpoena [1-31] and Documents Subpoena [1-32] contain fifteen document requests and request Mr. Finnerud's deposition in Atlanta, seeking evidence nChain argues goes to the heart of the contemplated claims in the High Court. The requests concern: (1) how and why Mr. Finnerud came to possess nChain's confidential information, including the Fairway Brief, which he threatened to disclose; (2) communications with Mr. Ager-Hanssen, including whether and when he provided confidential information to Mr. Finnerud; (3) whether and how Mr. Ager-Hanssen breached his confidentiality obligations; (4) whether and how Mr. Ager-Hanssen utilized Custos in obtaining and disseminating nChain's confidential information; and (5) the extent of Mr. Finnerud's knowledge of the conspiracy. nChain avers that such evidence will be the subject of its claim for injunctive relief against Custos and its claims for unlawful means conspiracy against Mr. Ager-Hanssen and his co-conspirators. (See Anderson Decl. ¶¶ 18, 23, 36-37.)

The requested evidence appears to fit within the scope of discovery permitted by the Federal Rules of Civil Procedure and are "proportional to the needs of the

19

case." Fed. R. Civ. P. 26(b)(1); <u>see also</u> <u>In re Consorcio</u>, 747 F.3d at 1272 (noting the applicability of the federal discovery rules to discovery requested under Section 1782).   At this juncture, based on the information presented, this Court cannot conclude that the request for evidence is "unduly intrusive or burdensome." <u>In re Consorcio</u>, 747 F.3d at 1272.   Once nChain has served Mr. Finnerud with the subpoenas, Mr. Finnerud may seek relief from this Court for any unduly intrusive or burdensome requests after working with nChain's counsel to narrow the scope of any such requests.

## III.   CONCLUSION

For the reasons set forth above, it is hereby **ORDERED** that Applicant nChain Holding AG is authorized, under 28 U.S.C. § 1782(a), to seek discovery from Eric Finnerud a/k/a E. Smitty pursuant to the Federal Rules of Civil Procedure by serving the proposed subpoenas [1-31] [1-32] on him.   Service of the subpoenas shall be accompanied by a copy of the Application [1], Applicant's Memorandum of Law [1-1], and a copy of this Order.

If Mr. Finnerud has objections to the subpoenas, his counsel shall meet and confer with counsel for nChain within fourteen (14) days after service of the subpoena in an effort to resolve those issues.   If the parties cannot resolve their

20

issues, then they are **DIRECTED** to contact the undersigned Magistrate Judge's

Courtroom Deputy Clerk (706-378-4090) with jointly agreeable proposed dates for

a telephonic hearing. The parties can send short emails to her

(Kari_Butler@gand.uscourts.gov) outlining their respective positions.

If Mr. Finnerud has no objections to the subpoenas, then he is **ORDERED**

to comply with them within thirty (30) days after their service, unless the parties

mutually agree to a date outside that deadline.

**SO ORDERED**, this 20th day of August, 2024.

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

21